# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| National Presto Industries, Inc., | Case No. 18-cv-03321 (SRN/BRT) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| U.S. Merchants Financial Group, Inc., d/b/a Greenmade, | |
| Defendant. | |

Andrea L. Arndt, Franklin M. Smith, and Yafeez Sohil Fatabhoy, Dickinson Wright PLLC, 2600 West Big Beaver Road, Suite 300, Troy, MI 48084; Christopher Mitchell and John S. Artz, Dickinson Wright PLLC, 350 South Main Street, Suite 300, Ann Arbor, MI 48104; and Sarah M. Stensland, Patterson Thuente Pedersen, P.A., 80 South Eighth Street, Suite 4800, Minneapolis, MN 55402, for Plaintiff.

Christopher K. Larus, George Benson Ashenmacher, and William E. Manske, Robins Kaplan LLP, 800 LaSalle Avenue, Suite 2800, Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the Cross-Motions for Summary Judgment [Doc. Nos. 240 & 244] and Motions to Exclude Expert Testimony [Doc. Nos. 212, 222, 231, 261] filed by the parties. Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Court **GRANTS in part** and **DENIES in part** Defendant's Motion for Summary Judgment, **DENIES** Plaintiff's Motion for Partial Summary Judgment, and **DEFERS** the Motions to Exclude Expert Testimony.

# I.    BACKGROUND

For over thirty years, Plaintiff National Presto Industries, Inc. ("Presto") has been the exclusive supplier of parabolic heaters to the Costco Wholesale Corporation ("Costco"). (Decl. of Franklin M. Smith ("Smith Decl.") [Doc. No. 299], Ex. 4 ("Cohen Dep."), at 294, 364-68.) In early 2017, Costco approached Defendant U.S. Merchants Financial Group, Inc. ("U.S. Merchants") to explore whether U.S. Merchants could provide an alternative product to Presto's "HeatDish" heater. (Decl. of William Manske ("Manske Decl.") [Doc. No. 253], Ex. O ("Costco Dep."), at 49.) Lester Cox, Costco's designee at its Rule 30(b)(6) deposition, testified that this request was motivated by the "one-sided" nature of Costco's relationship with Presto. (*Id.* at 51.) Cox explained that Costco had, at various times, requested accommodations from Presto intended to reduce costs for Costco's members—such as permitting Costco to directly import the HeatDish in order to utilize Costco's "freight and distribution synergies"—but Presto refused its requests. (*Id.* at 51-52.) Because Costco and Presto had come to a point "where . . . Presto wouldn't accommodate . . . our requests and also indicated that if we wanted to change the program that they wouldn't sell to us," Costco determined to pursue alternative suppliers of parabolic heaters. (*Id.* at 52.)

For this, Costco approached U.S. Merchants, which in turn contacted an overseas manufacturer to begin developing an alternative parabolic heater. (Manske Decl. [Doc. No. 259], Ex. Q ("Green Dep."), at 73-78.) U.S. Merchants presented its first prototype of its parabolic heater, ultimately dubbed "The Heat Machine," to Costco in June 2017. (Costco Dep. at 71-73.) Costco declined to purchase the prototype. (*Id.* at 74.) After incorporating

Costco's feedback, U.S. Merchants presented a second design in March 2018. (*Id.* at 109-13.) Costco purchased 17,968 units of The Heat Machine, and sold them through its Arizona business centers and warehouses during the 2018-2019 heater season. (*Id.* at 155; Manske Decl. [Doc. No. 262], Ex. CC[1], at ¶ 12.) During this time, Costco continued to sell the HeatDish outside of Arizona. (*See* Costco Dep. at 204-05; Manske Decl. [Doc. No. 262], Ex. DD.) Costco did not purchase additional units of The Heat Machine for the 2019-2020 season.[2] (Costco Dep. at 156.)

Presto brought this lawsuit against U.S. Merchants, alleging that U.S. Merchants infringed Presto's intellectual property rights in the HeatDish. Specifically, Presto alleges that U.S. Merchants violated Presto's trade dress rights in the HeatDish product, packaging, and point-of-sale display. (*See generally* Compl. [Doc. No. 1].) In addition, Presto asserts claims for false designation of origin under the Lanham Act, 15 U.S.C. § 1125, trademark infringement, infringement of Presto's copyrights in its instruction manuals and packaging, tortious interference with prospective business relations, unfair competition, and false advertising. (*Id.*) U.S. Merchants moves for summary judgment on all of Presto's claims. (Mot. for Summ. J. [Doc. No. 240].) In turn, Presto moves for summary judgment on its

---

[1] Exhibit CC is the expert report of Carl G. Degen, which is subject to one of Presto's *Daubert* motions. (*See* Mot. to Exclude Expert Test. [Doc. No. 212].) However, Presto does not seek to exclude Degen's statement that U.S. Merchants sold 17,968 units of The Heat Machine to Costco.

[2] Cox stated that Costco declined to purchase The Heat Machine for the 2019-2020 season after it learned that Presto had commenced this lawsuit against U.S. Merchants. (Costco Dep. at 156.)

copyright infringement claim. (Cross-Mot. for Partial Summ. J. [Doc. No. 244].) The parties have also filed several motions to exclude expert testimony [Doc. Nos. 212, 222, 231, 261].

The following recitation of the record begins with the development process for The Heat Machine, followed by a comparison of The Heat Machine and HeatDish products, packaging, and point-of-sale displays. The Court then examines the products' instruction manuals, and concludes with Presto's proffered evidence of actual consumer confusion caused by The Heat Machine.

### A. Development of The Heat Machine

In early 2017, Costco approached U.S. Merchants to explore a "better and less expensive" alternative to the HeatDish. (Costco Dep. at 49, 212.) During the development process, Costco provided feedback on the appearance and functionality of The Heat Machine.[3] (Green Dep. at 108-09.) Since Costco sought a replacement for the HeatDish, U.S. Merchants endeavored to create a heater that met or exceeded the HeatDish's features and performance, while maintaining a lower cost. (*Id.* at 186-87; Costco Dep. at 56-57; Decl. of John Artz ("Artz Decl.") [Doc. No. 250], Ex. 13, at 121.) With respect to The Heat Machine's appearance, Jeff Green, U.S. Merchants' founder and president, testified that Costco requested an "industrial looking" heater. (Green Dep. at 109.) Lester Cox, testifying

---

[3] During The Heat Machine's development process, U.S. Merchants considered several names for the product. U.S. Merchants originally chose the name "Hot Flash," but after internal discussions and consultation with Costco, U.S. Merchants changed the name to "The Heat Machine." (*See* Smith Decl. [Doc. Nos. 300, 306], Exs. 13-14, 53 at 48; Costco Dep. at 174.)

for Costco, explained that "industrial looking" meant something "more robust," and "bigger, better, faster, hotter, thicker gauge." (Costco Dep. at 58.) Although Cox identified the HeatDish's appearance as "best in class" in the parabolic heater market, he testified that the HeatDish's appearance was not entirely "industrial," and that Costco did not tell U.S. Merchants that it wanted the heater to look like the HeatDish. (*Id.* at 59-60.) During the development process, Costco requested various changes to The Heat Machine's features, and approved its final name, packaging, and point-of-sale display before purchasing the product. (*See id.* at 174-80.) Cox testified that Costco would not have given its approval if it believed The Heat Machine violated Presto's rights in the HeatDish. (*Id.*)

Despite Costco's testimony that it did not instruct U.S. Merchants to copy the HeatDish's appearance and did not believe the HeatDish violated Presto's rights, the record is replete with evidence that U.S. Merchants deliberately copied the appearance of the HeatDish. In a May 2017 email from Green to Gary Ojendyk,[4] Green wrote: "My people will be at the factory in China on Monday who [sic] is going to try and duplicate as close as possible to the Presto unit [sic]." (Smith Decl. [Doc. No. 303], Ex. 42 (all caps omitted); *see also* Smith Decl. [Doc. Nos. 301 & 306], Ex. 53 at 2 (May 2017 email from Green to U.S. Merchants' manufacturer, stating: "They also want it to look more industrial like what the [Presto] unit looks like."), Ex. 28 (May 2017 email from U.S. Merchants' manufacturer to Green, stating: "Presto Sample will be in my hands over the weekend, and Monday I am

---

[4] Ojendyk, a former Costco employee, was the manufacturer's representative for U.S. Merchants. (Costco Dep. at 48.) When Lester Cox initially contacted U.S. Merchants to inquire into an alternative parabolic heater, he contacted Ojendyk. (*Id.* at 47.)

in China for 7 days between various factories to meet the Factory Engineers, with Presto sample in hand to follow exactly same, with additional features and options . . . .").) In June 2017, Green wrote to U.S. Merchants' manufacturer regarding Costco's requirements for the appearance and functionality of the heater: "With respect to the color of the unit, they [Costco] do 'not' want white, they want it to look industrail [sic], so I would suggest either black or dark gray. Look at the Presto unit and try to keep it in keeping with the way that looks." (Smith Decl. [Doc. No. 306], Ex. 52 (all caps omitted).)

U.S. Merchants sent photographs and a physical model of its first prototype to Costco in June 2017. (Costco Dep. at 71-73.) In October 2017, Costco declined to purchase the unit. Michelle Rado, Costco's purchaser, explained in an email that "[t]he unit didn't give off the same amount of heat as the Heat Dish. . . . There are also significant changes that would need to be made to the design. . . . Most importantly, the price point was too high." (Smith Decl. [Doc. No. 300], Ex. 17, at 2-3.) Rado's email included a list of requested changes, which were largely focused on the heater's functionality but which also included a request for "a textured finish like competition." (*Id.* at 3.) Subsequently, in December 2017, Green wrote to Ojendyk: "I . . . have asked the factory to put [a new logo] on a new grill to show them. I also asked them to make a grill the same design as Presto to see if Costco would like that design better. . . . I have asked the factory to add a metal medallion to the front of the unit like Presto had." (Smith Decl. [Doc. No. 301], Ex. 30; *see also id.*, Ex. 31 (December 2017 email from Green to Ojendyk, noting: "I received today . . . the revised grill with our new color emblem on it, along with the design like Presto has." (all caps omitted)).)

In March 2018, U.S. Merchants produced a second model of The Heat Machine. In an effort to meet Costco's price target for The Heat Machine, the second model removed several features (some present in the HeatDish, some that were improvements over the HeatDish). (*See* Smith Decl. [Doc. No. 300], Ex. 19.) Although Rado expressed concerns with The Heat Machine—noting that it is "about equal to the Presto unit," but "doesn't feel / look as robust"—Costco ultimately proceeded to purchase more than 17,000 units of The Heat Machine to test in its Arizona business centers and warehouses during the 2018-2019 heater season. (Smith Decl. [Doc. No. 300], Ex. 16; Costco Dep. at 155.)

Prior to selling The Heat Machine to Costco, U.S. Merchants obtained clearance opinions from its intellectual property attorney. (Manske Decl. [Doc. No. 260], Ex. X.) U.S. Merchants also sought to register The Heat Machine trademark, and although its attorney advised U.S. Merchants to add a logo element to the mark to avoid a rejection of the trademark as descriptive, the attorney did not advise that Presto's trademarks would impact U.S. Merchants' ability to register the mark. (*Id.*, Ex. Y.) U.S. Merchants applied to register two trademarks for "The Heat Machine." (Manske Decl. [Doc. Nos. 256 & 257], Exs. Z, AA.) The United States Patent and Trademark Office did not cite Presto's trademarks as confusingly similar marks. (*Id.*) The marks were published for opposition, and neither Presto nor any third party filed an objection. (*Id.*) Both marks were registered in 2019. (*Id.*)

### B.     The Competing Products, Packaging, and Point-of-Sale Displays

### 1.     The Heat Machine and HeatDish Products

Over its thirty-year history, Presto's HeatDish has taken several forms, as shown in the photographs below:



(Mem. in Opp'n to Def.'s Mot. for Summ. J. [Doc. No. 297], at 15.)



(Mem. in Supp. of Def.'s Mot. for Summ. J. [Doc. No. 242], at 11.)

Presto has offered several descriptions of its claimed trade dress in the course of this litigation—each somewhat different. (*See* Manske Decl. [Doc. No. 257], Ex. KK.) Synthesizing these descriptions, Presto's claimed trade dress comprises several elements: (1) a heating element located in the center of the heater's parabolic dish; (2) a curved grille, made of bars arranged radially around the heating element, together with bars forming two concentric circles; (3) a recess in the center of the grille, which together with the grille's curvature, gives the grille a "Bundt cake" shape; (4) an emblem bearing the product's trademark, placed into the center of the grille; (5) a reflective coating on the dish, which gives off a warm, orange glow when the heating element operates; (6) on recent models, a chrome finish on the grille; and (7) a shroud extending from the product's base along the back of the dish, such that the dish tilts upward. (*See id.*, Exs. HH, KK; Compl. ¶ 38.) Although Presto describes its claimed trade dress in terms of the foregoing elements, Presto maintains that its trade dress rights are in the "overall appearance" of the HeatDish that results from the combination of these features. (*E.g.*, Manske Decl. [Doc. No. 257], Ex. HH.)

Photographs of the HeatDish and The Heat Machine models sold in the 2018-2019 heater season follow.[5]

---

[5] It appears Presto has since added an additional concentric bar to the HeatDish's grille, and changed the emblem in the grille's center from aluminum to black stainless steel. (*See* Manske Decl. [Doc. No. 266], Ex. BBB.) In addition, U.S. Merchants has ceased selling the model of The Heat Machine at issue in this lawsuit; another model, made in 2019, is not at issue in this litigation. (*See* Manske Decl. [Doc. Nos. 258 & 262], Exs. BB, FFF; Green Dep. at 120.)

| The HeatDish | The Heat Machine |
|:---:|:---:|



(Rep. of Michael Jobin ("Jobin Rep.") [Doc. No. 227], at 48, 86-89.[6])

As detailed in the report of Michael Jobin, one of U.S. Merchants' experts, there are several physical differences between the products.[7] Among these differences is the diameter and depth of the products' dish: The Heat Machine's dish is slightly smaller in diameter than that of the HeatDish—15.75 in. versus 16.124 in.—and shallower—3.125 in. deep versus 3.666 in. deep. (*Id.* at 88.) And The Heat Machine's dish is tilted at a 12-degree angle, as opposed to the HeatDish's 20-degree angle; consequently, the products project heat at different angles. (*Id.*) In addition, The Heat Machine's base and shroud (which connects the base to the parabolic dish) are shaped differently than the HeatDish's base and shroud, the products' controls are placed in different positions, there is a handle and cord wrap on The Heat Machine, and there is a gap at the base of The Heat Machine (purportedly designed to support oscillation in future models). (*Id.* at 88-89.) Finally, there are differences in the depth of the recess in the center of each product's grille, as well as the number and spacing of bars forming the grille. (*Id.* at 90-93.)

In his report, Jobin also endeavored to compare the HeatDish to competing parabolic heaters and desk fans to demonstrate that the various elements of Presto's claimed trade dress are not exclusively embodied by the HeatDish. (*See id.* at 13-33.) However, as Presto

---

[6] The foregoing photographs are drawn from the expert report of Michael Jobin, which is subject to one of Presto's *Daubert* motions. (Mot. to Exclude Expert Test. [Doc. No. 222].) But Presto does not seek to exclude any of the photographs in Jobin's report.

[7] As noted previously, Jobin's report is subject to one of Presto's *Daubert* motions. But Jobin's measurements of the products are not among the portions of the report Presto seeks to exclude.

observes in its motion to exclude Jobin's report, many of the competing products pictured in Jobin's report are no longer commercially available—and some have not been marketed for decades. But among the potentially relevant competing products, each heater identified by Jobin utilizes a circular dish with a grille, and many include grilles with a shallow recess containing an emblem bearing the product's mark. See, for example, the TEKNOS PH-800 heater:



(*Id.* at 34.) Additional contemporary examples are not individually pictured in Jobin's report, but can be seen in Jobin's analysis of product packaging:



(*Id.* at 38.) Notably, none of the competing products Jobin examined embodies the distinctive curvature and deep recess of the HeatDish's grille, which resembles the shape of a Bundt cake. Indeed, it appears that shape is exclusive to the various HeatDish models. And Presto has utilized that grille shape for quite some time:



(*Id.* at 55.)

### 2. The Products' Packaging

Presto alleges that U.S. Merchants violated Presto's copyright[8] and trade dress rights in its HeatDish packaging. Presto describes its claimed trade dress with reference to the following features: (1) the product name, printed in white; (2) a prominent photograph

---

[8] Presto's copyright in its HeatDish packaging is federally registered. (Artz Decl. [Doc. No. 250], Ex. 6.)

of the heater depicting the orange glow created by its operation, positioned on the center-right of the package's front face and occupying two-thirds of that face; (3) a list of product features in bullet-point format, positioned to the left of the photograph; (4) a red, white, and black color scheme; (5) on the right face, a photograph of the operational heater coupled with a list of its "advantages," including the statement "feels like three times the heat"; and (6) on the left face, a two-by-two array of four photographs depicting the product's features. (*See* Compl. ¶¶ 24, 26, 28, 69.) Photographs of the products' packaging follow.

| The HeatDish | The Heat Machine |
|---|---|
|  | |

| The HeatDish | The Heat Machine |
|:---:|:---:|
|  |  |
|  |  |

(Jobin Rep. at 96-98.)

Alfredo Bustamante, a graphic designer for U.S. Merchants, testified that Green asked him to use Presto's packaging to set the layout for The Heat Machine's packaging. (Manske Decl. [Doc. No. 295], Ex. B ("Bustamante Dep."), at 86-87; *see also* Artz Decl. [Doc. No. 250], Ex. 24.) However, Bustamante reviewed other competitors' packaging during the design process as well, and was directed to make changes to ensure the packaging was not "too similar" to Presto's. (*See* Bustamante Dep. at 62-63, 79, 86-92.)

### 3. Point-of-Sale Displays

Finally, Presto alleges that U.S. Merchants copied its point-of-sale display. Presto's point-of-sale display incorporates a sample HeatDish, typically turned on and angled toward passing customers, surrounded by promotional material and pallets of product for customers to purchase. Presto's point-of-sale display is pictured below. Presto has long utilized its point-of-sale display at all Costco stores carrying its HeatDish. (*See* Cohen Dep. at 130-33.) Maryjo Cohen, Presto's Chief Executive Officer, testified that Presto would change its point-of-sale display—including its wording, font, color, shape, and artwork— whenever Presto released a new model of the HeatDish or changed its packaging. (*Id.* at 328-35.)



(Jobin Rep. at 99.)

Because Costco believed that a point-of-sale display was important to the commercial viability of The Heat Machine, U.S. Merchants designed its own point-of-sale display, pictured below. (Green Dep. at 179-81.)



(Jobin Rep. at 99.)

Both displays feature a sample of the product, typically turned on and directed toward passing customers so as to demonstrate the product's heat output, surrounded by promotional material and pallets of the product. (*See id.*; Green Dep. at 183-85.) However,

unlike the HeatDish display, The Heat Machine's display includes only one informational panel and does not feature photographs of the product.

Although Costco has displays for other types of products, neither party has submitted evidence that other parabolic heaters are sold using comparable point-of-sale displays. (*See* Costco Dep. at 142-43 (testifying that there are no vendor-built heater displays at Costco, apart from the Presto and U.S. Merchants displays).)

### C.    Instruction Manuals

Presto alleges that U.S. Merchants infringed Presto's registered copyrights in its 1995 and 2016 instruction manuals. (*See* Artz Decl. [Doc. No. 250], Exs. 5, 9.) Both manuals' covers contain a picture of the HeatDish and a list of product features. (Artz Decl. [Doc. No. 249], Ex. 29 ("Presto 1995 Manual"); Ex. 30 ("Presto 2016 Manual").) The manuals contain directions for the safe operation of the HeatDish, organized under several headings. Although the "Important Safeguards" section contains information largely mandated by Underwriters Laboratories ("UL"), the manuals' contents were created by Presto to convey information about the HeatDish product in an "easy to use, unique and visually appealing manner." (Decl. of Maryjo Cohen ("Cohen Decl.") [Doc. No. 248], at ¶¶ 2-9.)

U.S. Merchants' instruction manual was created by its manufacturer. (Manske Decl. [Doc. No. 295], Ex. A, at 5; Green Dep. at 111-13.) However, U.S. Merchants reviewed the manual's layout, proofed it for typographical and formatting errors, and gave ultimate approval to print the manual and include it in The Heat Machine's packaging. (Green Dep. at 112-14; Bustamante Dep. at 126-29.) Bustamante, the graphic designer charged with

creating the manual's layout, testified that he had never seen Presto's instruction manual, and that his work involved making the text provided by the manufacturer look presentable. (Bustamante Dep. at 126-27.) Bustamante did not review the manual's choice of words, or change the wording. (*Id.*) Similarly, Barbara Trejo, another graphic designer for U.S. Merchants, testified that she proofed the manual for graphical issues—"[l]ike extra spaces, things not lining up"—but did not recall making any changes to the text supplied by the manufacturer, and had never reviewed Presto's manual. (Manske Decl. [Doc. No. 295], Ex. C ("Trejo Dep."), at 41-43, 51.) Consistent with Bustamante and Trejo's testimony that they did not alter the manufacturer-supplied text, Green testified that U.S. Merchants "would have looked at [the manual] to ensure that grammatically it read properly. As far as the content of it, that was something that the factory handled, because my people wouldn't have -- you know, they didn't manufacture the unit, so they weren't in a position to write the manual." (Green Dep. at 113.)

The table that follows presents the headings and structure of Presto's 1995 and 2016 manuals and U.S. Merchants' manual. The font weight and color are reproduced as they appear in the record, unless otherwise noted. (*See* Presto 1995 Manual; Presto 2016 Manual; Artz Decl. [Doc. No. 249], Ex. 31 ("USM Manual").)

| Presto 1995 Manual | Presto 2016 Manual | U.S. Merchants Manual |
|---|---|---|
| **IMPORTANT SAFEGUARDS** | **IMPORTANT SAFEGUARDS** | **IMPORTANT SAFEGUARDS** |
| | **Important Cord and Plug Information** | |

| Presto 1995 Manual | Presto 2016 Manual | U.S. Merchants Manual |
|---|---|---|
| **GETTING ACQUAINTED WITH YOUR PRESTO® PARABOLIC HEATER** | **GETTING ACQUAINTED WITH YOUR HEATER** | **Getting acquainted with your Greenmade® Parabolic Heater** |
| **How the "Parabolic Heater" keeps you warm…** | **How the parabolic heater keeps you warm…** | **How the "Parabolic Heater" keeps you warm…** |
| **How the "Parabolic Heater" can help save energy…** | **How the parabolic heater can help save energy…** | **How the "Parabolic Heater" can help save energy…** |
| **How your Presto® Parabolic Heater works…** | **How the parabolic heater works…** | **How your Greenmade® Parabolic Heater works…** |
| **Tilt feature…** | | |
| **Locating the heater...** | **Positioning the heater…** | **Locating the heater...** |
| **Operating the heater…** | **Operating the heater…** | **Operating the heater…** |
| | | **Over Heating -** |
| | | **Tip-Over/Uneven Surface -** |
| **Cleaning and Storage…** | **Care, cleaning, and storage…** | **Care, Cleaning, and Storage…** |
| **Service Information…** | **Consumer Service Information…** | |
| PRESTO® Limited Warranty[9] | PRESTO® Limited Warranty[10] | Greenmade® Warranty[11] |

---

[9] This heading is positioned within a black box, and has a white font.

[10] This heading is positioned within a black box, and has a white font.

[11] This heading is positioned within a black box, and has a white font.

In addition to the structure and heading language, much of the manuals' content is identical or nearly identical. (*See* Mem. in Supp. of Pl.'s Mot. for Summ. J. [Doc. No. 247], at 28-32 (highlighting identical or nearly identical text).) This verbatim or near verbatim similarity includes not only facts about the devices, such as directions for using the heater, but also creative expressions Presto utilized in explaining those facts. The following table contains several examples, which are not exhaustive.

| Presto 1995 Manual | Presto 2016 Manual | U.S. Merchants Manual |
|---|---|---|
| Do not operate this heater with a broken element or ceramic cone or with a damaged cord or plug, or after the heater malfunctions, or after it has been dropped or damaged in any manner. Return the heater to the Presto Factory Service Department or to the nearest Presto Authorized Service Station for examination, repair or electrical or mechanical adjustment. | Do not operate this heater with a broken element or ceramic cone, with a damaged cord or plug, after the heater malfunctions, or after it has been dropped or damaged in any manner. Discard the heater or return it to the Presto Factory Service Department for examination and/or repair. | Do not operate this heater with a broken element or ceramic cone or with a damaged cord or plug, or after the heater malfunctions, or after it has been dropped or damaged in any manner. Return the heater to the Greenmade**®** Factory Service Department for examination, repair, or electrical or mechanical adjustment.[12] |
| The parabolic reflector focuses heat output, like a satellite dish concentrates TV signals, so it requires less energy than convection electric heaters to deliver all the warmth you'll want. | The parabolic reflector focuses heat output, like a satellite dish concentrates TV signals, so it requires less energy than convection electric heaters to deliver all the warmth you'll want. | The parabolic reflector focuses heat output, like a satellite dish concentrates TV signals, so it requires less energy than convection electric heaters to deliver all the warmth you will want. |
| When positioned correctly, the parabolic heater will keep you toasty warm. | When positioned correctly, the parabolic heater will keep you toasty warm. | When positioned correctly, the parabolic heater will keep you toasty warm. |
| [Explaining that the heater should be placed between 3 and 10 feet from the user.] Placing it | [Explaining that the heater should be placed between 3 and 10 feet from the user.] Placing it | [Explaining that the heater should be placed between 3 and 10 feet from the user.] Placing it |

---

[12] Like the parallel text in Presto's manuals, this paragraph is numbered paragraph 5 under the Important Safeguards heading.

| Presto 1995 Manual | Presto 2016 Manual | U.S. Merchants Manual |
|---|---|---|
| closer will turn the heater into a foot warmer, rather than a body warmer. Experiment with various positions until you find the one that is right for you. | closer will turn the heater into a foot warmer, rather than a body warmer. Experiment with various positions until you find the one that is right for you. | closer will turn the heater into a foot warmer, rather than a body warmer. Experiment with various positions until you find the one that is right for you. |
| Remember that this unit is primarily a people heater rather than a room heater, and using it to heat a room is not recommended. | Remember, this unit is primarily a people heater rather than a room heater and using it to heat a large room or open area is not recommended. | Remember, this unit is primarily a people heater rather than a room heater and using it to heat a room is not recommended. |
| [Explaining how to clean dust from the grille:] move the cloth over the surface of the parabolic reflector by inserting a long thin handle (such as a dowel or the handle portion of a wooden spoon) through the grille, using it to push the cloth from spot to spot | [Explaining how to clean dust from the grille:] move the cloth over the surface of the parabolic reflector by inserting a long thin handle (such as a dowel or the handle portion of a wooden spoon) through the grille, using it to slide the cloth from spot to spot over the surface of the reflector | [Explaining how to clean dust from the grille:] Move the cloth over the surface of the parabolic reflector by inserting a long thin handle (such as a dowel or the handle portion of a wooden spoon) through the grille, using it to slide the cloth from spot to spot over the surface of the reflector |

**D.    Consumer Confusion**

Finally, the Court turns to Presto's evidence that consumers have been confused by the similarity between the parties' products. Notably, Presto has not conducted any consumer survey, focus group, or other consumer interview to establish that consumers are likely to mistake The Heat Machine for the HeatDish. (Cohen Dep. at 303.) However, Presto presents several other indicia of consumer confusion arising from The Heat Machine's alleged similarity to the HeatDish. Presto notes that it was the exclusive supplier of parabolic heaters to Costco for thirty years. (*Id.* at 298, 364-68.) Presto asserts that once U.S. Merchants' similar-looking product supplanted the HeatDish in Costco's Arizona warehouses and business centers, both Costco employees and customers mistook The Heat

Machine for the Presto HeatDish. Presto points to Cohen's testimony that a Presto salesman went to a Costco store to buy a heater, asked a Costco employee whether they carried Presto heaters, and the employee, responding in the affirmative, directed the salesman to The Heat Machine. (*Id.* at 299.) Presto's return center has also received several returns of The Heat Machine, including instances where Costco employees processing the return packaged The Heat Machine in a Presto HeatDish box.[13] (*See* Smith Decl. [Doc. No. 303], Ex. 39.) In addition, Presto produced Costco receipts for The Heat Machine that identify the product as a HeatDish. (Smith Decl. [Doc. No. 299], Ex. 38.)

Finally, Presto received two complaints about The Heat Machine from consumers—one claiming that the product had a faulty plug, another claiming a defective heating element—who apparently believed their Heat Machines originated from Presto. (Smith Decl. [Doc. No. 302], Exs. 34-35.) Presto did not follow up with these consumers, however, and their communications do not indicate why they believed their product came from Presto. Notably, both individuals contacted Presto after the conclusion of the 2018-2019 heater season, and neither identified their product as a Presto HeatDish (in fact, one consumer called the product a "heat dome"). (*See id.*)

---

[13] This mistake is puzzling, given Cox's testimony, on behalf of Costco, that Costco's returns system should have routed The Heat Machine returns to U.S. Merchants. (*See* Costco Dep. at 150 ("Q. Is there any reason that Costco would have returned any Heat Machine products to National Presto? A. No, because the return dispositions are specific to the item number, which is specific to a supplier. So 1257172 item number would have belonged to US Merchants, and therefore, if you key that item number into our system, the return disposition that would come up would be for US Merchants.").)

## II.    DISCUSSION

### A.    Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it may affect the outcome of the lawsuit." *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). And a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the moving party bears the burden of establishing the lack of a genuine issue of fact, the party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

## B.    Trade Dress Claims

The Court begins its analysis with Presto's trade dress claims. Presto alleges that U.S. Merchants infringed its unregistered trade dress in the design of its product, packaging, and point-of-sale display. Trade dress rights under the Lanham Act serve to protect the "total image of a product, the overall impression created," rather than "the individual features." *Goddard, Inc. v. Henry's Foods, Inc.*, 291 F. Supp. 2d 1021, 1040 (D. Minn. 2003) (quoting *Children's Factory, Inc. v. Benee's Toys, Inc.*, 160 F.3d 489, 494 (8th Cir. 1998)). As the Supreme Court has explained, "The design or packaging of a product may acquire a distinctiveness which serves to identify the product with its manufacturer or source; and a design or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001). But "trade dress law does not provide a blanket protection 'from a competitor's imitation of one's marketing concept,' or 'the mere method and style of doing business.'" *Goddard, Inc.*, 291 F. Supp. 2d at 1040 (quoting *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 868 (8th Cir. 1994)). Consistent with the Lanham Act's purposes, "[t]rade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products." *TrafFix Devices, Inc.*, 532 U.S. at 29.

"To establish a claim for unregistered trade dress infringement, a plaintiff must demonstrate that the claimed trade dress (1) is distinctive; (2) is nonfunctional; and (3) its imitation would likely cause confusion for consumers as to the source of the product."

25

*Honeywell Int'l Inc. v. ICM Controls Corp.*, 45 F. Supp. 3d 969, 990 (D. Minn. 2014) (citing *Gateway, Inc. v. Companion Prods.*, 384 F.3d 503, 507 (8th Cir. 2004)). Where the claimed trade dress has not been federally registered, the plaintiff "bears the burden of establishing that its marks are protectible under trademark law." *Frosty Treats Inc. v. Sony Computer Entm't Am. Inc.*, 426 F.3d 1001, 1003 (8th Cir. 2005) (citations omitted). Thus, an unregistered trade dress does not enjoy the presumption of distinctiveness and non-functionality extended to a registered trade dress. *Aromatique, Inc.*, 28 F.3d at 869.

The Court will consider Presto's product, packaging, and point-of-sale display trade dress claims in turn.

### 1.    The HeatDish Product

Presto claims trade dress rights in the overall appearance of the HeatDish product. In describing its trade dress, Presto has identified several elements of the claimed trade dress: (1) a heating element located in the center of the heater's parabolic dish; (2) a curved grille, made of bars arranged radially around the heating element, together with bars forming two concentric circles; (3) a recess in the center of the grille, which together with the grille's curvature gives the grille a "Bundt cake" shape; (4) an emblem bearing the product's trademark, placed into the center of the grille; (5) a reflective coating on the dish, which gives off a warm, orange glow when the heating element operates; (6) on recent models, a chrome finish on the grille; and (7) a shroud extending from the product's base along the back of the dish, such that the dish tilts upward. (*See* Manske Decl. [Doc. No. 257], Exs. KK, HH; Compl. ¶ 38.) U.S. Merchants contends that none of these features, either individually or taken together, is distinctive and non-functional. And U.S. Merchants

argues that Presto has not raised a genuine dispute of material fact regarding the likelihood that consumers would mistake The Heat Machine for Presto's HeatDish.

### a. Distinctiveness

Generally, distinctiveness may be established by showing that the trade dress is "inherently distinctive"—that is, "[its] intrinsic nature serves to identify a particular source"—or by showing that the trade dress "has developed a secondary meaning, which occurs when, 'in the minds of the public, the primary significance of the [trade dress] is to identify the source of the product rather than the product itself.'" *Goddard, Inc. v. Henry's Foods, Inc.*, 291 F. Supp. 2d 1021, 1041–42 (D. Minn. 2003) (quoting *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 210–11 (2000)). But an unregistered product trade dress cannot be inherently distinctive, and Presto therefore must show secondary meaning. *Wal-Mart Stores, Inc.*, 529 U.S. at 216 ("[A] product's design is distinctive . . . only upon a showing of secondary meaning.").

In order to establish secondary meaning, a plaintiff "must show that by long and exclusive use in the sale of the user's goods, the mark has become so associated in the public mind with such goods that the mark serves to identify the source of the goods and to distinguish them from those of others." *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 870 (8th Cir. 1994) (citing *Co–Rect Prods., Inc. v. Marvy! Advertising Photography, Inc.*, 780 F.2d 1324, 1330 (8th Cir. 1985)). "[T]he chief inquiry is whether in the consumer's mind the mark has become associated with a particular source." *Co-Rect Prod., Inc.*, 780 F.2d at 1332–33. The Eighth Circuit has observed that "[c]onsumer surveys and testimony of consumers . . . may be the only direct evidence of secondary meaning and should be

considered."[14] *Aromatique, Inc.*, 28 F.3d at 871. In addition, "[t]he existence of secondary meaning of a mark may be inferred from evidence of deliberate copying of that mark." *Id.* Additional factors include the length of time the trade dress has been used, the plaintiff's established place in the market, advertising expenses directed toward associating the trade dress with the product's source in the minds of consumers, and whether the trade dress is exclusive. *Id.* at 871–72; *Frosty Treats Inc. v. Sony Computer Entm't Am. Inc.*, 426 F.3d 1001, 1005 (8th Cir. 2005); *Empi, Inc. v. Iomed, Inc.*, 923 F. Supp. 1159, 1164 (D. Minn. 1996).

Secondary meaning is a fact-intensive inquiry. Although Presto's evidence overall appears weak on this element of proof, for a variety of reasons, the Court cannot conclude as a matter of law that no reasonable factfinder could find that Presto's product trade dress is source-identifying.

---

[14] U.S. Merchants, citing *Co-Rect*, states that "[c]ourts have found the lack of survey evidence to be an "insurmountable hindrance" to establishing secondary meaning. (Mem. in Supp. of Def.'s Mot. for Summ. J. at 19.) To the extent U.S. Merchants suggests that survey evidence is always necessary to establish secondary meaning, U.S. Merchants is incorrect. In *Co-Rect*, the Eighth Circuit characterized consumer surveys as "an additional factor in determining whether a mark has acquired secondary meaning," not a dispositive factor. 780 F.2d at 1333–34 n.9. Insofar as prior cases have considered the lack of survey evidence an "insurmountable hindrance," that conclusion followed from a review of all the relevant factors on the facts of each case. *See id.*; *see, e.g.*, Sec. Ctr., Ltd. v. First Nat. Sec. Centers, 750 F.2d 1295, 1301 (5th Cir. 1985) ("[T]he *Vision Center* court considered the lack of evidence in the form of an objective survey a significant hindrance to meeting the standard of proof required. We find the hindrance here insurmountable, especially when considered with the paucity of other evidence purporting to show secondary meaning," including evidence regarding advertising expenses, the length of the mark's use, and deliberate copying.).

First, U.S. Merchants makes much of the fact that Presto did not conduct a consumer survey or otherwise attempt to ascertain direct evidence that consumers associate Presto's claimed trade dress with Presto, rather than the product itself. Although consumer surveys may furnish direct evidence of secondary meaning and are unquestionably relevant, the lack of a survey is not *dispositive*. *See supra* note 14. Therefore, the lack of survey evidence does not itself defeat Presto's trade dress claims. Nonetheless, as explained below, several of the inferences Presto seeks to make on this record are exceptionally difficult without survey evidence.

Second, Presto argues that an inference of secondary meaning arises from U.S. Merchants' efforts to deliberately copy the HeatDish's appearance. Although U.S. Merchants denies copying the HeatDish, there is record evidence to the contrary. Jeff Green, President of U.S. Merchants, repeatedly instructed the manufacturer to attempt to duplicate the HeatDish's appearance. (*See* Smith Decl. [Doc. Nos. 301, 303, 306], Exs. 28, 42, 52, 53 at 2.) Importantly, the first model of The Heat Machine—rejected by Costco—featured a relatively flat grille:



(Mem. in Opp'n to Def.'s Mot. for Summ. J. at 5.) After Costco declined to purchase this model, Green wrote that he had asked the manufacturer "to make a grill the <u>same design as Presto</u> to see if Costco would like that design better," and to "add a metal medallion to the front of the unit like Presto had." (Smith Decl. [Doc. No. 301], Ex. 30 (emphasis added).) The result was a grille that mimicked the HeatDish's Bundt cake shape:

| The HeatDish | The Heat Machine |
|---|---|
| | |

However, the Eighth Circuit has held that deliberate copying "does not necessarily indicate that the original product has secondary meaning," where there is demand for that type of product and the copier "conspicuous[ly] place[s]" its own identifying trademarks in "an attempt to distinguish" the accused product. *Aromatique, Inc.*, 28 F.3d at 871. In *Aromatique*, the court held that in light of the copier's "conspicuous use of its own trademarks" on a copy-cat potpourri bag, "it was clearly erroneous to infer from [the alleged infringer's] copying of Aromatique's product that the marks at issue here had acquired secondary meaning." *Id.*[15] Under *Aromatique*, because U.S. Merchants

---

[15] *Accord MSP Corp. v. Westech Instruments, Inc.*, 500 F. Supp. 2d 1198, 1214 (D. Minn. 2007) (observing that "courts will not infer secondary meaning when the defendant conspicuously uses its own trademark to identify the product," and finding that the defendant's intention to "conspicuously display its own mark" on the accused product defeated the plaintiff's effort to establish a likelihood of secondary meaning supporting a preliminary injunction); *Swisher Mower & Mach. Co. v. Haban Mfg., Inc.*, 931 F. Supp. 645, 650 (W.D. Mo. 1996) ("[T]he copying alleged in this case cannot support an inference of secondary meaning. Haban's name and logo are prominently displayed on its Model 614–001 mower. In addition, the silver color of the Haban Model 614–001 is very distinct from the red on the Swisher T–40. . . . Therefore, no secondary meaning may be inferred from Haban's alleged copying." (citations omitted)). *But cf. Ott v. Target Corp.*, 153 F. Supp. 2d 1055, 1064 (D. Minn. 2001) (finding a genuine issue of material fact barring summary judgment where there was evidence that the defendants deliberately copied the plaintiff's dolls without "conspicuously placing their trademarks on their products," or "prominently display[ing] their sources" on the products' packaging); *Empi, Inc. v. Iomed, Inc.*, 923 F. Supp. 1159, 1166 (D. Minn. 1996) (distinguishing *Aromatique* and inferring secondary meaning from deliberate copying where the defendant "failed to indicate anywhere" on the accused products or packaging that they belonged to the defendant, such that "it would be very difficult for a user or purchaser to identify the electrodes as those of" the defendant).

conspicuously placed its The Heat Machine and Greenmade trademarks on The Heat Machine, U.S. Merchants' copying does not necessarily support secondary meaning.[16]

Third, Presto asserts that the HeatDish's appearance is exclusive in the parabolic heater market. But many of the elements of Presto's claimed trade dress appear to be standard fare. For example, each of the competing products pictured in the record feature a centrally located heating element, a circular reflector covered by a curved grille, an emblem in the center of the grille displaying the maker's trademark, a reflective coating on the dish which gives off a warm, orange glow while the product operates, and a structure that enables the reflective dish to face upward at an angle. Some competitors use a similar chrome plating on the grille, too. Consider the following:



---

[16] The holding of *Aromatique* is, at least arguably, inapplicable where a copier's trademark is itself a look-alike of the plaintiff's mark. In such a case, the copier's conspicuous placement of its copycat trademark may not necessarily defeat the inference that the product's trade dress is source-identifying. In *this* case, however, U.S. Merchants' trademark is dissimilar from Presto's as a matter of law. *See infra* Section II.C. And Presto has not argued that *Aromatique* is distinguishable due to the similarity of the parties' marks.



(Jobin Rep. at 34, 38.[17]) Thus, the record does not appear to support Presto's claim of exclusivity with respect to many of the elements of its trade dress.

Importantly, however, there is one feature of Presto's claimed trade dress that *does* appear to be unique to the HeatDish: the particular curvature and recess of its grille, which together create a Bundt cake shape. U.S. Merchants has not identified any competing product—apart from The Heat Machine—with such a look. Because Presto's design prominently features a uniquely shaped grille, a reasonable factfinder could weigh the exclusivity factor in favor of secondary meaning.

Fourth, Presto argues that the length of time its product has been in the market supports the acquisition of secondary meaning. U.S. Merchants counters, correctly, that Presto has made significant changes to the HeatDish's appearance over the course of its thirty-year history. In response, Presto contends that a factfinder could find its HeatDish has conveyed a common commercial impression throughout its entire history, despite

---

[17] Although Presto argues that the Jobin Report analyzes several parabolic heaters that are no longer in the market, it is not clear that any of the competing products pictured above are subject to Presto's objection. At the very least, Presto has not specifically explained whether the products pictured above have been out of the market for so long as to render them irrelevant to the exclusivity analysis.

changes to the heater's appearance, such that "tacking" applies to the claimed trade dress. As the Supreme Court has explained, "two marks may be tacked when the original and revised marks are 'legal equivalents.' This term refers to two marks that 'create the same, continuing commercial impression' so that consumers 'consider both as the same mark.'" *Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 422 (2015) (citation omitted). But tacking is a doctrine applicable where the priority of two trademarks is disputed; Presto does not present, and the Court has not found, any case applying the doctrine to the secondary meaning inquiry.[18]

Regardless, even without the tacking doctrine, a factfinder could conclude that the HeatDish's time in the market supports a finding of secondary meaning. Despite changes to its color, the design of its emblem, and the shape of its base, Presto's use of a Bundt cake-shaped grille has been continuous. Presto's longstanding use of this unique feature could support a finding of secondary meaning. Moreover, when considering the whole

---

[18] *See id.* at 419–20 ("The party who first uses a mark in commerce is said to have priority over other users. Recognizing that trademark users ought to be permitted to make certain modifications to their marks over time without losing priority, lower courts have provided that, in limited circumstances, a party may clothe a new mark with the priority position of an older mark. This doctrine is called 'tacking' . . . ."). Notably, Presto obtained several separate design patents for its HeatDish during the tacking period. (*See* Manske Decl. [Doc. No. 257], Ex. MM.) In order to obtain each patent, Presto was required to show each design was "new, original and ornamental," 35 U.S.C. § 171(a), and a design patent is novel "when the 'average observer takes the new design for a different, and not a modified already existing design.'" *Clark Equip. Co. v. Keller*, 570 F.2d 778, 799 (8th Cir. 1978) (quoting *Thabet Manufacturing Co. v. Kool Vent Metal Awning Corp.*, 226 F.2d 207, 212 (6th Cir. 1955)). Although the different design patents do not themselves foreclose a claim to protectable trade dress, the claim that an average observer would regard each patented design as a new design, rather than a modification of an old one, undercuts the claim that a consumer would "consider both as the same mark" for tacking purposes.

appearance of the 2016-2019 HeatDish—rather than merely the Bundt cake shape—a factfinder could also conclude that the three years the 2016-2019 HeatDish was sold supports the acquisition of secondary meaning.[19] Although U.S. Merchants argues that three years is insufficient to establish secondary meaning, it cites no case resolving the issue at summary judgment. At summary judgment, the Court must view the evidence in the light most favorable to Presto. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Accordingly, the Court finds that Presto's longstanding use of the Bundt cake-shaped grille and the three-year tenure of the disputed HeatDish model could support a reasonable factfinder's conclusion that the claimed trade dress attained secondary meaning.

Fifth, Presto stresses that the HeatDish was the only parabolic heater sold *at Costco* for thirty years. But "[c]ourts focus the trade dress analysis 'on a comparison of plaintiff's trade dress to others in the same class of goods.'" *My Pillow, Inc. v. Ontel Prods. Corp.*, No. 19-cv-903 (JNE/HB), 2020 U.S. Dist. LEXIS 73475, at *18–19 (D. Minn. Apr. 3, 2020). There is no dispute that the HeatDish, and parabolic heaters generally, are sold at retailers other than Costco. Presto offers no support for the proposition that the HeatDish's

---

[19] *Compare Co-Rect Prod., Inc. v. Marvy! Advert. Photography, Inc.*, 780 F.2d 1324, 1332 (8th Cir. 1985) (holding that the district court's factual finding that ten months was insufficient to establish secondary meaning was not clearly erroneous), *and Sec. Ctr., Ltd. v. First Nat. Sec. Centers*, 750 F.2d 1295, 1301 (5th Cir. 1985) (upholding the district court's factual finding that two years was insufficient to establish secondary meaning), *with Bank of Texas v. Com. Sw., Inc.*, 741 F.2d 785, 788 (5th Cir. 1984) (observing that although a plaintiff *could* successfully "imbu[e] a name with secondary meaning in three short years, that does not mean that length of time alone is sufficient to establish secondary meaning").

status as the only parabolic heater sold at Costco is evidence that consumers associate the HeatDish's trade dress with Presto.[20]

Sixth, Presto emphasizes the HeatDish's commercial success. Even viewing the facts in the light most favorable to Presto and assuming that the HeatDish obtained significant commercial success,[21] evidence of a product's substantial commercial success "may not provide the basis for an inference of secondary meaning because something other than the secondary meaning of the trade dress may have been responsible for the success of the product." *Aromatique, Inc.*, 28 F.3d at 873. Presto offers no other evidence that its sales were driven by its trade dress, rather than other commercial factors (which may even include the fact that Costco customers had only one choice of parabolic heater when shopping at Costco). On this record, therefore, Presto's commercial success does not appear to support a finding of secondary meaning.

Seventh, Presto points to its efforts to promote the HeatDish to Costco's customers. Advertising efforts directed toward associating a product with a particular source are relevant to secondary meaning. *See Goddard, Inc.*, 291 F. Supp. 2d at 1047–48. But Presto does not explain how displaying its product through its point-of-sale display and packaging (the only advertising efforts Presto identifies) served to associate the claimed trade dress

---

[20] As discussed below, Presto's exclusivity at Costco is relevant to the likelihood that consumers would be confused by a look-alike sold at Costco. But it does not speak to whether consumers associate Presto's trade dress with Presto, rather than the product itself, so as to establish secondary meaning.

[21] U.S. Merchants disputes the HeatDish's success, and contends that falling sales figures were a key motivation for Costco to seek an alternative parabolic heater.

with Presto so as to create secondary meaning. There is no evidence in the record that, by virtue of Presto's promotional efforts, consumers began to associate the look of the HeatDish with Presto. *Cf. id.* at 1048 ("[W]e are unable to assess the relevance of Freshway's advertising expense, as we have no showing that those advertisements were aimed at familiarizing the public with the identity of Freshway's products, by virtue of its trade dress, as opposed to some other aspect of the Plaintiff's product, or business."). Therefore, evidence in the record of Presto's promotional efforts do not appear to speak to secondary meaning.

Finally, Presto points to its evidence of actual confusion—namely, that two customers contacted Presto to report defects in The Heat Machine, that Costco's receipts labeled The Heat Machine as a HeatDish, that Costco employees directed a Presto salesman to The Heat Machine when he inquired about Presto products, and that Presto's return center received several returns of The Heat Machine placed in the HeatDish's packaging. (*See* Smith Decl. [Doc. Nos. 299, 302, 303], Exs. 34-35, 38-39.) The evidence that some customers contacted Presto believing that their Heat Machine originated from Presto is relevant to the likelihood of confusion analysis, but does not necessarily speak to secondary meaning. The messages from those customers do not indicate whether they believed their Heat Machine originated from Presto because of the way it looked—that is, because Presto's trade dress served to associate the product with Presto. Nor does evidence that Costco employees were confused by the shift from selling the HeatDish to selling The Heat Machine seem to bear on whether Presto's trade dress had attained secondary meaning. That the Costco employees charged with assisting customers, processing returns, and

programming receipts failed to distinguish their new supplier of parabolic heaters says little about whether Presto's trade dress served to associate the HeatDish's appearance with Presto in consumers' minds. *Cf. Goddard, Inc.*, 291 F. Supp. 2d at 1046 ("The paramount consideration [in the search for secondary meaning] is 'whether in the consumer's mind the mark has become associated with a particular source.'" (citation omitted)).

\*       \*       \*

In short, some evidence in the record suggests that Presto's trade dress attained secondary meaning. The Bundt cake shape of the HeatDish grille is unique to Presto, and has been featured on many of Presto's HeatDish models, spanning many years. And at this stage, the length of time Presto sold the HeatDish model at the center of this case (from 2016 to 2019) could support a factfinder's conclusion that the HeatDish had obtained secondary meaning. But some of Presto's proffered evidence does not appear to support a finding of secondary meaning. The lack of a consumer survey is particularly significant, though not itself dispositive. Without direct evidence of consumers' perception of the claimed trade dress, there appears to be no evidence in the record to support Presto's claim that its exclusive presence in Costco stores, its commercial success, or its advertising efforts served to associate the claimed trade dress *with Presto* (rather than with the product) in consumers' eyes. And under *Aromatique*, evidence that U.S. Merchants deliberately copied the HeatDish's appearance does not necessarily support an inference of secondary meaning. Finally, because Presto's evidence of actual confusion does not tie consumers' confusion to Presto's claimed trade dress, that evidence does not seem to bear on secondary meaning.

The Court finds, however, that Presto's evidence of exclusivity and time in the market are sufficient to withstand summary judgment. Although much of Presto's evidence is better directed to the likelihood of confusion inquiry than secondary meaning, Presto has presented evidence that its product has featured a unique grille shape for decades, and Presto had sold the particular model at issue for several years before U.S. Merchants deliberately copied it. Viewing the facts of this case in the light most favorable to Presto, and taking all reasonable inferences therefrom in Presto's favor, Presto has presented sufficient evidence that a reasonable factfinder could conclude that the HeatDish's design attained secondary meaning. Presto's evidence is, therefore, sufficient to preclude summary judgment in favor of U.S. Merchants on this issue.

### b.    Non-Functionality

The Court next considers whether Presto has raised a genuine factual dispute as to the non-functionality of its claimed trade dress. The functionality doctrine "serves as a buffer between patent law and trademark law by preventing a competitor from monopolizing a useful product feature in the guise of identifying itself as the source of the product." *Home Builders Ass'n of Greater St. Louis v. L&L Exhibition Mgmt., Inc.*, 226 F.3d 944, 948 (8th Cir. 2000). "In general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Id.* (citing *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 850 n.10 (1982)). Yet "the fact that the feature at issue serves some function is not enough; to be functional in the trade dress sense, the feature must be necessary to afford a competitor the means to compete effectively." *Id.* (quoting *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277,

297 (7th Cir. 1998)). In determining whether a claimed trade dress is functional, courts must examine "the total image of a product, the overall impression created, and not the individual features." *Empi, Inc. v. Iomed, Inc.*, 923 F. Supp. 1159, 1164 (D. Minn. 1996) (citing *Woodsmith Publ'g Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir. 1990)); *accord Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, 963 F.3d 859, 867 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1514 (2021) ("[A] product's overall appearance is necessarily functional if *everything* about it is functional, not merely if *anything* about it is functional.").

U.S. Merchants argues that each element of Presto's claimed trade dress is functional. Many of the elements of Presto's trade dress plainly exist to serve a function— for example, the shape of the dish, the centrally located heating element, and the reflective backing on the dish. But the question is not whether individual elements of the trade dress serve some function. "[T]he inquiry is whether the combination of features, the overall shape and design of plaintiff's product, is adopted for purposes of identification and individuality." *Empi, Inc.*, 923 F. Supp. at 1164. Importantly, there is no evidence in the record that the Bundt cake shape of the grille is dictated by the grille's function—namely, preventing objects from coming into contact with the hot surfaces of the heater—rather than for purposes of identification and individuality. And competitors need not utilize that grille design in order to compete effectively, as evidenced by the numerous competing products depicted in the record with a much flatter grille.[22] It is "not enough" for U.S.

---

[22] *Cf. id.* ("[T]he Court cannot discern any legitimate competitive need to sell an iontophoresis product with plaintiff's particular shape and design. The record reflects that

Merchants to contend that discrete features of the HeatDish, considered in isolation, "serve[] some function." *Home Builders Ass'n of Greater St. Louis*, 226 F.3d at 948. Because a reasonable factfinder could conclude that Presto's overall trade dress was adopted for purposes of identification and individuality, and that a competitor can compete effectively without copying the whole claimed trade dress—especially the unique shape of the grille—the Court finds that Presto has raised a genuine factual dispute regarding whether its claimed trade dress is nonfunctional.

### c.    Likelihood of Confusion

Finally, Presto must ultimately demonstrate that imitation of its claimed trade dress "would likely cause confusion for consumers as to the source of the product." *Honeywell Int'l Inc. v. ICM Controls Corp.*, 45 F. Supp. 3d 969, 990 (D. Minn. 2014). The Eighth Circuit has identified a number of factors relevant to the likelihood of confusion inquiry: "1) the strength of the plaintiff's [trade dress]; 2) the similarity between the plaintiff's and defendant's [trade dresses]; 3) the degree to which the allegedly infringing product competes with the plaintiff's goods; 4) the alleged infringer's intent to confuse the public; 5) the degree of care reasonably expected of potential customers, and 6) evidence of actual confusion." *Davis v. Walt Disney Co.*, 430 F.3d 901, 903 (8th Cir. 2005) (citing *SquirtCo*

---

a number of alternative, equally suitable designs exist to perform the tasks of plaintiff's product, which is a key factor demonstrating nonfunctionality. In fact, defendant's former design and shape in the market was nothing like that of plaintiff's. With a number of actual electrode designs currently on the market, it is unnecessary for a competitor to copy plaintiff's trade dress in order to effectively compete."); *Ott v. Target Corp.*, 153 F. Supp. 2d 1055, 1063 (D. Minn. 2001) (finding a genuine dispute of material fact barring summary judgment regarding whether "realistic-looking" doll designs were functional).

*v. Seven–Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980)). No one factor is determinative, and courts must analyze each factor. *Insty\*Bit, Inc. v. Poly-Tech Indus., Inc.*, 95 F.3d 663, 670 (8th Cir. 1996). Likelihood of confusion is typically a question of fact. *SquirtCo.*, 628 F.2d at 1091.

Regarding the first factor, Presto asserts that a jury must weigh the strength of its trade dress, but offers little evidentiary support for its claim that its trade dress is strong. Presto points to the distinctiveness of its HeatDish, its thirty-year exclusive history in Costco stores, and U.S. Merchants' deliberate copying as evidence of its trade dress's strength. The strength of a claimed trade dress depends on the dress's recognizability in the market, however, and none of these facts directly speak to whether consumers readily recognize Presto's trade dress. *Cf. Insty\*Bit, Inc.*, 95 F.3d at 670 (holding, on an appeal from the district court's grant of summary judgment to the defendant, that the plaintiff's trade dress was strong because "its products have received favorable reviews from several woodworking magazines and nationally televised home-improvement programs," and the plaintiff's "consumer survey showed that over thirty-eight percent of the respondents were familiar with" the plaintiff); *Ott v. Target Corp.*, 153 F. Supp. 2d 1055, 1065 (D. Minn. 2001) (reasoning, on a motion for summary judgment, that "the strength of Ott's trade dress is evinced by the plethora of articles and advertisements in doll magazines about Ott and her unique designs, her numerous doll industry awards, her customary appearances at international toy shows, Target's own national advertising promoting her fame, and strong consumer recognition"). Unlike in *Insty\*Bit* and *Ott*, Presto does not point to favorable reviews of its trade dress or consumer surveys showing the recognizability of the

HeatDish's appearance. Thus, there appears to be a weak evidentiary record to support Presto's assertion that its claimed trade dress is strong.

But the second factor, the similarity between Presto's trade dress and The Heat Machine, could support a finding of a likelihood of confusion. Apart from small differences in the products' measurements, *see* Jobin Rep. at 88-93, some differences in the shape of the products' bases and shrouds, and a handful of differences in the products' features, the HeatDish and The Heat Machine look quite similar:

| The HeatDish | The Heat Machine |
|:---:|:---:|
|  | |

| The HeatDish | The Heat Machine |
| --- | --- |
|  |  |

Most strikingly, The Heat Machine's grille features the same Bundt cake shape as the HeatDish, which does not appear in any competing product pictured in the record. At this stage, this factor could support a finding of a likelihood of confusion.

Likewise, the third factor—the degree to which The Heat Machine competes with the HeatDish—could support a finding of a likelihood of confusion. Products in "[d]irect competition require[] a lesser degree of showing to establish likelihood of confusion than products not in direct competition with one another." *Empi, Inc. v. Iomed, Inc.*, 923 F. Supp. 1159, 1167 (D. Minn. 1996). It is true, as U.S. Merchants emphasizes, that the products were not sold side-by-side at the same Costco stores in Arizona, and that the disputed Heat Machine model was not sold outside of one heater season in the Arizona market. Nonetheless, the products were both parabolic heaters, were similarly priced, and were sold in the same broader market even if not the same stores. These facts could support

a finding that the products were in direct competition. *Cf. Ott*, 153 F. Supp. 2d at 1065–66 (weighing the direct competition factor in favor of the plaintiff where one competitor's accused doll collection and the plaintiff's collection "were similarly priced, incorporated a similar theme, were located side-by-side on Collector's Lane, and were both sold exclusively at Target," and where another competitor's accused collection, although not sold at Target, featured "identically sized dolls based on the same international theme").

The fourth factor could also support a finding of a likelihood of confusion. Presto has presented evidence that U.S. Merchants copied the appearance of the HeatDish. "An inference of intent [to confuse the public] arises where a party, with knowledge of a competitor's trade dress, chooses a similar dress from an infinite number of possibilities. One who does copy a trade dress of another, previously established trade dress is presumed to have deceived the public." *Id.* (citations omitted). Although U.S. Merchants conspicuously placed its own trademarks on The Heat Machine, a reasonable factfinder could nonetheless conclude that U.S. Merchants intended to confuse the public based on its deliberate copying of the HeatDish. *Cf. Ott*, 153 F. Supp. 2d at 1066 (finding that a reasonable jury could find intent to confuse the public where there was evidence of deliberate copying, although unlike U.S. Merchants, the defendants failed to place conspicuous trademarks on the knock-off product).

The fifth factor is the degree of care reasonably expected of potential customers. "As a general rule, the greater the cost of the product or service, the more time and effort consumers are expected to expend when making decisions, and therefore the likelihood of confusion decreases." *Mars Musical Adventures, Inc. v. Mars, Inc.*, 159 F. Supp. 2d 1146,

1153 (D. Minn. 2001). There is no evidence that the price of the HeatDish and The Heat Machine are so high, or the conditions of their purchase so complex, that consumers would reflect carefully on their purchase so as to undercut the confusion generated by The Heat Machine's imitation of Presto's trade dress. Therefore, this factor could support a finding of a likelihood of confusion.

The final factor considers evidence that consumers were actually confused by the imitation of the claimed trade dress. Again, Presto did not present direct evidence of consumer confusion in the form of consumer surveys or interviews. Rather, Presto notes that it was the exclusive supplier of parabolic heaters to Costco for thirty years, Cohen Dep. at 298, 364-68, and that once The Heat Machine replaced the HeatDish in Costco's Arizona warehouses and business centers, both Costco employees and customers mistook The Heat Machine for the Presto HeatDish. Presto's evidence that Costco employees were confused following this shift—after thirty years of exclusively selling Presto's HeatDish— unfortunately does not address whether *consumers* were confused *because of* The Heat Machine's alleged imitation of Presto's trade dress. *Cf. LTJ Enterprises, Inc. v. Custom Mktg. Co., LLC*, 168 F. Supp. 3d 1202, 1216 (D. Minn. 2016) (discounting, at summary judgment, evidence of actual confusion that did not flow from the unauthorized use of the plaintiff's mark). And the complaints Presto received from customers regarding their Heat Machines do not indicate whether those customers believed they possessed a Presto product because The Heat Machine imitated Presto's trade dress. Indeed, the customers' complaints, sent after the conclusion of the 2018-2019 heater season, say nothing about why the customers thought their products originated from Presto. Neither customer

identified their product as a Presto HeatDish,[23] and Presto did not follow up with them. Regardless, "even several isolated incidents of actual confusion that occur initially upon the creation of a potentially confusing mark are insufficient to establish a genuine issue of material fact as to the likelihood of confusion." *Id.* at 1216. Thus, the actual confusion factor does not appear to support a finding of a likelihood of confusion.

On balance, the Court finds that Presto has presented sufficient evidence that consumers would likely be confused by the imitation of its trade dress to withstand summary judgment. Although the strength of Presto's trade dress and instances of actual confusion caused by imitation are not apparent on this record, Presto has presented evidence regarding the similarity of the products, direct competition between the products, U.S. Merchants' intent to copy the HeatDish, and the low degree of care expected of consumers. These factors raise a genuine factual dispute regarding the likelihood of consumer confusion.

### d.   Conclusion

In sum, the Court finds that Presto has raised a genuine factual dispute regarding the distinctiveness, non-functionality, and likelihood of confusion elements of its product trade dress claim. Accordingly, the Court denies U.S. Merchants' Motion for Summary Judgment as to this claim.

---

[23] In fact, one customer called the product a "heat dome," matching neither party's trademark.

### 2. The HeatDish Packaging

The Court next considers Presto's packaging trade dress claim. Presto describes its claimed packaging trade dress as the combination of several features: (1) the product name, printed in white; (2) a prominent photograph of the heater depicting the orange glow created by its operation, positioned on the center-right of the package's front face and occupying two-thirds of the face; (3) a list of product features in bullet-point format, positioned to the left of the photograph; (4) a red, white, and black color scheme; (5) on the right face, a photograph of the operational heater coupled with a list of its "advantages," including the statement "feels like three times the heat"; and (6) on the left face, a two-by-two array of four photographs depicting the product's features. (*See* Compl. ¶¶ 24, 26, 28, 69.) To succeed on this claim, Presto ultimately "must demonstrate that the claimed trade dress (1) is distinctive; (2) is nonfunctional; and (3) its imitation would likely cause confusion for consumers as to the source of the product." *Honeywell Int'l Inc. v. ICM Controls Corp.*, 45 F. Supp. 3d 969, 990 (D. Minn. 2014) (citing *Gateway, Inc. v. Companion Prods.*, 384 F.3d 503, 507 (8th Cir. 2004)).

The Court's analysis begins and ends with distinctiveness. Presto may prove that its packaging is distinctive either by showing it is inherently distinctive—that "[its] intrinsic nature serves to identify a particular source"—or that it has acquired secondary meaning, which occurs when, 'in the minds of the public, the primary significance of the [trade dress] is to identify the source of the product rather than the product itself.'" *Goddard, Inc. v. Henry's Foods, Inc.*, 291 F. Supp. 2d 1021, 1041–42 (D. Minn. 2003) (quoting *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 210–11 (2000)). Presto does not appear to assert

that its packaging is inherently distinctive, however, and instead argues that its packaging has acquired secondary meaning for many of the same reasons as the HeatDish itself. (*See* Mem. in Opp'n to Def.'s Mot. for Summ. J. at 19-22.) Secondary meaning may be shown by direct evidence in the form of consumer surveys or consumer testimony, or by circumstantial evidence such as proof of deliberate copying, the length of time the trade dress has been used, the plaintiff's established place in the market, advertising expenses directed toward associating the trade dress with the product's source in the minds of consumers, and the exclusivity of the trade dress. *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 871–72 (8th Cir. 1994); *Frosty Treats Inc. v. Sony Computer Entm't Am. Inc.*, 426 F.3d 1001, 1005 (8th Cir. 2005); *Empi, Inc. v. Iomed, Inc.*, 923 F. Supp. 1159, 1164 (D. Minn. 1996).

Presto has not offered direct evidence that consumers associate the claimed trade dress with the source of the packaging. Rather, Presto points to the HeatDish's thirty-year exclusivity in Costco stores, its commercial success, promotion of the HeatDish to Costco's customers, U.S. Merchants' alleged copying of Presto's packaging, and actual consumer confusion.[24] For the reasons that follow, the Court finds that this evidence does not create a genuine factual dispute regarding the distinctiveness of Presto's claimed packaging trade dress.

---

[24] Although Presto asserts that its packaging is exclusive, Presto does not explain which features of its trade dress are unique to its packaging, or how its packaging (viewed as a whole) markedly differs from competitors' packaging. (*See* Mem. in Opp'n to Def.'s Mot. for Summ. J. at 21-22.)

As with the HeatDish, Presto has changed its packaging several times throughout its thirty-year history:



(*Id.* at 21.) Presto asserts that a jury could find that the packaging conveyed a common commercial impression—but, as explained above, the tacking doctrine pertains to trademark priority, not secondary meaning. *See Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 419–20 (2015); *see also supra* Section II.B.1.a. Regardless, a reasonable factfinder could conclude that the length of time Presto offered the 2016-2019 HeatDish packaging supports the acquisition of secondary meaning. *Compare Co-Rect Prod., Inc. v. Marvy! Advert. Photography, Inc.*, 780 F.2d 1324, 1332 (8th Cir. 1985) (holding that district court's finding that ten months was insufficient to establish secondary meaning was not clearly erroneous), *with Bank of Texas v. Com. Sw., Inc.*, 741 F.2d 785, 788 (5th Cir. 1984) (observing that a plaintiff *could* successfully "imbu[e] a name with secondary meaning in three short years"). But length of time is not alone sufficient to establish secondary meaning. *E.g.*, *Bank of Texas*, 741 F.2d at 788.

Presto offers no support for the proposition that its position as Costco's exclusive supplier of parabolic heaters means that Presto's packaging trade dress had attained secondary meaning. While such exclusivity suggests that Costco customers were familiar with Presto's products, it does not suggest that Presto's packaging trade dress had become source-identifying.

Nor does the HeatDish's commercial success appear to support secondary meaning. Presto does not explain how its success was attributable to its packaging trade dress. *See Aromatique, Inc.*, 28 F.3d at 873 (reasoning that evidence of a product's substantial commercial success "may not provide the basis for an inference of secondary meaning because something other than the secondary meaning of the trade dress may have been responsible for the success of the product"). Similarly, there is no evidence in the record that, by virtue of Presto's promotional efforts, consumers began to associate the look of the HeatDish's packaging with Presto, rather than the HeatDish itself, so as to create secondary meaning. *Cf. Goddard, Inc.*, 291 F. Supp. 2d at 1048 ("[W]e are unable to assess the relevance of Freshway's advertising expense, as we have no showing that those advertisements were aimed at familiarizing the public with the identity of Freshway's products, *by virtue of its trade dress*, as opposed to some other aspect of the Plaintiff's product, or business." (emphasis added)).

Presto also asserts that U.S. Merchants' alleged copying of Presto's packaging supports a finding of secondary meaning. While there is extensive evidence that U.S. Merchants' president directed its manufacturer to duplicate the HeatDish's appearance, the only evidence that U.S. Merchants deliberately copied Presto's packaging is that U.S.

Merchants' graphic designers used Presto's packaging as a reference for layout purposes. (Bustamante Dep. at 86-87; *see also* Artz Decl. [Doc. No. 250], Ex. 24.) But Bustamante was directed to ensure the packaging was not "too similar" to Presto's. (*See* Bustamante Dep. at 62-63, 79, 86-92.) Regardless, as the Court previously explained with respect to Presto's product trade dress claims, U.S. Merchants' conspicuous placement of its own trademarks on the packaging precludes any inference of secondary meaning that might be drawn from the asserted copying. *See Aromatique, Inc.*, 28 F.3d at 871.

Finally, Presto's evidence of actual confusion (the same evidence presented with respect to Presto's product trade dress claim) does not attribute any confusion—whether Costco employees' confusion or consumers'—to the asserted imitation of Presto's packaging trade dress. That evidence therefore does not support the conclusion that Presto's packaging had acquired secondary meaning.

In sum, Presto has not presented probative evidence regarding whether consumers associate Presto's packaging trade dress with Presto, so as to support a finding of secondary meaning. Accordingly, the Court finds that Presto has not raised a genuine factual dispute on this issue, and therefore grants U.S. Merchants' Motion for Summary Judgment on Presto's packaging trade dress claim.[25]

---

[25] Although Presto has raised a genuine factual dispute barring summary judgment for U.S. Merchants on its product trade dress claim, the fact that the HeatDish product is pictured on Presto's packaging is insufficient to save Presto's packaging trade dress claim. Presto has not argued that packaging may obtain trade dress protection merely by depicting a product that has such protection. In any event, such a proposition would improperly conflate product and packaging trade dress claims.

### 3.   The HeatDish Point-of-Sale Display

Finally, Presto asserts that U.S. Merchants infringed its trade dress rights in its point-of-sale display. As with Presto's packaging trade dress claim, the Court's analysis begins and ends with distinctiveness. Presto argues that its point-of-sale display is both inherently distinctive and distinctive by virtue of secondary meaning. A trade dress is inherently distinctive, dispensing of the requirement to show secondary meaning, if it is arbitrary, fanciful, or suggestive. *Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 785 (8th Cir. 1995). "If the specific design of the trade dress is only tenuously connected with the nature of the product, then it is inherently distinctive . . . ." *Id.* at 786. But "[i]f the design of the trade dress is dictated by the nature of the product, then secondary meaning must be proven." *Id.* Under the *Seabrook* test, another "widely-adopted standard," courts consider whether a claimed trade dress "was a 'common' basic shape or design, whether it was unique or unusual in a particular field, [or] whether it was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods.'" *Id.* (quoting *Seabrook Foods, Inc. v. Bar–Well Foods Ltd.*, 568 F.2d 1342, 1344 (C.C.P.A. 1977)) (alteration in original).

Presto's point-of-sale display features a sample of the HeatDish, turned on and directed toward passing customers, surrounded by panels of text displaying information about the product. To be sure, there is no evidence in the record that any other parabolic heater (besides The Heat Machine) utilized such a display, either at Costco or at other retailers. But that does not make Presto's display inherently distinctive. A display featuring

a sample of the product is "dictated by the nature of the product." If the product is a heater, to display the product during operation requires the heater to be placed outside of its box and directed toward passing customers. Similarly, a list of the product's features accompanying the display is not "tenuously connected with the nature of the product," but is instead dictated by the product's nature. *Id.* at 785. And, under the *Seabrook* test, Presto's display appears to be a mere "refinement" of other product displays, including those at Costco.[26] The "inherently distinctive" analysis seeks to ascertain whether "one can assume without proof" that a trade dress "will automatically be perceived by customers as an indicia of origin." *Id.* at 786 (emphasis and quotation omitted). Here, Presto does not explain why, were a customer to see Presto's point-of-sale display with Presto's name omitted, a customer would automatically associate that display with Presto. Thus, Presto must show secondary meaning.

The Court finds that Presto has not raised a genuine factual dispute regarding secondary meaning. In order to establish secondary meaning, a plaintiff "must show that by long and exclusive use in the sale of the user's goods, the mark has become so associated in the public mind with such goods that the mark serves to identify the source of the goods and to distinguish them from those of others." *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 870 (8th Cir. 1994) (citing *Co–Rect Prods., Inc. v. Marvy! Advertising Photography, Inc.*, 780 F.2d 1324, 1330 (8th Cir. 1985)). Relevant factors include consumer surveys or

---

[26] Although Costco does not display competing heaters using vendor-built displays, Costco does display other products—either by taking the product out of the box or by placing a sample of the product in a vendor-built display. (*See* Costco Dep. at 30, 141-43.)

consumer testimony, proof of deliberate copying, the length of time the trade dress has been used, the plaintiff's established place in the market, advertising expenses directed toward associating the trade dress with the product's source in the minds of consumers, and the exclusivity of the trade dress. *Id.* at 871–72; *Frosty Treats Inc. v. Sony Computer Entm't Am. Inc.*, 426 F.3d 1001, 1005 (8th Cir. 2005); *Empi, Inc. v. Iomed, Inc.*, 923 F. Supp. 1159, 1164 (D. Minn. 1996).

Presto argues that its display acquired distinctiveness through its exclusive presence at Costco, and that secondary meaning is demonstrated by U.S. Merchants' deliberate copying and the resulting actual confusion. Notably, there is no evidence that U.S. Merchants deliberately copied Presto's point-of-sale display—apart from the similarity of the displays and the evidence that U.S. Merchants copied Presto's product. Unlike with Presto's product and packaging, Presto has not identified any direct evidence that U.S. Merchants directed its graphic designers to copy, or even reference, Presto's display. Regarding the display's exclusive presence at Costco and Presto's evidence of actual confusion, as the Court explained in the context of Presto's product and packaging trade dress claims, these factors do not indicate that consumers associate Presto's point-of-sale display with Presto, so as to support a finding of secondary meaning. *See supra* Sections II.B.1.a, II.B.2.

In sum, the Court finds that Presto has not presented sufficient evidence for a reasonable factfinder to conclude that the point-of-sale display was either inherently distinctive or source-identifying. Accordingly, the Court grants U.S. Merchants' Motion for Summary Judgment as to Presto's display trade dress claim.

### C.     Trademark Infringement Claim

The Court next turns to Presto's claim that U.S. Merchants infringed its word and design trademarks.[27] "To prove a trademark infringement claim, a plaintiff must show that it has a valid, protectible mark and that there is a likelihood of confusion between its mark and the defendant's mark." *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 569 F.3d 383, 389 (8th Cir. 2009) (citation omitted). U.S. Merchants argues that Presto has not raised a genuine factual dispute regarding the likelihood of confusion between the parties' marks. The same factors discussed with respect to Presto's trade dress claims govern the likelihood of confusion inquiry on Presto's trademark claim: "1) the strength of the plaintiff's mark; 2) the similarity between the plaintiff's and defendant's marks; 3) the degree to which the allegedly infringing product competes with the plaintiff's goods; 4) the alleged infringer's intent to confuse the public; 5) the degree of care reasonably expected of potential customers, and 6) evidence of actual confusion." *Davis v. Walt Disney Co.*, 430 F.3d 901, 903 (8th Cir. 2005) (citing *SquirtCo v. Seven–Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980)). No one factor is determinative, and courts must analyze each factor. *Insty*Bit, Inc. v. Poly-Tech Indus., Inc.*, 95 F.3d 663, 670 (8th Cir. 1996). Likelihood of confusion is typically a question of fact. *SquirtCo.*, 628 F.2d at 1091.

### 1.     The Strength of Presto's Mark

The conceptual strength of a trademark depends on whether the mark is (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful. *Cellular Sales, Inc. v. Mackay*,

---

[27] Presto's design trademark is a stylized version of its "HeatDish" mark.

942 F.2d 483, 485 (8th Cir. 1991). The degree of protection afforded a trademark varies based on which of these categories it falls into. "An arbitrary or fanciful trademark is the strongest type of mark and is afforded the highest level of protection," a generic mark "merits no trademark protection," and "[s]uggestive and descriptive marks fall somewhere in between." *Duluth News-Trib., a Div. of Nw. Publications, Inc. v. Mesabi Pub. Co.*, 84 F.3d 1093, 1096 (8th Cir. 1996) (citations omitted). Presto contends that its word and design marks are "strong," though it does not identify which category it believes its marks fall into. (*See* Mem. in Opp'n to Def.'s Mot. for Summ. J. at 46.) U.S. Merchants argues that Presto's marks are descriptive, deserving only weak protection. "A descriptive mark . . . immediately conveys the nature or function of the product and is entitled to protection only if it has become distinctive by acquiring a secondary meaning."[28] *Duluth News-Trib.*, 84 F.3d at 1096 (citation omitted).

In the Court's view, Presto's "HeatDish" mark is conceptually weak. The mark "immediately conveys the nature or function" of a parabolic heater: an appliance that distributes heat via a reflective dish. *Cf. Frosty Treats Inc. v. Sony Computer Ent. Am. Inc.*, 426 F.3d 1001, 1005 (8th Cir. 2005) ("Frosty Treats is in the business of selling frozen desserts out of ice cream trucks. 'Frosty Treats' conveys an immediate idea of the qualities and characteristics of the goods that it sells. No imagination, thought, or perception is

---

[28] Although descriptive marks typically require proof of secondary meaning, U.S. Merchants does not argue that Presto's trademarks lack secondary meaning.

required to reach a conclusion as to the nature of its goods."). Presto does not explain what is "arbitrary or fanciful" or "suggestive" about its HeatDish mark.

But a trademark's commercial value, in addition to its conceptual strength, is relevant to the overall strength of the mark. *Zerorez Franchising Sys., Inc. v. Distinctive Cleaning, Inc.*, 103 F. Supp. 3d 1032, 1042 (D. Minn. 2015). "In the likelihood of confusion context, commercial strength is based on the 'public recognition and renown' of the mark as shown by the amount of advertising, sales volume, features and reviews in publications, and survey evidence." *Id.* (collecting cases). Presto's long use of its word and design marks, the promotion attributable to its longstanding status as Costco's exclusive supplier of parabolic heaters, and its commercial success furnish some evidence of the marks' strength.

Yet U.S. Merchants also identifies several third-party trademarks that weaken Presto's marks. "[E]vidence of third party usage of similar marks on similar goods is admissible and relevant to show that the mark is relatively weak and entitled to a narrower scope of protection." *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626–27 (8th Cir. 1987). U.S. Merchants points to federally registered marks associated with heaters, such as: HEAT FORCE, HEAT BUD, POWERHEAT, PROFUSION HEAT, and SURROUND HEAT. (*See* Manske Decl. [Doc. No. 258], Exs. GGG-NNN.) Presto argues that these marks are irrelevant because "they do not relate to electric heaters sold at Costco." (Mem. in Opp. to Def.'s Mot. for Summ. J. 47.) Although Presto is correct that "[t]he relevant market for the commercial strength evaluation is 'the class of customers and potential customers of a product or service, and not the general public,'" *Zerorez Franchising Sys., Inc.*, 103 F.

Supp. 3d at 1042 (citation omitted), Presto does not persuasively explain why the class of customers is limited to Costco customers. It is undisputed that Presto sells its HeatDish through retailers other than Costco. The relevant class of customers, therefore, cannot be limited to Costco members.[29] Thus, the existence of similar third-party trademarks—which each feature the descriptive term "heat," along with a nod to the heater's features—reduces the strength of Presto's trademarks.

Because Presto's word trademark is descriptive and similar to several third-party marks, Presto's trademark is relatively weak despite its commercial strength. Although Presto faults U.S. Merchants for ignoring Presto's design trademark, Presto does not explain why its design trademark is any stronger than its word trademark.

### 2. The Similarity Between the Parties' Marks

The Court finds that the parties' trademarks are insufficiently similar to support a finding of a likelihood of confusion. Courts "must look to the overall impression created by the marks, not merely compare individual features," and "may consider the marks' visual, aural, and definitional attributes and compare the trade dress of the products in determining whether the total effect conveyed by the two marks is confusingly similar." *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 830 (8th Cir. 1999) (citation omitted). In *Luigino's*, on an appeal from a motion granting summary judgment of no infringement, the

---

[29] Because The Heat Machine was sold exclusively in Costco stores, it is sensible to look at Costco customers when evaluating the likelihood that The Heat Machine would be mistaken for Presto's HeatDish. But Costco is not the only relevant environment for evaluating the strength of Presto's trademark.

Eighth Circuit considered whether the marks "Lean Cuisine" and "Lean 'N Tasty" were confusingly similar. *Id.* After disregarding the word "lean" because it is "generally descriptive of food and not registerable as a trademark," the court held that the meaning, appearance, and sound of the marks' remaining words were not similar as a matter of law. *Id.* Here, Presto's arguments on the similarity of the marks rely principally on the word "heat." (*See* Mem. in Opp'n to Def.'s Mot. for Summ. J. at 49.) But "heat" is generally descriptive of all heaters. After disregarding that word, the remaining elements of the trademarks are dissimilar: "Dish" and "The . . . Machine" do not immediately convey similar meanings, do not sound similar, and do not have similar visual appearances.

Nor does the graphical implementation of the marks appear similar:



(Jobin Rep. at 96.) To be sure, both marks use a white color, and are positioned in the upper-left corner of the parties' packaging and in the center of their products. Presto's mark, however, is arranged horizontally, without spacing between its component words; U.S. Merchants' mark, by contrast, is arrayed vertically. The characters in Presto's mark bear uniform weight; U.S. Merchants' mark more heavily weighs the word "heat". The

fonts differ, and the background colors differ. Although the marks' location on the products and packaging is the same, competing parabolic heaters also place their trademarks in the upper-left corner of their boxes and in the central emblems of their heaters:



Accordingly, the Court finds that the parties' marks are insufficiently similar to support a finding of a likelihood of confusion.

### 3. Competition Between the Plaintiffs' Products

U.S. Merchants does not dispute that the parties' products are in direct competition, nor could it. *See supra* Section II.B.1.c. This factor therefore indicates a likelihood of consumer confusion.

### 4. U.S. Merchants' Intent to Confuse the Public

U.S. Merchants argues that it did not intend to confuse consumers by selecting "The Heat Machine" as its trademark. It points to evidence that Costco approved the name, that U.S. Merchants obtained a clearance opinion for the use of the name, and that U.S. Merchants federally registered its marks. (*See* Costco Dep. at 174; Manske Decl. [Doc. Nos. 256, 257, 260], Exs. Y, Z, AA.) Presto asserts that U.S. Merchants changed its product's name from "Hot Flash" to "The Heat Machine" in order to more closely align the name with the HeatDish mark, and that "this basis alone" would permit "a jury to find that Defendant selected its product name to capitalize on Presto's goodwill" in its HeatDish

mark. (Mem. in Opp'n to Def.'s Mot. for Summ. J. at 51.) But the record does not support

Presto's assertion. Nothing in the record indicates that U.S. Merchants changed its initial

name to more closely mimic the "HeatDish" mark. U.S. Merchants' president, Jeff Green,

initially suggested the name "Hot Flash" in an email to U.S. Merchants' manufactures'

representatives Gary Ojendyk and Robert Calder. (*See* Manske Decl. [Doc. No. 300], Ex.

14, at 3.) Calder replied:

> While the term "Hot Flash" may denote a certain amount of excitement and
> enthusiasm, it may also be associated with "Danger - Beware". I remember
> illegal Japanese fire crackers with the brand name Hot Flash.. [sic]

> The first thought that comes to all women's minds is a certain medical
> condition associated with menopause - not a pleasant thought for women who
> represent over 50% of the population and would be a major purchaser of the
> Parabolic Heater. "Hot Flash" has a negative connotation for women.

(*Id.* at 2-3.) Green requested alternative names, and Ojendyk and Calder suggested a

number of options, including The Heat Machine, Heat Me Up, The Heat Source, Instance

Heat, E Z Heat, and E Z Glow. (*Id.* at 2.) Green chose "The Heat Machine." (*Id.*)

Thus, contrary to Presto's assertion, the record suggests that U.S. Merchants elected

to abandon the "Hot Flash" name due to the name's unintended connotations, not its

dissimilarity to "HeatDish." And Green chose "The Heat Machine" from a list of

alternative names that were quite dissimilar to Presto's mark. Notably, there is no evidence

that Ojendyk and Calder concocted the list of alternative names in order to approximate

"HeatDish," or that Green chose "The Heat Machine" because he believed it was similar

to "HeatDish." Additionally, Presto does not point to anything in the record that would

indicate U.S. Merchants' graphic designers intended to imitate Presto's design trademark.

Accordingly, the record does not suggest that U.S. Merchants intended to appropriate Presto's trademarks, and this factor does not support a likelihood of confusion.

### 5.    Consumers' Degree of Care

U.S. Merchants does not contend that the price of the parties' products or the conditions of their sale are such that consumers can be reasonably expected to carefully evaluate their choice of product. *Cf. Mars Musical Adventures, Inc. v. Mars, Inc.*, 159 F. Supp. 2d 1146, 1153 (D. Minn. 2001) ("As a general rule, the greater the cost of the product or service, the more time and effort consumers are expected to expend when making decisions, and therefore the likelihood of confusion decreases."). Viewing the evidence in the light most favorable to Presto, this factor supports a likelihood of confusion.

### 6.    Evidence of Actual Confusion

Finally, Presto offers the same evidence of actual confusion as in its trade dress claims. Although Presto does not present direct evidence that consumers have confused the parties' trademarks, Presto points to confusion by Costco employees and two consumers who directed service inquiries regarding The Heat Machine to Presto. (*See* Smith Decl. [Doc. Nos. 299, 302, 303], Exs. 34-35, 38-39.) But Presto has not explained how Costco's employees' confusion resulted from the similarity of the parties' marks, as opposed to, for example, the fact that Costco had traditionally exclusively sold Presto parabolic heaters. *Cf. LTJ Enterprises, Inc. v. Custom Mktg. Co., LLC*, 168 F. Supp. 3d 1202, 1216 (D. Minn. 2016) (discounting, at summary judgment, evidence of actual confusion that did not flow from the unauthorized use of the plaintiff's mark). And the complaints Presto received from customers regarding their Heat Machines do not indicate whether those customers believed

they possessed a Presto product because The Heat Machine imitated Presto's trademark. Indeed, the customers' complaints say nothing about why the customers thought their products originated from Presto. Neither customer identified their product as a Presto HeatDish (in fact, one customer called the product a "heat dome"), and Presto did not follow up with them. Regardless, "even several isolated incidents of actual confusion that occur initially upon the creation of a potentially confusing mark are insufficient to establish a genuine issue of material fact as to the likelihood of confusion." *Id.* at 1216. Therefore, the Court finds that the evidentiary record does not support a finding of a likelihood of confusion.

### 7.    Conclusion

In sum, although Presto's trademarks are conceptually weak and further weakened by similar third-party marks, it is true that Presto has presented evidence that the marks are commercially strong. But the parties' marks are also dissimilar: after discarding the descriptive word "heat," the marks are not similar in look, sound, or meaning. In addition, there is no evidence that U.S. Merchants intended to trade on the goodwill of Presto's trademark. And Presto's evidence of actual confusion does not tie Costco employees' apparent confusion or the two proffered instances of consumer confusion to the similarity of the parties' marks. Although the products are in direct competition and consumers cannot be reasonably expected to exercise a great deal of care, the Court finds that these two factors are insufficient to create a genuine factual dispute regarding the likelihood of confusion element of Presto's trademark claim. Accordingly, the Court grants U.S. Merchants' Motion for Summary Judgment as to this claim.

**D.      Copyright Infringement Claims**

The Court next considers Presto's copyright infringement claims. Presto alleges that U.S. Merchants infringed its copyrights in its 1995 and 2016 instruction manuals and its 2018 packaging. Both parties move for summary judgment on this claim. "To establish copyright infringement, two elements must be proven: '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Honeywell Int'l Inc. v. ICM Controls Corp.*, 45 F. Supp. 3d 969, 1007 (D. Minn. 2014) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).

**1.      Ownership of a Valid Copyright**

It is undisputed that Presto has federally registered copyrights in its 1995 and 2016 instruction manuals, as well as its 2018 packaging. (*See* Artz Decl. [Doc. No. 250], Exs. 5, 6, 9.) "A certificate of registration constitutes *prima facie* evidence of the validity of a copyright and of the facts, including ownership and existence, stated in the certificate." *Taylor Corp. v. Four Seasons Greetings LLC*, 171 F. Supp. 2d 970, 972 (D. Minn. 2001), *aff'd*, 315 F.3d 1039 (8th Cir. 2003) (citation omitted).

U.S. Merchants contends that Presto's copyrights are invalid because Presto's copyright applications contained material inaccuracies. Namely, one section of the instruction manuals—the "Important Safeguards" section—contains safety information largely dictated by Underwriters Laboratories ("UL"), and some UL text appears on Presto's packaging. (Cohen Decl. at ¶ 5.) Despite this fact, Presto's copyright applications claimed the entire works as original and did not disclose that some material was authored by UL. (*See* Artz Decl. [Doc. No. 250], Exs. 7-9.)

The Copyright Act provides that a copyright registration is valid, "regardless of whether the certificate contains any inaccurate information," unless:

> (A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and

> (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration.

17 U.S.C. § 411(b)(1). The Act requires courts, where a litigant demonstrates that the application included inaccurate information and the registrant knowingly included that inaccuracy, to seek an advisory opinion from the Copyright Office regarding whether that inaccuracy would have been material to the Office's decision to register the copyright. *See id.* § 411(b)(2); *Palmer/Kane LLC v. Rosen Book Works LLC*, 188 F. Supp. 3d 347, 348–49 (S.D.N.Y. 2016) (examining cases).

To the extent Presto claimed authorship of the entire works, its copyright registrations were inaccurate. It is undisputed that UL authored at least some material appearing in Presto's manuals and on its packaging. Nonetheless, U.S. Merchants points to nothing in the record to support its claim that Presto decisionmakers knowingly included that inaccuracy in its registrations. Instead, U.S. Merchants points to testimony showing that Presto understood that parts of the manual were authored by UL; but that evidence does not show that Presto decisionmakers knew that the registrations were inaccurate.

Moreover, U.S. Merchants does not explain why the inaccuracy would have been material to the Copyright Office. As explained further below, an author may have a valid copyright in original components of a work even where some of the work is authored by another. *See E.F. Johnson Co. v. Uniden Corp. of Am.*, 623 F. Supp. 1485, 1500 (D. Minn.

1985) ("The mere fact that component parts of a work are not original to the plaintiff does not preclude a determination that the combination of such component parts as a separate entity is both original and copyrightable." (citing *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 388 (5th Cir. 1984))). U.S. Merchants offers no argument on the materiality of the inaccuracy.

Accordingly, the Court finds that Presto's copyright registrations are valid, satisfying the first element of its copyright infringement claims.

## 2. Copying of Original Elements of the Work

The second element ultimately requires Presto to prove that U.S. Merchants copied original elements of its instruction manuals and packaging. *Rottlund Co. v. Pinnacle Corp.*, 452 F.3d 726, 731 (8th Cir. 2006). Copying may be established either by direct evidence or "by showing that the defendants had access to the copyrighted materials and showing that substantial similarity of ideas and expression existed between the alleged infringing materials and the copyrighted materials." *Id.*

### a. Copyrightable Elements of the Works

As an initial matter, the parties dispute whether U.S. Merchants copied *protectable* elements of Presto's works. U.S. Merchants argues that Presto's manuals and packaging contain non-original text authored by UL. Presto does not contest the fact that any text dictated by UL is not protectable. Such text is, however, confined to the "Important Safeguards" section of the manual and a small section of Presto's packaging.

U.S. Merchants further argues that the remaining text of the manual, though not dictated by UL, articulates facts that can only be expressed in a limited number of ways.

"Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991) (citation omitted). But "the requisite level of creativity is extremely low," and "even a slight amount will suffice." *Id.* "The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be." *Id.* (citation omitted). Facts are not themselves copyrightable; but an original expression of facts may obtain protection. *Applied Innovations, Inc. v. Regents of the Univ. of Minnesota*, 876 F.2d 626, 636 (8th Cir. 1989). But "[b]ecause authors who wish to express ideas in factual works are usually confined to a 'narrow range of expression . . . , similarity of expression may have to amount to verbatim reproduction or very close paraphrasing before a factual work will be deemed infringed.'" *Id.* (quoting *Worth v. Selchow & Righter Co.*, 827 F.2d 569, 572 (9th Cir. 1987)). Moreover, under the merger doctrine, "copyright protection will be denied to even some *expressions* of ideas if the idea behind the expression is such that it can be expressed only in a very limited number of ways." *Toro Co. v. R & R Prod. Co.*, 787 F.2d 1208, 1212 (8th Cir. 1986).

U.S. Merchants is correct that much of Presto's instruction manuals amount to facts about the operation of a parabolic heater. For example, in Presto's 2016 manual Presto included directions for positioning its heater, which included: "Point the front grille towards the area in which heat is desired." (Presto 2016 Manual.) U.S. Merchants' manual contains an identical instruction. (*See* USM Manual.) But this statement is not

copyrightable because it is both an unoriginal description of a fact about heater operation and an idea capable of expression in only a limited number of ways.

Nevertheless, U.S. Merchants has not addressed the extensive verbatim copying of creative expressions of facts found within Presto's manuals. Consider the following example, also from the section on positioning the heater:

| Presto 1995 Manual | Presto 2016 Manual | U.S. Merchants Manual |
|---|---|---|
| When positioned correctly, the parabolic heater will keep you toasty warm. | When positioned correctly, the parabolic heater will keep you toasty warm. | When positioned correctly, the parabolic heater will keep you toasty warm. |

That positioning a heater correctly will keep the user warm is a non-protectable fact; the expression of that fact in the colorful terms used by Presto, by contrast, involves sufficient "creative spark," which is original "'no matter how crude, humble or obvious' it might be." *Feist Publications, Inc.*, 499 U.S. at 345 (citation omitted). It is these statements, rather than Presto's headings and bald directions on the use of a heater, which are properly subject to the infringement analysis. *See Schoolhouse, Inc. v. Anderson*, 275 F.3d 726, 730–31 (8th Cir. 2002) (holding that headings such as "Classes Offered" and "Certified Staff" were "obvious labels for these categories and therefore lack originality"); *Decorative Aides Corp. v. Staple Sewing Aides Corp.*, 497 F. Supp. 154, 157 (S.D.N.Y. 1980), *aff'd*, 657 F.2d 262 (2d Cir. 1981) (holding, on a motion for summary judgment, that similarities to plaintiff's instruction sheet could not be the basis for an infringement claim, because such similarities were "dictated by functional considerations," and the instructions could be

"expressed only in limited ways"); *Black & Decker (U.S.) Inc. v. Pro-Tech Power Inc.*, 26 F. Supp. 2d 834, 861 (E.D. Va. 1998) (finding that the diagrams in plaintiff's instruction manual were "dictated by functional considerations," and therefore insufficiently original to support a claim of copyright infringement).

Like its manuals, Presto's packaging contains non-protectable elements. In its comparison of the parties' packaging, Presto identifies several features allegedly copied by U.S. Merchants: (1) the package's "predominant red background"; (2) a picture of the product, glowing orange, on the right side of the box's front face; (3) the product name in the box's upper-left corner; (4) bullet points listing product features adjacent to the product's picture; (5) the product name, displayed in white against a dark background, on the box's left and right faces; (6) a two-by-two array of product images on the left face, which depicts the products' adjustable heat switch, cord storage, and indicator light; and (7) the statements "feels like three times the heat" and "costs a third less to operate." (Mem. in Supp. of Pl.'s Mot. for Summ. J. at 33-39.)

But "stock elements," such as "incidents, characters, or settings which are, as a practical matter indispensable, or at least standard, in the treatment of a given topic," are not copyrightable. *My Pillow, Inc. v. Ontel Prods. Corp.*, No. 19-cv-903 (JNE/HB), 2020 U.S. Dist. LEXIS 73475, at *26 (D. Minn. Apr. 3, 2020). Several of the foregoing elements appear to be stock elements utilized by competing producers of parabolic heaters. Compare:





(*See* Jobin Rep., Appx. C.) Each of these packages features a picture of the product, glowing orange, and some of them prominently feature orange-to-red color schemes. They all place trademarks at the top of the box's front face, and many anchor it in the upper-left corner. The Soleus package features a bullet-point list of product features in the same location as Presto's, although the description of those features is more succinct. In short, several components of Presto's claimed packaging copyright appear to be stock elements which cannot serve as the basis for an infringement claim.

### b.    Access

Having identified several elements of Presto's copyrighted works that do not appear to be protectable, the Court next considers whether Presto has raised a genuine factual

dispute regarding U.S. Merchants' access to the works. The access element requires Presto to show that U.S. Merchants had a "reasonable possibility" of viewing Presto's copyrighted works. *Thimbleberries, Inc. v. C & F Enterprises, Inc.*, 142 F. Supp. 2d 1132, 1139 (D. Minn. 2001). Notably, access can be established by showing that the copyrighted work and the allegedly infringing work are not only "substantially similar," but "strikingly similar." *Id.* (inferring access where two quilts were "so strikingly similar as to preclude the possibility that defendant's designer independently arrived at the same result").

U.S. Merchants does not dispute that it had access to Presto's packaging. Alfredo Bustamante, a graphic designer for U.S. Merchants, testified that he used Presto's packaging to set the layout for The Heat Machine's packaging. (Bustamante Dep. at 86-87.)

But U.S. Merchants does dispute that it had access to Presto's manuals, especially its 1995 manual. U.S. Merchants' manual was created by its overseas manufacturer. (Manske Decl. [Doc. No. 295], Ex. A, at 5; Green Dep. at 111-13.) Although U.S. Merchants reviewed the manual's layout, proofed it for typographical and formatting errors, and gave ultimate approval to print the manual, each of U.S. Merchants' witnesses testified that they had not reviewed Presto's manuals prior to this litigation. (*See* Green Dep. at 112-14; Bustamante Dep. at 126-29; Trejo Dep. at 41-43, 51.)

However, U.S. Merchants' manufacturer clearly had access to a physical sample of the HeatDish, and it is undisputed that Presto includes a copy of its manual with each HeatDish. (*See, e.g.*, Smith Decl. [Doc. No. 301], Ex. 28 (May 2017 email from U.S. Merchants' manufacturer to Green, stating: "Presto Sample will be in my hands over the

weekend, and Monday I am in China for 7 days between various factories to meet the Factory Engineers, with Presto sample in hand to follow exactly same, with additional features and options . . . .").) Although this evidence does not establish that the manufacturer had access to the 1995 manual, access to the older manual can be inferred from the verbatim copying of that manual.[30] *See Thimbleberries, Inc.*, 142 F. Supp. 2d at 1139.

While U.S. Merchants blames its manufacturer for any similarities between the parties' manuals, U.S. Merchants offers no support for its claim that the manufacturer's responsibility for drafting the manual absolves it of liability for copyright infringement. U.S. Merchants ultimately approved the manual for printing and distribution with The Heat Machine. (Green Dep. at 112-14.) And it was U.S. Merchants that arranged for its manufacturer to obtain a sample of the HeatDish. (*See* Artz Decl. [Doc. No. 250], Ex. 18, at 3.) Further, U.S. Merchants referenced Presto's packaging in developing its own, which supports an inference that U.S. Merchants possessed a physical copy of Presto's packaging, and hence the copy of Presto's manual that would have accompanied the packaging. (*See* Bustamante Dep. at 126-29 (testifying that Bustamante referenced Presto's packaging for layout purposes).)

---

[30] Presto made several changes in its 2016 manual, and some components of U.S. Merchants' manual mirror the text of the 1995 manual rather than the modified text published in the 2016 manual. See, for example, the headings presented in Section I.C, *supra*.

The Court finds that this evidence is sufficient to create a genuine factual dispute regarding whether U.S. Merchants had a reasonable possibility of access to Presto's manuals.

### c.      Substantial Similarity

Finally, the Court considers whether Presto has raised a genuine factual dispute regarding the substantial similarity of the parties' instruction manuals. Substantial similarity requires a two-step analysis. *Hartman v. Hallmark Cards, Inc.*, 833 F.2d 117, 120 (8th Cir. 1987). "First, an 'extrinsic' analysis is performed to determine whether the general idea of the two works is substantially similar." *Taylor Corp. v. Four Seasons Greetings LLC*, 171 F. Supp. 2d 970, 975 (D. Minn. 2001), *aff'd*, 315 F.3d 1039 (8th Cir. 2003) (citations omitted). U.S. Merchants does not appear to dispute that the parties' manuals and packaging share extrinsic similarities. Both manuals convey safety and operational instructions relevant to parabolic heaters; both packages serve to display the product and promote its features. Instead, the parties' dispute focuses on the second stage of the analysis.

Once extrinsic similarity is found, "the court must then perform an 'intrinsic' analysis to determine whether there is similarity of expression. The intrinsic test is a subjective test, where the court examines the two works 'to ascertain if they are so dissimilar that ordinary, reasonable minds [can]not differ as to the absence of substantial similarity in expression.'" *Id.* (internal quotation marks and citations omitted) (alteration in original). The "critical question" is "whether the accused work has captured the 'total concept and feel' of the copyrighted work." *Id.* at 976 (citation omitted). Summary

judgment on the intrinsic test is appropriate if "reasonable minds could not differ as to the absence of substantial similarity in expression." *Hoch v. MasterCard Int'l Inc.*, 284 F. Supp. 2d 1217, 1222 (D. Minn. 2003) (quoting *Litchfield v. Spielberg*, 736 F.2d 1352, 1355–56 (9th Cir. 1984)).

The Court finds that Presto has raised a genuine factual dispute regarding the substantial similarity between its manuals and U.S. Merchants' manuals. U.S. Merchants' manual mirrors Presto's in structure, *see supra* Section I.C, and contains numerous verbatim duplications of protectable text, including:

| Presto 1995 Manual | Presto 2016 Manual | U.S. Merchants Manual |
| --- | --- | --- |
| The parabolic reflector focuses heat output, like a satellite dish concentrates TV signals, so it requires less energy than convection electric heaters to deliver all the warmth you'll want. | The parabolic reflector focuses heat output, like a satellite dish concentrates TV signals, so it requires less energy than convection electric heaters to deliver all the warmth you'll want. | The parabolic reflector focuses heat output, like a satellite dish concentrates TV signals, so it requires less energy than convection electric heaters to deliver all the warmth you will want. |
| When positioned correctly, the parabolic heater will keep you toasty warm. | When positioned correctly, the parabolic heater will keep you toasty warm. | When positioned correctly, the parabolic heater will keep you toasty warm. |
| [Explaining that the heater should be placed between 3 and 10 feet from the user.] Placing it closer will turn the heater into a foot warmer, rather than a body warmer. Experiment with various positions until you find the one that is right for you. | [Explaining that the heater should be placed between 3 and 10 feet from the user.] Placing it closer will turn the heater into a foot warmer, rather than a body warmer. Experiment with various positions until you find the one that is right for you. | [Explaining that the heater should be placed between 3 and 10 feet from the user.] Placing it closer will turn the heater into a foot warmer, rather than a body warmer. Experiment with various positions until you find the one that is right for you. |
| Remember that this unit is primarily a people heater rather than a room heater, and using it to heat a room is not recommended. | Remember, this unit is primarily a people heater rather than a room heater and using it to heat a large room or open area is not recommended. | Remember, this unit is primarily a people heater rather than a room heater, and using it to heat a room is not recommended. |
| [Explaining how to clean dust from the grille:] move the cloth | [Explaining how to clean dust from the grille:] move the cloth | [Explaining how to clean dust from the grille:] Move the cloth |

| Presto 1995 Manual | Presto 2016 Manual | U.S. Merchants Manual |
|---|---|---|
| over the surface of the parabolic reflector by inserting a long thin handle (such as a dowel or the handle portion of a wooden spoon) through the grille, using it to push the cloth from spot to spot | over the surface of the parabolic reflector by inserting a long thin handle (such as a dowel or the handle portion of a wooden spoon) through the grille, using it to slide the cloth from spot to spot over the surface of the reflector | over the surface of the parabolic reflector by inserting a long thin handle (such as a dowel or the handle portion of a wooden spoon) through the grille, using it to slide the cloth from spot to spot over the surface of the reflector |

Although U.S. Merchants generally argues that Presto's manuals contain factual information that can only be expressed in limited ways, U.S. Merchants offers no explanation for why it was necessary to include the highlighted turns-of-phrase above.[31] As explained previously, Presto's choice of language is sufficiently creative to trigger copyright protection. Because Presto has shown verbatim copying of protectable elements of its work, the Court finds that it has raised a genuine factual dispute barring summary judgment for U.S. Merchants.

Nonetheless, this is a factually intensive inquiry and Presto's evidence is not so conclusive that summary judgment for Presto is warranted. "Infringement of expression occurs only when the total concept and feel of the works in question are substantially similar." *Hartman*, 833 F.2d at 120–21. Although Presto has demonstrated verbatim copying of certain protectable elements of its works, whether the *total* concept and feel of the works are substantially similar is for the factfinder to determine.

---

[31] U.S. Merchants' expert, likewise, does not opine on the necessity of including Presto's colorful language. (*See* Jobin Rep. at 100-02.)

With respect to Presto's packaging, however, Presto's evidence of substantial similarity is significantly weaker. Although the layout of the parties' packaging is similar, the execution of that layout differs substantially:

| The HeatDish | The Heat Machine |
|---|---|



| The HeatDish | The Heat Machine |
|:---:|:---:|
|  | |

Again, Presto asserts several points of similarity: (1) the package's "predominant red background"; (2) a picture of the product, glowing orange, on the right side of the box's front face; (3) the product name in the box's upper-left corner; (4) bullet points listing product features adjacent to the product's picture; (5) the product name, displayed in white against a dark background, on the boxes' left and right faces; (6) a two-by-two array of product images on the left face, which depicts the products' adjustable heat switch, cord storage, and indicator light; and (7) the statements "feels like three times the heat" and "costs a third less to operate." (Mem. in Supp. of Pl.'s Mot. for Summ. J. at 33-39.)

But Presto's "predominant" background color is white, not red. And U.S. Merchants' packaging features a black-and-red color scheme, rather than Presto's white-

and-red scheme. As noted previously, a picture of the product, glowing orange, is standard fare—as is placing the product's trademark in the upper-left corner. Insofar as Presto asserts that similarity exists because both products' trademarks begin with the word "heat," this similarity cannot serve as a basis for copyright infringement for the same reasons it cannot serve as the basis for trademark infringement. *See supra* Section II.C.2. Although both packages feature a bullet-point list of features on the front face, placing a list of product features next to the product picture is common. And, notably, the packages list different product features; U.S. Merchants' list actually uses bullet points, unlike Presto's; U.S. Merchants' text is red, compared to what appears to be black text on Presto's box; and U.S. Merchants' text is aligned at the left margin, while Presto's is aligned on-center.

Moreover, Presto's claim that the products are similar because they display their trademark in white text against a "dark" background is not sufficient. Although both parties utilize a white trademark, Presto's red box cannot be described as "dark" vis-à-vis U.S. Merchants' black background. Although both packages include a two-by-two array of photographs on the left face, Presto's left face also includes significant text, whereas U.S. Merchants' left face contains barely two-dozen words. Finally, Presto does not explain how the puffery statements "feels like three times the heat" and "costs a third less to operate" are copyrightable. Given these significant differences, the Court finds that the parties' packages are not substantially similar as a matter of law.

### 3. Conclusion

In sum, the Court finds that Presto has raised a genuine factual dispute on each element of its instruction manual copyright claim, and therefore denies U.S. Merchants'

Motion for Summary Judgment with respect to that claim. However, genuine factual disputes also preclude summary judgment in Presto's favor, and the Court therefore denies Presto's Motion for Partial Summary Judgment. Finally, the Court finds that no reasonable factfinder could conclude that the parties' packages are substantially similar, and therefore grants U.S. Merchants' motion with respect to Presto's packaging copyright claim.

### E.     False Designation of Origin

The Court next turns to Presto's false designation of origin claim. In their memoranda, the parties appear to treat this claim as equivalent to Presto's trade dress and trademark infringement claims. But as originally pleaded, the claim was premised on a sales receipt Presto obtained from Costco, which labeled The Heat Machine as a "HeatDish." (*See* Compl. at Count V.) It is unclear whether Presto persists with this claim. Regardless, Presto has not presented any evidence that U.S. Merchants caused Costco to misidentify The Heat Machine on its receipts. The Court therefore grants U.S. Merchants' Motion for Summary Judgment as to Count V.

### F.     Tortious Interference with Prospective Business Relations

Next, the Court turns to Presto's claim that U.S. Merchants tortiously interfered with Presto's relationship with Costco. To succeed on a claim for tortious interference with prospective business relations under Minnesota law, a plaintiff must show:

1) The existence of a reasonable expectation of economic advantage;

2) Defendant's knowledge of that expectation of economic advantage;

3) That defendant intentionally interfered with plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation;

4) That in the absence of the wrongful act of defendant, it is reasonably probable that plaintiff would have realized his economic advantage or benefit; and

5) That plaintiff sustained damages.

*Fagen, Inc. v. Exergy Dev. Grp. of Idaho, L.L.C.*, No. CV 12-2703 (JRT/SER), 2016 WL 5660418, at *11 (D. Minn. Sept. 29, 2016) (citing *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014)).

The Court finds that Presto has raised a genuine factual dispute as to the first element. U.S. Merchants argues that Presto did not have a reasonable expectation of obtaining a contract to supply Costco's Arizona warehouses and business centers for the 2018-2019 heater season because Costco chose not to purchase from Presto for certain test markets prior to approaching U.S. Merchants. U.S. Merchants relies on an email exchange between Costco's Lester Cox and Presto's Maryjo Cohen, in which Cox requested a change to the parties' 2017/2018 contract that would permit Costco "to test a competing Heat Dish in not more than 10 warehouses. These 10 warehouses will not stock the Presto HeatDish." (Manske Decl. [Doc. No. 259], Ex. P.) Cohen responded by attempting to persuade Cox that testing alternative products was not necessary, and the cited email exchange ends with the parties agreeing to meet to discuss the 2017/2018 contract. (*See id.*) Testifying for Costco, Cox stated that "National Presto . . . wouldn't allow us to test products and so we started looking for other options." (Costco Dep. at 40.) U.S. Merchants has not identified any evidence in the record addressing whether Costco indeed purchased Presto's HeatDish for the proposed test market during the 2017-2018 season, suggesting that Presto never acquiesced to Costco's demand. In light of Presto's thirty-year history as Costco's

exclusive supplier of parabolic heaters, the evidence that Costco unsuccessfully attempted to convince Presto to permit Costco to carry an alternative product in certain test markets does not mean that Presto did not have a reasonable expectation that Costco would purchase Presto heaters for the Arizona market in the 2018-2019 season.

As for the second element, U.S. Merchants passingly asserts that "Presto presents no evidence that U.S. Merchants was aware of" Presto's expectation. (Mem. in Supp. of Def.'s Mot. for Summ. J. at 52.) The record suggests otherwise. The evidence suggests that by the time U.S. Merchants chose to develop a heater for Costco, U.S. Merchants was aware of Presto's longstanding and profitable relationship with Costco. (*See* Smith Decl. [Doc. No. 306], Ex. 53, at 18 (May 2017 email from Jeff Green stating: "Here is a very large opportunity if we are able to do this. . . . We could possibly replace Presto completely if we can accomplish this. It would be a multi million [sic] dollar yearly business." (all caps omitted)).) From that evidence, a reasonable factfinder could conclude that U.S. Merchants was aware of Presto's expectation of continued contracts with Costco.

The third element requires that the alleged tortfeasor's interference be "independently tortious or in violation of a state or federal statute or regulation." *Fagen, Inc.*, 2016 WL 5660418, at *12. As explained above, Presto has raised a genuine factual dispute concerning U.S. Merchants' infringement of Presto's product trade dress. Trade dress infringement, if proven, would constitute an independent violation of federal law. Accordingly, Presto has raised a genuine factual dispute on this element.

On the fourth element, for the same reasons that Presto has presented sufficient evidence regarding its reasonable expectation of supplying Costco's Arizona market during

the 2018-2019 season, Presto has raised a genuine factual dispute regarding the likelihood that it would have attained those sales absent U.S. Merchants' alleged interference.

Finally, U.S. Merchants argues that Presto was not harmed. But Presto has presented evidence that it would have gained additional HeatDish sales in the Arizona market had U.S. Merchants not displaced Presto as Costco's supplier during the 2018-2019 season. Therefore, Presto has raised a genuine factual dispute on the damages element of its tortious interference claim.

Because the Court finds that Presto has raised genuine disputes of material fact on each of the elements of tortious interference with prospective business relations, the Court denies U.S. Merchants' Motion for Summary Judgment as to this claim.

### G. Unfair Competition and Trade Practices Claims

Insofar as Presto's state law unfair competition and trade practices claims are premised on Presto's product trade dress claim and instruction manual copyright claims, the Court denies U.S. Merchants' Motion for Summary Judgment as to Counts IX, X, and XI. Insofar as these claims are premised on Presto's packaging and point-of-sale display trade dress claims, trademark claim, or packaging copyright claim, the Court grants U.S. Merchants' motion. (*See* Mem. in Opp'n to Def.'s Mot. for Summ. J. at 63 (implicitly acknowledging that Counts IX, X, and XI depend on Presto's trade dress, trademark, and copyright infringement claims).)

Presto also asserts a false advertising claim under the Lanham Act, premised on U.S. Merchants' statement that The Heat Machine "feels like three times the heat yet costs a third less to operate." A false or deceptive advertising claim under the Lanham Act requires

proof of: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998) (citations omitted).

Because Presto does not appear to argue that U.S. Merchants' statement was literally false, Presto must offer evidence of consumer deception. *Glob. Traffic Techs., LLC v. Emtrac Sys., Inc.*, 946 F. Supp. 2d 884, 908 (D. Minn. 2013), *aff'd sub nom. Glob. Traffic Techs. LLC v. Morgan*, 620 F. App'x 895 (Fed. Cir. 2015). Presto points to evidence that 17,968 units of The Heat Machine, containing the false statement, were sold to Costco, and argues that the fact "Costco purchased more than 17,000 units of the HEAT MACHINE evidences consumer . . . perception and behavior with respect to statements made regarding the HEAT MACHINE." (Mem. in Opp'n to Def.'s Mot. for Summ. J. at 64.) Presto also asserts that U.S. Merchants "clearly . . . understood this statement was important for consumers to include on its packaging [sic] because it copied it wholesale from Presto's packaging." (*Id.*)

The Court finds that this evidence is insufficient to raise a genuine factual dispute on the materiality of the statement to consumers' purchasing decisions. Presto presents no evidence that Costco purchased 17,968 units of The Heat Machine in reliance on the

disputed statement, rather than the myriad other reasons Costco offered for changing suppliers. (*See* Costco Dep. at 51-52.) And, crucially, Presto offers no evidence to support its claim that the disputed statement was material to end-users' purchasing decisions. *Cf. Glob. Traffic Techs., LLC*, 946 F. Supp. 2d at 907 ("Under the Lanham Act, it is typically the burden of the party seeking relief . . . to prove actual deception by using consumer or market research." (citation omitted)). Without such evidence, Presto has not raised a genuine factual dispute on an essential element of its false advertising claim. *Cf. id.* (granting summary judgment where the party claiming false advertising failed to offer any evidence of consumer deception). Accordingly, the Court grants U.S. Merchants' Motion for Summary Judgment as to Presto's false advertising claim.

## H. Injunctive Relief

U.S. Merchants also moves for summary judgment on Presto's prayer for an injunction prohibiting the sale of the 2018-2019 Heat Machine. U.S. Merchants argues that Presto's request for injunctive relief is moot because U.S. Merchants no longer sells that model, and its 2019-2020 model is not at issue in this case. But U.S. Merchants' voluntary cessation does not moot Presto's request for an injunction. *See Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 71–72 (1983) (explaining that defendants claiming mootness by voluntary cessation of alleged misconduct "face a heavy burden to establish mootness . . . because otherwise they would simply be free to 'return to [their] old ways' after the threat of a lawsuit had passed," and therefore they "must establish that 'there is no reasonable likelihood that the wrong will be repeated'" (citations omitted) (alteration in original)). Although U.S. Merchants asserts that there is no evidence it will resume selling

the 2018-2019 model, the "heavy burden" is on U.S. Merchants to establish that there is *no reasonable likelihood* it will resume selling that product. U.S. Merchants has not made such a showing. Accordingly, the Court denies U.S. Merchants' Motion for Summary Judgment as to Presto's prayer for injunctive relief.

## I.     *Daubert* Motions

Finally, the Court turns to the parties' *Daubert* motions. As the Court stated at oral argument, the parties' motions essentially request that the Court dissect the proffered experts' anticipated testimony and prohibit the experts from rendering certain opinions before the jury. Such a task is better undertaken through motions in limine prior to trial and through objections at trial. Accordingly, the Court will defer ruling on the parties' *Daubert* motions at this time.

## III.    CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment [Doc. No. 240] is **GRANTED in part** and **DENIED in part**, as follows:

    a. The Motion is **GRANTED** as to Counts II, III, IV, V, and VIII of the Complaint [Doc. No. 1]; as to Plaintiff's packaging copyright infringement claim alleged in Count VI; and as to Plaintiff's unfair competition and deceptive trade practices claims alleged in Counts IX, X, and XI, insofar as those claims are premised on Plaintiff's

packaging and point-of-sale display trade dress claims, trademark claim, or packaging copyright claim;

b. The Motion is **DENIED** as to Counts I and VII; as to the instruction manual copyright infringement claim alleged in Count VI; as to Plaintiff's unfair competition and deceptive trade practices claims alleged in Counts IX, X, and XI, insofar as those claims are premised on Plaintiff's product trade dress or instruction manual copyright claims; and with respect to Plaintiff's prayer for injunctive relief;

2. Plaintiff's Motion for Partial Summary Judgment [Doc. No. 244] is **DENIED**;

3. The Motions to Exclude Expert Testimony [Doc. Nos. 212, 222, 231, 261] are **DEFERRED**;

4. The parties are ordered to submit supplemental memoranda addressing whether Presto's surviving claims must be tried to a jury. Presto shall submit its memorandum by July 2, 2021, and U.S. Merchants shall submit a responsive memorandum by July 16, 2021; and

5. This case is set for trial (in the third position) on September 27, 2021 in Courtroom 7B, St. Paul Courthouse. A separate trial order will issue.

**IT IS SO ORDERED.**


Dated: June 18, 2021                                  s/Susan Richard Nelson
                                                      SUSAN RICHARD NELSON
                                                      United States District Judge