# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| National Presto Industries, Inc., | Case No. 18-cv-03321 (SRN/BRT) |
| Plaintiff, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| U.S. Merchants Financial Group, Inc. *doing business as* Greenmade, | |
| Defendant. | |

John S. Artz and Christopher Mitchell, Dickinson Wright PLLC, 350 South Main Street, Suite 300, Ann Arbor, MI 48104; Andrea L. Arndt, Franklin M. Smith, and Yafeez S. Fatabhoy, Dickinson Wright PLLC, 2600 West Big Beaver Road, Suite 300, Troy, MI 48084; and Jeffer Ali and Ariel O. Howe, Patterson Thuente Pedersen, P.A., 80 South Eighth Street, Suite 4800, Minneapolis, MN 55402, for Plaintiff.

Christopher K. Larus, William E. Manske, Ellen Levish, Emily J. Tremblay, and Jessica L. Gutierrez, Robins Kaplan LLP, 800 LaSalle Avenue, Suite 2800, Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

Plaintiff National Presto Industries, Inc. ("Plaintiff" or "Presto"), a manufacturer of household appliances, sells a parabolic electric heater under the brand name "HeatDish." For most of the last 30 years, Presto has exclusively sold the HeatDish parabolic electric heater to Costco Wholesale Corporation ("Costco"), and Costco has not offered any other parabolic electric heaters to its members.

Defendant U.S. Merchants Financial Group, Inc. ("Defendant" or "U.S. Merchants") is a company that manufactures and distributes a variety of consumer products and packaging solutions to retailers. At Costco's request, U.S. Merchants developed a parabolic electric heater under the brand name "The Heat Machine." U.S. Merchants developed this product under its "Greenmade" trademark, which is clearly displayed on the base of The Heat Machine. Costco purchased The Heat Machine from U.S. Merchants and sold it during the 2018-2019 heater season at certain Costo locations in Arizona on a trial basis.

In March 2018, Presto filed this lawsuit, asserting federal and state law claims against U.S. Merchants for trade dress infringement under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), common law claims for tortious interference with prospective business relations and unfair competition, and state law claims for unlawful trade practices and deceptive trade practices under the Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.44 ("MDTPA") and the Minnesota Unlawful Trade Practices Act, Minn. Stat. § 325D.13 ("MUTPA"), for which it seeks damages, injunctive relief, and an award of attorneys' fees and costs.

To succeed on a claim for unregistered trade dress infringement under the Lanham Act, a plaintiff must demonstrate, by a preponderance of the evidence, that the claimed trade dress is distinctive or has secondary meaning and is nonfunctional, and that its imitation would likely cause confusion for consumers as to the source of the product. *Gateway, Inc. v. Companion Prods.*, 384 F.3d 503, 507 (8th Cir. 2004).

Under Minnesota common law, Presto asserts a claim for tortious interference with prospective business relations.  (Compl. ¶¶ 116-121 (Count 7).)  To succeed on such a claim, a plaintiff must show that a reasonable expectation of economic advantage existed, which the defendant knew about, and that the defendant intentionally interfered with that relationship by committing some other tortious or illegal act that prevented plaintiff from realizing that economic advantage, resulting in damage to plaintiff.  *Fagen, Inc. v. Exergy Dev. Grp. of Idaho, L.L.C.*, Civ. No. 12-2703 (JRT/SER), 2016 WL 5660418, at *11 (D. Minn. Sept. 29, 2016) (citing *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014)).

Presto also asserts a claim for unfair competition under Minnesota common law, arguing that U.S. Merchants' infringing use of the HeatDish's trade dress causes a likelihood of confusion as to the origin of The Heat Machine.  (Compl. ¶¶ 132-39 (Count 9).)  Likewise, Presto asserts a state law claim under the MDTPA, based on U.S. Merchants' allegedly willful deceptive trade practice of intentionally copying the HeatDish's trade dress.  (*Id.* ¶¶ 140-48 (Counts 10).)  Lastly, Presto asserts a claim under the MUTPA, alleging that The Heat Machine confuses the ordinary consumer as to its origin.  (*Id.* ¶¶ 149-61 (Count 11).)  These state law claims are subject to the same requirements as the Lanham Act claim for trade dress infringement, which require a plaintiff to prove, by a preponderance of the evidence, the likelihood of confusion among consumers between plaintiff's trade dress and defendant's trade dress.  *See, e.g., Lutheran Ass'n of Missionaries & Pilots, Inc. v. Lutheran Ass'n of Missionaries & Pilots, Inc.*, Civ. No. 03-6173 (PAM/RLE), 2005 WL 629605, at *4 (D. Minn. Mar. 15, 2005) (requiring a

3

showing of likelihood of confusion for a claim of Minnesota common law unfair competition); *Rainbow Play Sys., Inc. v. GroundScape Techs., LLC.*, 364 F. Supp. 2d 1026, 1039 (D. Minn. 2005) (applying Lanham Act standard to a claim under the MDTPA); *Alternative Pioneering Sys., Inc. v. Direct Innovative Prod., Inc.*, 822 F. Supp. 1437, 1441 (D. Minn. 1993) (applying the Lanham Act's substantially similar false advertising standard (i.e., that false statement must have "actually deceived or have the tendency to deceive a substantial segment of their audience") to a claim under the MUTPA); *Buetow v. A.L.S. Enterprises, Inc.*, 650 F.3d 1178, 1184 (8th Cir. 2011) (explaining that pendent claims, like a MUTPA claim, are coextensive with the federal claims in a Lanham Act trademark dispute brought by a commercial plaintiff).

This matter was tried by way of a bench trial before the undersigned judge over six days on April 21, 22, 25–28, 2022. At trial, the parties introduced over 160 exhibits and testimony from 17 witnesses. Plaintiff introduced the testimony of 12 witnesses, five of whom appeared live and seven by deposition designation.[1] Defendant introduced the testimony of six witnesses, five of whom appeared live and one by deposition designation.[2]

---

[1]   Plaintiff introduced the live testimony of the following witnesses at trial: Maryjo Cohen, David Ross (via video link), Colleen Hawkins, Lawrence Tienor, and Michael Chase. Also, Plaintiff designated, and the Court admitted, portions of the deposition testimony of Robert Calder (video), Larry Khemlani (video), Gary Ojendyk (video), Alfredo Bustamante Corona (read), Jan Tanner (video), Lester Cox (video), and Jeff Green (video).

[2]   Defendant introduced the live testimony of the following witnesses at trial: Brian Cade, Michael Jobin, Jeff Green, Carl Degan, and Michael Berge. Defendant designated, and the Court admitted, portions of the video testimony of Jeff Morgan.

Based on the evidence presented at trial, and all of the files, records, and proceedings in this matter, the Court makes the following Findings of Fact and Conclusions of Law.[3]

## FINDINGS OF FACT

**II.    FACT WITNESSES AND EVIDENCE**

**A.    The Parties**

1.    Plaintiff is a publicly traded company that manufactures and sells products in various business segments, namely, household appliances, national defense, and safety. (Tr. at 51:6-11, 154:24-155:1; *see generally* Ex. D-311.)

2.    Presto was founded in 1905 and is located in Eau Claire, Wisconsin.  (Tr. at 51:12-16).

3.    Presto's household appliance products include pressure cookers, control probes for kitchen tools, kitchen slicer/shredder devices, deep fryers, pizza ovens, and parabolic electric heaters.  (Tr. at 51:17-52:8.)  Presto sells most of its houseware appliances through brick-and-mortar establishments. (Tr. at 52:23-53:3.)  In recent years, it has sold its goods online as well.  (Tr. at 52:19-22.)

4.    Presto's parabolic electric heaters are sold under the brand name "HeatDish." (Tr. at 52:7-8.)  The HeatDish is sold to Costco and to the public on Presto's website.  (Tr. at 397:6-18).

5.    Ms. Maryjo Cohen is Presto's President and CEO, titles she has held since 1989 and 1994, respectively.  (Tr. at 50:19-23, 55:4-5.)  Ms. Cohen has also served as

---

[3]    To the extent that any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and vice versa.

Presto's Chairman of the Board since 2002. (Tr. at 55:5-8.) She has been, and continues to be, very involved in the sale of the HeatDish to Costco. (Tr. at 64:7-14.)

6. Defendant U.S. Merchants manufactures and distributes a variety of consumer products and packaging solutions to retailers throughout the United States and internationally. (Tr. at 980:7-9, 981:9-23.) For some of its products, like Ziploc bags and Windex bottles, U.S. Merchants manufactures and sells the products and their packaging. (Tr. at 981:9-19.) It also provides logistics, including transportation and warehousing services for third parties. (Tr. at 981:17-19.)

7. U.S. Merchants was founded in the early 1980s and is co-owned by Mr. Jeff Green and his wife, Marie. (Tr. at 729:12-730:8, 981:3-4.)

8. Today, U.S. Merchants operates primarily in the wholesale club channel and the mass-merchant channel, which is characterized by a self-serve shopping environment. (Tr. at 981:20-982:4.)

9. U.S. Merchants entered the wholesale club channel by selling to Costco when it was about to open its first two locations. (Tr. at 982:16-20.) Its relationship with Costco helped it to grow because it was able to grow with Costco. (Tr. at 984:14-17.)

10. Mr. Green is a named inventor on nineteen U.S. Patents. (Tr. at 985:18-24.) Among other inventions, U.S. Merchants (and Mr. Green) developed a patented packaging system that allows wholesale club retailers, such as Costco, to more effectively merchandize—or display—small, high value items in a wholesale club environment. (Tr. at 983:3-984:6.)

11.     U.S. Merchants also holds 35 federally registered trademarks, among them the "Greenmade" and "The Heat Machine" trademarks.  (Tr. at 985:25-986:11, 996:15-17.) U.S. Merchants places its Greenmade mark on several different products to foster an association with the company's reputation for quality.  (Tr. at 986:7-19.)

**B.     Presto's HeatDish**

12.     Ms. Cohen, Presto's President and CEO, testified live about the history of the HeatDish.  (Tr. at 50:17-228:21.)

**1.     History**

**a.     Presto Launches The HeatDish**

13.     In the late 1980s, Presto wanted to introduce a new, fashionable-looking product exuding the design motifs present in the 1980s, which largely featured retro-styling.  (Tr. at 60:7-13, 60:25-61:1).

14.     During a meeting of Presto's New Products Committee, the Vice President of Engineering presented an old heater that he had found in his garage as a possible new product offering.  (Tr. at 60:14-17, 61:2-20).

15.     Upon looking at this product, the younger members of the New Products Committee suggested that, instead of a retro look, a parabolic heater based on this concept could take on a "high-tech look."  (Tr. at 60:18-24, 61:16-20.)  They believed that "with some design work" they could make it "look like a satellite dish."  (Tr. at 60:18-22.)

16.     Presto introduced its first model, Model 07909, of the HeatDish brand parabolic electric heater in 1989, as shown below.  (Tr. at 67:21-23, 71:1-12; Ex. P-25.)  It was a personal heater, meaning it was intended to heat an individual person as opposed to a room.  (*See* Tr. at 222:9-11, 518:8-15.)  Ms. Cohen testified that a person must stand within six feet of the HeatDish to feel the actual warmth of the heat.  (Tr. at 222:14-23.)



(Ex. P-25.)[4]

17.     The first model of the HeatDish was sold at many stores, including Price Club, which eventually merged with Costco.  (Tr. at 57:10-11, 67:24-68:12, 90:5-7.)

---

[4]     This image is a screenshot of the HeatDish Plus, Model 07909, as shown in Exhibit P-25.

   **b.**  **Design Changes to the HeatDish Over Time**

18. Since launching the first HeatDish model in 1989, Presto has launched at least ten other models of the HeatDish parabolic electric heater.  (*See* Ex. P-25; Ex. D-41; Ex. D-122A.)[5]  Each version showcases certain design changes "[t]o keep the product fresh" and "to modernize things."  (Tr. at 72:2-11.)  Presto sold each model to Costco only for a certain number of "heater seasons," which is the period from September through the following January or February of each year.  (Tr. at 59:17-60:1, 639:20-640:4; Ex. P-25.)

19. Exhibit P-25, as shown below, identifies the HeatDish models that Presto offered from 1989 through 2018.  (Tr. at 70:4-13.)



---

[5] During trial, some of the parabolic electric heaters were presented with separate designations for the product and the packaging (i.e., "A" and "B"), while some did not make that distinction, (*compare* Ex. P-446, *with* Ex. P-454A *and* Ex. P-454B).  The Court refers to the exhibits as they were offered and received during trial.

20.     Presto's original HeatDish featured a square base, a housing with a control knob located on the top, a circular parabolic reflector, a heating element located in the center of the reflector, and a grille.  (*See* Ex. P-446, Ex. P-447, Ex. P-448.)  The grille's design was angular and thus looked rigid ("angular grille").  (*See* Ex. P-446, Ex. P-447, Ex. P-448; *see also* P-25.)

21.     In 1995, Presto introduced the HeatDish Plus Rise, Model 07904, which included components that allowed the parabolic reflector to move up and down.  (*See* Ex. P-447; Tr. at 927:7-11.)  This model looked different in several respects than the two early models, as shown below.



(Ex. P-25; Tr. at 76:10-16, 927:7-12.)[6]

---

[6]     This image is a screenshot of the HeatDish Plus Rise, Model 07904, as shown in Exhibit P-25.

22.     After two years, Presto returned to the original design of the HeatDish, introducing Model 07908.  (Tr. at 69:6-14; Ex. P-448; *see* Ex. P-25.)  This version looked similar to Model 07909 but featured a gray base and housing and a black angular grille.  (Ex. P-448; Tr. at 68:24-69:14.)

23.     Then, in 2000, Presto introduced the HeatDish Plus Footlight, Model 07903.  (Ex. P-25; Tr. at 79:10-14.)  The footlight version featured a lamp located in the center of the base.  (Ex. P-449.)  The grille design also changed from an angular design to a curved design, which created a bundt-cake shape ("Bundt cake grille").  (*Compare* Ex. P-448, *with* Ex. P-449.)  The Bundt cake grille had a white finish, as shown below.  (Ex. P-449.)



(Ex. P-25; Tr. 79:7-14.)[7]  This model was offered from 2000 until 2006.  (Tr. at 79:11-14; Ex. P-25.)

---

[7]     This image is a screenshot of the HeatDish Plus Footlight, Model 07903, as shown in Exhibit P-25.

24.     From 2006 to 2008, Presto slightly modified the HeatDish Plus Footlight by introducing Model 07912, as can be seen below.  (*See* Ex. P-25.)  Presto made changes to the aesthetic design of the product including changes to the heater's "body, base, and footlight," as well as the grille's color, while leaving the grille's shape and the parabolic reflector the same.  (Ex. P-260 at 1.)



(Ex. P-25; Tr. at 80:1-7.)[8]

25.     In 2008, Presto made additional design changes to the HeatDish Plus Footlight in Model 07914.  (Ex. P-25; Ex. P-260 at 2.)  Presto described the changes as "a

---

[8]     This image is a screenshot of the HeatDish Plus Footlight, Model 07912, as shown in Exhibit P-25.

shift in personality."  (Ex. P-260 at 2.)  The new model featured a black base, a chrome

plated grille, and a redesigned center grille cap.  (Ex. P-260 at 2.)  But "[n]o changes were

made to the grill[e] or reflector design."  (Ex. P-260 at 2.)



(Ex. P-260 at 2; Ex. P-25; Tr. at 80:15-81:7.)[9]

26.     Presto "restyle[d]" the HeatDish in 2010, as shown in Model 07917.  (Ex. P-

25; Ex. P-260 at 3.)  Presto removed the footlight and incorporated "black color trends."

(Ex. P-260 at 3.)  Again, however, "[n]o changes were made to the grill[e] or reflector

design," as can be seen below.  (Ex. P-260 at 3.)

---

[9]     This image is a screenshot of the HeatDish Plus Rise, Model 07914, as shown on
the second page of Exhibit P-260.



(Ex. P-260 at 3; Ex. P-25.)[10]

27.     In 2014, Presto began selling HeatDish Model 07922, which internal documents describe as a "dramatic shift" in the design of the HeatDish's base.  (Ex. P-25; Ex. P-260 at 4.)  The base "incorporated a more angular style with hard accents."  (Ex. P-260 at 4.)  But other features stayed the same including the grille.  (Ex. P-260 at 4.)

---

[10]     This image is a screenshot of the HeatDish Plus Rise, Model 07917, as shown on the third page of Exhibit P-260.



(Ex. P-260 at 4; Ex. P-25; Tr. at 82:11-17.)[11]

28.    In 2016, Presto began selling HeatDish Model 07924, which is the version that Costco sold during the 2016, 2017, and 2018 heater seasons.   (Ex. P-454A; Tr. at 58:14-18, 59:6-8.)  For this model, Presto identified certain design changes including a new accent plate, grille cap, and nameplate, along with changes to the base, housing, handle, and cord storage features.  (Ex. P-333.)  However, the grille and reflector stayed the same.  (Ex. P-260 at 5.)

---

[11]    This image is a screenshot of the HeatDish, Model 07922, as shown on the fourth page of Exhibit P-260.



(Ex. P-260 at 5; Ex. P-454A; Ex. P-25; Tr. at 58:14-21.)[12]

29.    In 2019, during this lawsuit, Presto undertook to revise the HeatDish to add a third concentric ring to the grille, as featured in HeatDish Model 07926.  (*See* Ex. D-41; Ex. P-54 ("Same parabolic heater as 21-981 but with extra radial wire on grill[e].")

30.    That same year, Presto also undertook to revise the HeatDish for the 2020-2021 heater season, resulting in HeatDish Model 07928.  (Tr. at 1150:22-1151:14; Ex. D-122A; *see* Ex. D-44; Ex. D-1184.)  For Model 07928, Presto's internal documents show that its objective was to create "a refreshed style parabolic heater" that "optimiz[ed]

---

[12]    This image is a screenshot of the HeatDish, Model 07924, as shown on the fifth page of Exhibit P-260.

material usage" and "minimiz[ed] packaged size to achieve a cost-neutral end product." (Ex. D-44 at 1.)

31.     Ms. Cohen testified that the overall look of the HeatDish has been consistent in all of its models.  (Tr. at 74:25-75:5.)  She also testified that, despite these refreshes, the "overall look of the product needed to remain the same."  (Tr. at 83:9-18.)  She identified the key features as "the reflector, the grille, [and] the position of the reflector vis-à-vis the base."  (Tr. at 83:17-18.)  She explained that with each refresh, Presto kept the same dish, grille, recess in the grille, and angle between the base and the grille.  (Tr. at 72:17-20.)

## 2.     Presto's Intellectual Property Strategy

32.     Because the small appliance business is highly competitive, Presto seeks patents to help protect its product designs, and it tries to obtain design patent protection whenever it can.  (Tr. at 158:7-10, 158:25-159:4.)  It is Presto's standard procedure to file design patents for its HeatDish products. (Tr. at 158:11-20.)

33.     Consistent with its general efforts to seek patent protection, Presto obtained three design patents covering certain HeatDish models.  (Ex. P-173; Ex. P-174; Ex. D-156.)  When Presto obtains a design patent, its standard practice is to mark its product packaging with the patent number.  (Tr. at 162:13-17.)

34.     Presto obtained U.S. Design Patent Number D312,684 on December 4, 1990. (Ex. P-174.)  This patent number was marked on the packaging for HeatDish Model 07908. (Ex. D-25 at 4; Ex. P-448.)

35.     Presto obtained U.S. Design Patent Number D391,355 on February 24, 1998. (Ex. D-156.)  Presto marked the packaging for HeatDish Plus Rise, Model 07904, with this patent number.  (*See* Tr. at 76:14-16, 161:15-162:17.)

36.     Presto obtained U.S. Design Patent Number D456,067 on April 23, 2002. (Ex. P-173.)  Presto marked the packaging for the HeatDish Plus Footlight, Models 07903 and 07914, with this patent number.  (Ex. P-574 at 2; Ex. P-451; *see* Tr. at 162:22-164:2.)

37.     Each of these design patents expired before Presto brought this lawsuit.  (*See* Ex. D-156; Ex. P-174; Ex. P-173; Tr. at 164:24-165:2.)

38.     Presto did not mark the packaging for its HeatDish Models 07924, 07926, and 07928 with design patent numbers.  (Ex. P-454B; Ex. D-41B; D-122B.)

39.     Presto never sought to register any trade dress in any model of its HeatDish brand parabolic electric heater.  (Tr. at 166:16-19, 170:22-171:10.)

40.     Although Presto has asserted trademark protection over some unregistered designs and terms that it uses in connection with other small appliance products—which is sometimes indicated by placing a "TM" next to the claimed design or term—it has never placed such a mark on its HeatDish design.  (Tr. at 174:18–20, 175:1-4, 178:20-179:5.)

41.     Prior to Costco buying heaters from U.S. Merchants, Presto never informed Costco that it had any trade dress rights in the HeatDish.  (Tr. at 195:22-196:1.)

### 3.    Presto's Merchandising Program

42.     When Presto first began selling the HeatDish to Price Club, it was "a disaster."  (Tr. at 84:1-3.)  Consumer sales were poor at most of Price Club's locations. (Tr. at 84:6–14.)  Price Club informed Presto that "the product was out."  (Tr. at 84:9–10.)

43.     However, Presto asked for, and was given, a second chance to improve its sales numbers at certain Price Club locations.  (Tr. at 85:23–86:4.)

44.     Presto implemented a merchandising program built around specific placement in the stores.  (Tr. at 84:21-25.)

45.     Presto's merchandising program utilizes a point-of-sale display of the HeatDish units.  (*See, e.g.*, Ex. P-497; Ex. P-556.)  This display is configured with an operational heater set atop multiple packages of the HeatDish.  (Tr. at 86:11–15.)  The operational heater is pointed downward toward passing shoppers to demonstrate the product's heat output, as shown below.  (Tr. at 86:5-87:18; Ex. P-556.)



(Ex. P-556.)

46.     The merchandising program also required placement of the HeatDish at "end caps" or along the "front fence." (Tr. at 86:16–17, 108:25.) End caps are product locations at the beginning of each side aisle that are adjacent to the main aisle. (Tr. at 86:17–18.) The front fence is located at the entrance of the store and each consumer passes products placed there while advancing toward the main aisle. (Tr. at 108:25-109:2.) These are prime locations for products to be seen by consumers. (Tr. at 109:3–4.)

47.     The purpose of placing the point-of-sale display at an end cap or along the front fence is to attract the attention of consumers by having them see the orange glowing light and feel the heat of the operating HeatDish unit as they walk past the product. (Tr. at 86:8–87:1.)

48.     For the first thirteen years, the merchandising program also included playing a video of the HeatDish at the point-of-sale display. (Tr. at 115:7–10.)

49.     Presto's merchandising program relies on field representatives and monitors to facilitate and ensure correct placement of the HeatDish and its associated point-of-sale display on end caps. (Tr. at 114:12-118:20, 119:6-120:17.)

50.     The merchandising program made the HeatDish a success at Costco. (Tr. at 203:12-22; *see also* Tr. at 123:7-10.) For example, Ms. Cohen testified that without the merchandising program the HeatDish would be a "turkey," meaning it would not sell. (Tr. at 198:20-23; Ex. P-277 at 1.)

### 4.      Presto's Advertising

51.      Presto mainly advertises the HeatDish through its packaging, but it has also advertised the product through a video played at its point-of-sale display from about 1990 through 2003.  (Tr. at 134:21-135:11.)

52.      Presto has never advertised its parabolic electric heater without prominently displaying the HeatDish and Presto trademarks.  (Tr. at 187:5-9, 190:10-14.)   The packaging for Presto's HeatDish has always prominently displayed the HeatDish and Presto trademarks in multiple locations.  (Tr. at 187:10-13.)  And the point-of-sale display prominently shows these marks.  (Tr. at 188:11-13; *see also* Ex. P-545; Ex. P. 556.)

53.      Presto's HeatDish has also been featured in an advertisement by the Sleep Number Company, in car advertisements in San Diego, on a television show, and in a movie.  (Tr. at 136:5-137:5.)  Presto did not pay for these advertisements.  (Tr. at 140:17-141:20.)

54.      Ms. Cohen testified that Presto has never used the specific term "look for" in advertising the HeatDish design.  (Tr. at 182:23-183:1.)  However, she did testify that "the whole idea" of Presto's point-of-sale display is to be "sort of a '[l]ook at me' " display and that it "provides this huge image of heat."  (Tr. at 135:5-11.)

55.      Ms. Cohen also confirmed that Presto has not used any advertisement or promotional material that referred to the grille as "iconic" or having a "Bundt" shape.  (Tr. at 184:4-14.)  And she confirmed that Presto never used those terms in communications with Costco.  (Tr. at 184:8-17.)

56. Ms. Cohen further testified that the only language on its packaging or point-of-sale display referring to the HeatDish's grille highlights the grille's functional attributes, namely, that the HeatDish has a "strong steel grille" that "guards the ceramic-insulated heating element." (Tr. at 184:24-185:24; *see* Ex. P-454B, D-122B.)

**C.   Presto's Business Relationship with Costco**

**1.   Commitment Letters**

57. Presto began selling the HeatDish brand parabolic electric heater to Price Club in 1989. (Tr. at 83:23–25.) Price Club merged with Costco in 1993. (Tr. at 308:5–7.) After the merger, Presto continued to supply Costco with the HeatDish brand parabolic electric heater. (*See* Tr. at 198:24-199:2.)

58. Each heater season, Presto and Costco entered a single-season commitment letter setting the terms for the sale of the HeatDish. (Tr. at 204:13-16, 641:12-13; *see, e.g.*, Ex. P-94 (commitment letter for 2013-2014 heater season); Ex. P-516 (same for 2018-2019 heater season); Ex. P-503 (same for 2019-2020 heater season).)

59. Ms. Cohen testified that commitment letters are "highly unusual" for Costco. (Tr. at 130:3-11.) She also testified that obtaining Costco's permission to use monitors and field representatives inside Costco stores is "atypical." (Tr. at 129:4-11; *see also* Tr. at 130:14-22.) She further confirmed that getting Costco to agree to reserve end cap or front fence locations for Presto's HeatDish is "highly unusual" as well. (Tr. at 132:2-4.) While other Costco suppliers pay to obtain end cap product placement, Presto never paid for such placement. (Tr. at 497:11-19, 704:4-10.)

60.     As part of its negotiated purchase commitment with Costco, Presto demanded that individual Costco store managers be provided with instructions directing them to place the HeatDish on end cap locations.  (Tr. at 496:22-497:3; *see* Ex. P-411 at 5-7; Ex. P-45.)  It is unusual for a supplier to demand that specific direction be given to Costco store managers.  (Tr. at 702:20-703:1.)

### 2.     Costco Seeks Cost Reductions

61.     Mr. Lester Cox, Costco's 30(b)(6) representative, testified that, during the course of Costco's relationship with Presto, Costco had sought ways to reduce its costs associated with Presto.  (Tr. at 646:1-21.)  For example, Costco requested that Presto import the HeatDish directly from overseas so that Costco could save on freight and distribution costs. (Tr. at 646:3-6.)  Costco also asked that Presto stop sending its monitors to maintain the point-of-sale displays in its locations.  (Tr. at 646:12-21.)

62.     Costco made these requests because it felt that it was "being limited in [its] ability to bring a better value to the market by introducing [Costco's] supply chain synergies."  (Tr. at 721:20-23.)  As Costco explained, it had "figured out ways to accomplish services that National Presto was offering" and thus believed that it could "drive cost out of the product."  (Tr. at 698:10-13.)

63.     But Presto refused to make these changes.  (Tr. at 646:20-21, 647:4-7, 698:14-21.)  Thus, Costco felt the relationship was "one-sided."  (Tr. at 646:1-3.)

64.     Costco also was concerned about the HeatDish's sales.  (*See* Tr. at 705:8-18.)  The sales of Presto's HeatDish were down four percent during the 2016-2017 heater season.  (*See* Ex. P-277 at 2; *see also* Tr. at 705:2-11.)  Costco viewed this decrease as

"problematic" because sales were down despite the fact that Costco had opened additional locations. (Tr. at 705:8-18.)

65.     In response, Mr. Cox sent Ms. Cohen an e-mail on February 8, 2017, seeking to change certain terms of the 2017-2018 commitment letter, including making changes to the merchandising program. (Ex. P-277 at 2; Tr. at 641:19-23.) These requests were rejected by Ms. Cohen. (Ex. P-277 at 1-2.) In fact, Presto noted that it would rather stop selling to Costco than make the requested changes to the program. (*See* Tr. at 647:4-7; *see also* Ex. P-411 at 6 ("Without endcaps, I'm afraid a program with the business delivery centers does not make sense.").)

66.     Costco then began looking to replace Presto's HeatDish. (Tr. at 642:1-5.)

67.     Costco advised Presto during the spring of 2017 that it would not be purchasing the HeatDish for certain Arizona warehouse locations in the upcoming 2017-2018 heater season. (Tr. at 204:22-25; *see* Ex. P-501 at 1.) Presto was also advised that Costco may be testing a different heater product in those locations. (Tr. at 205:13-18; Ex. P-501 at 1.)

68.     Additionally, Ms. Jan Tanner, a buyer for Costco's business centers—which are Costco locations that cater to business customers—testified that Costco did not buy Presto's HeatDish for its business centers during the 2017-2018 heater season. (*See* Tr. at 458:9-19, 492:7-25, 495:20-25.)

69.     During this time, Costco continued to be concerned with the HeatDish's sales. Michelle Rado, the small electronics buyer for Costco Wholesale, e-mailed Ms. Cohen in January 2018, stating that she "still get[s] challenged by management to find a

way [to] get more from [the HeatDish] program." (Ex. P-261 at 14-15.) Ms. Rado wrote that the HeatDish's sales were showing a "down trend" and advised Ms. Cohen that Costco's purchases of the HeatDish would decrease year after year if Presto did not "try to do something new / different with the [HeatDish] program." (Ex. P-261 at 14.) Ms. Rado also noted that Presto did not pay for end cap placement, which affected Costco's margin. (Ex. P-261 at 14.) To account for the lost sales, Ms. Rado encouraged Presto to take part in a "Connection ad or some other form of marketing for the Fall 2018 program." (Ex. P-261 at 14.)

70.     Later that spring, Costco again advised Presto that it would not be purchasing the HeatDish for Arizona locations during the upcoming 2018-2019 heater season. (Tr. at 206:7-11.) Thus, Arizona was excluded from the 2018-2019 commitment letter. (Tr. at 206:17-207:8; Ex. P-516 ("Heaters will not be carried by warehouse buildings located in Arizona.").)

71.     Mr. Cox explained that the Arizona market was excluded from the 2018-2019 commitment letter because Presto was not "happy with the support they were receiving from Costco at an operation level," and Costco's "regional operations management wasn't happy with the amount of involvement National Presto had in [Costco's] warehouses." (Tr. at 707:8-708:1.)

72.     Despite these concerns, Costco has continued to purchase the HeatDish for sale in other markets. (*See* Tr. at 133:12-17, 638:5-24; Ex. P-503; Ex. P-516.)

**D.    U.S. Merchants and The Heat Machine**

**1.    U.S. Merchants' Business Relationship with Costco**

73.    U.S. Merchants has provided products and services to Costco for over 40 years.  (Tr. at 982:24-983:2.)  U.S. Merchants was one of Costco's first vendors; they started working together when Costco had only two stores.  (Tr. at 982:24-983:2.)

74.    Mr. Green testified that U.S. Merchants has a "very close association with Costco," and in many ways, it has been a sort of "one-stop shop" for Costco.  (Tr. at 984:12-25.)  U.S. Merchants has helped create opportunities for Costco to work with certain suppliers through its packaging business.  (Tr. at 984:24-985:10.)

**2.    Costco's Request to U.S. Merchants**

75.    In 2017, Costco began searching for a new supplier of a parabolic electric heater, seeking an improvement over its then-current heater offering, the HeatDish.  (Tr. at 288:5-10, 643:1-644:20, 744:9-12, 998:1-6, 1002:16-1003:1.)  Mr. Cox contacted Gary Ojendyk—a former Costco employee who was working as a manufacturer's representative for U.S. Merchants—about an opportunity for U.S. Merchants to develop an improved parabolic electric heater.  (Tr. at 279:3-24, 285:14-286:7, 644:16-20, 648:21-649:11, 998:7-10.)  Costco explained that it wanted to test the competing heater in its Arizona warehouse stores.  (Tr. at 634:24-635:4, 645:20-22.)

76.    Costco wanted an improved parabolic heater and made several requests regarding those improvements.  (*See* Tr. at 1002:21-1003:1; Ex. P-179 at 2.)  It wanted a unit that was UL approved, had high heat, and looked industrial and robust, featuring a dark color.  (Tr. at 311:2-9, 651:6-15, 1003:2-1004:11; Ex. P-179 at 2.)

### 3.     U.S. Merchants' Response

#### a.     Advice of Counsel

77.     Shortly after receiving Costco's request to develop an improved parabolic electric heater, U.S. Merchants sought the advice of its intellectual property counsel to avoid infringing any third-party intellectual property rights.  (Tr. at 1008:11-1009:7.)

78.     In addition, U.S. Merchants sought advice from its intellectual property counsel in connection with its selection of the trademark "The Heat Machine" to ensure that U.S Merchants would not be infringing any trademark rights with its product branding. (Tr. at 1016:10-14; 1017:9-16; Ex. D-155 at 1.)  U.S. Merchants' counsel did not identify any trademarks held by Presto.  (Tr. at 1017:22-24.)   Instead, counsel informed U.S. Merchants that it would likely be able to obtain a design mark for the name "The Heat Machine" if it incorporated a special logo or design with the name.  (Tr. at 1017:17-21.) U.S. Merchants ultimately registered a design mark for "The Heat Machine" trademark, and the United States Patent and Trademark Office did not identify any trademarks held by Presto during that process.  (Tr. at 1018:4-10.)

79.     In October 2017, U.S. Merchants' counsel identified one of Presto's expired design patents (U.S. Patent No. D456,067) covering parts of a previous HeatDish model. (Tr. at 1009:8-18; Ex. D-1161 at 6; Ex. D-141.)

80.     U.S. Merchants then provided photos of the initial The Heat Machine prototype, which featured the name "The Hot Flash" on the center medallion, to counsel, as shown below.  (Tr. at 1011:15-20; Ex. D-1161 at 3-6.)



(Ex. D-1161 at 5.)[13]

81.     Counsel informed U.S. Merchants that she found no U.S. design patents that would be infringed by the design of The Heat Machine prototype. (Ex. D-1161 at 3.) Counsel wrote that the market for parabolic electric heaters is "crowded," and that all of the patented heater designs that she reviewed contained "a parabolic radiator with a protective screen."  (Ex. D-1161 at 3.)  Counsel advised that "ornamental differences appear to reside in the base and the stem behind the parabolic radiator."  (Ex. D-1161 at 3.) She also explained that she did not locate any design patents that have a base and stem like

---

[13]     This image is a screenshot of the prototype on the fifth page of Exhibit D-1161.

those of the prototype.  (Ex. D-1161 at 3.)  U.S. Merchants' counsel then advised that U.S. Merchants could itself pursue design patent protection on the prototype.  (Tr. at 1013:13-17; Ex. D-1161 at 3.)

82.     Mr. Green testified that U.S. Merchants understood this advice of counsel to mean that it would not be violating anyone's patent or intellectual property rights with respect to the design of The Heat Machine.  (Tr. at 1012:18-22; 1030:2-4.)  He also testified that U.S. Merchants believed that this advice confirmed that no portion of Presto's HeatDish brand parabolic electric heaters—including Presto's parabolic reflector and grille—was covered by any existing patent.  (*See* Tr. at 1012:13-1013:17, 1030:17-1031:19; *see also* Ex. D-1161 at 3.)  He further explained that U.S. Merchants understood that counsel's focus on the base and the stem of the heater meant counsel "gave her blessing" that U.S. Merchants was not violating any intellectual property rights on the grille.  (Tr. at 1030:2-13.)  The Court finds Mr. Green's testimony credible.

83.     U.S. Merchants informed its overseas manufacturer of the advice received from its intellectual property counsel.  (Tr. at 1014:24-1015:16; Ex. D-1161 at 1-2.)  Mr. Mahesh Tanwani, U.S. Merchants' overseas contact who U.S. Merchants had done business with for many years, responded by writing that he had helped design the prototype "so as to differentiate [the product] from Presto."  (Ex. D-1161 at 1-2; *see* Tr. at 999:1-9, 1000:2-8.)

### b.     Product Development

84.     U.S. Merchants set out to "put together the best parabolic heater in the industry," (Tr. at 306:16-21).

85.     U.S. Merchants began by analyzing the specifications of various third-party heater products to "see what some of the functions and benefits of the different ones had to offer."  (Tr. at 749:4-8; *see also* Tr. at 235:11-13, 239:6-13, 289:11-290:14.)  U.S. Merchants did not identify any commercially available heater—including any version of the Presto HeatDish—that included the options that U.S. Merchants wanted to offer to Costco in a new design.  (*See* Tr. at 306:10-15.)

86.     U.S. Merchants then reached out to Mr. Tanwani for help identifying an overseas manufacturer to design and manufacture a new parabolic electric heater that would improve upon the Presto HeatDish.  (Tr. at 998:23-999:9, 1000:2-1001:2.)

87.     U.S. Merchants sent that manufacturer a sample of the HeatDish Model 07924 and forwarded a website link to the Costco information page for that model.  (Tr. at 1000:9-24; 1005:1-4; Ex. P-161.)

88.     U.S. Merchants instructed its overseas manufacturer to "come up with something that they felt, and ultimately [U.S. Merchants] would feel, was a better performing product than the current product Costco was handling on their floor at the time," namely, the Presto HeatDish.  (Tr. at 754:8-16.)

89.     U.S. Merchants presented various design options to Mr. Ojendyk and his partner, Mr. Robert Calder,[14] and they provided to Costco a "menu" of options that could be incorporated into the new design.  (Tr. at 243:9-24.)

---

[14]     Mr. Ojendyk and Mr. Calder had formed a general partnership called Nova Associates and they represent manufacturers who sell products to Costco.  (Tr. at 230:8-14, 278:21-24, 285:14-17.)

90.     On June 16, 2017, Mr. Green spoke with engineers and sent options for price reductions to Mr. Ojendyk and Mr. Calder, which they forwarded to Costco as well.  (*See* Ex. P-209 at 2-5.)

91.     Costco responded with feedback, and Mr. Green let Costco know that he would get them a sample of the unit.  (Ex. P-209 at 1-2.)  Later that June, U.S. Merchants presented a digital prototype to Costco, followed by a physical prototype.  (Tr. at 653:2-654:21; Ex. P-279.)

92.     Ultimately, Costco declined to purchase this first version of the heater.  (*See* Tr. at 654:13-16.)  Costco "didn't like the aesthetics" of the prototype and "[t]he product appeared inferior to what the goal was, which was something industrial of nature."  (Tr. at 654:18-20.)

93.     Mr. Ojendyk relayed this feedback to U.S. Merchants, outlining how certain improvements needed to be made in order for The Heat Machine to be superior to Presto's HeatDish.  (Tr. at 1019:18-1020:10; Ex. P-21 at 1-2.)  Mr. Ojendyk wrote that Costco wanted improvements relating to many aspects of the prototype like its illumination, timer, tip-over, oscillation, and base features.  (Ex. P-21 at 1-2.)

94.     Notably, Costco's suggestions mainly focused on how the prototype's features compared with Presto's HeatDish.  (Ex. P-21 at 1-2.)  For example, in relation to the tip-over feature, Costco stated that "[t]he tip over feature on the Presto unit is much more substantial than ours" and asked whether U.S. Merchants could "improve on the system Presto uses."  (Ex. P-21 at 1.)  Likewise, in relation to the grille, Costco stated that

it "believe[d] the Presto grill[e] wire is a heavier gauge than ours giving it a more substantial appearance." (Ex. P-21 at 2.)

95.    U.S. Merchants interpreted these suggestions to mean, among other things, that Costco wanted a product "that was heavier duty" and "more industrial looking," including "thicker wires" for the grille. (Tr. at 1021:21-1022:7.) U.S. Merchants sent Costco's suggestions to Mr. Tanwani so that he could pass them along to the manufacturer to determine how to address the concerns. (Tr. at 1069:5-8, 1023:4-8.)

96.    In December of 2017, U.S. Merchants communicated by e-mail with Mr. Ojendyk and Mr. Calder regarding the improvements to the prototype. (Ex. P-164; Ex. P-166.) During these communications, Mr. Green wrote that he had asked the manufacturer "to make a grill[e] the same design as Presto to see if Costco would like that design better." (Ex. P-166.)

97.    Shortly thereafter, Mr. Green communicated by e-mail with Mr. Tanwani about Costco's feedback and how to adjust the prototype. (Ex. P-597; Ex. P-194.) In one of those e-mails, Mr. Tanwani requested that Mr. Green send "the latest Presto look-alike-Grill[e]." (Ex. P-194.)

98.    Meanwhile, the manufacturer finalized a second prototype, which Mr. Tanwani and U.S. Merchants called "T2." (Tr. at 1024:23-1025:6.)

99.    Mr. Tanwani explained the changes between the first prototype and T2 in an e-mail communication to Mr. Green. (Ex. P-597 at 1-10.) Regarding the grille, Mr. Tanwani indicated that the T2 grille was "designed based on Presto's current grill[e]" and was made with the objective of making it "bulkier." (Ex. P-597 at 5, 8-10.) Mr. Tanwani

also wrote that they must confirm that Presto's "bulkier" grille design had "no UL issue." (Ex. P-597 at 10.)  The overseas manufacturer eventually made revisions to Presto's grille, so that The Heat Machine would "pass UL approval." (Ex. P-597 at 6.)  Mr. Tanwani sent a physical version of the improved T2 grille to U.S. Merchants for review. (Ex. P-597 at 1-2, 6.)

100.    U.S. Merchants eventually presented a revised second version of its parabolic electric heater to Costco in early-to-mid 2018. (*See generally* Tr. at 663:2-664:24.)  Costco directed removal of certain features (e.g., an oscillation feature) and vetoed the use of the brand name "Ziari." (Tr. at 674:1-10, 760:13-761:9.)  Costco then approved this version of The Heat Machine. (*See* Tr. at 468:23-469:3; 690:2-6.)

### 4.    The Heat Machine's Overall Appearance

101.    The Heat Machine is a parabolic electric heater and Model 1951 is the first version that was sold to Costco during the 2018-2019 heater season.[15] (Ex. P-499A; *see* Tr. at 987:4-12, 1050:3-10.)

102.    The Heat Machine has a base, electrical cord, handle, stem, grille, and control knob. (Ex. P-299A; *see* Tr. at 989:3-990:17.)

---

[15]    Model 1951 is the original The Heat Machine, which is in dispute in this case. (Tr. at 142:13-18, 1050:3-10.)  Later, U.S. Merchants manufactured a second version, The Heat Machine Model 1949, which is in evidence at Exhibit D-115A. (Tr. at 1097:18-1098:3.) The Court refers to the original version as "The Heat Machine" throughout these Findings of Facts and Conclusions of Law; any reference to the second version will be as "The Heat Machine Model 1949."

103.    The Heat Machine's base is black.  (Ex. P-499A.)  It has a silver nameplate, featuring the Greenmade trademark in silver letters, highlighted in green.  (Tr. at 992:9-14, 1031:23-1032:1; P-499A.)  The base is solid and heavy to prevent it from tipping over.  (Tr. at 989:10-11, 990:15-19.)  It also has a cord wrap for the electrical cord built into the bottom of the base.  (Tr. at 989:12-16; Ex. P-499A.)

104.    The Heat Machine's grille is connected to the parabolic reflector with visible screw fasteners.  (Ex. P-499A; Tr. at 945:24-946:7, 990:7-10.)  The screws on the outer edge of the grille allow someone to remove the grille and repair the heater if necessary.  (Tr. at 990:7-10.)  The grille also has radial wires that satisfy UL standards.  (Tr. at 990:11-14.)

105.    The Heat Machine's shroud connects the base to the parabolic reflector.  (Ex. P-499A.)  It angles the parabolic reflector at a 12-degree angle.  (Tr. at 940:8-9.)  It features a control knob and a handle.  (Ex. P-499A; Tr. at 989:7-990:3.)  The Heat Machine's control knob has three settings: off, low, and high.  (Ex. P–499A.)  The two operating settings allow the heater to stay on continuously at an even temperature.  (Tr. at 989:24-990:3.)

### 5.    Costco Purchases The Heat Machine

106.    Costco purchased The Heat Machine because it believed the product offered Costco members a better value on a comparable item.  (Tr. at 468:23-469:3, 690:2-6.)

Costco purchased The Heat Machine only for a limited test market[16] during the 2018-2019 heater season.  (Tr. at 710:9-13.)

107.  Prior to purchasing The Heat Machine, Costco's legal department determined that it did not infringe anyone else's intellectual property rights. (Tr. at 722:15-723:6.)

108.  Mr. Cox testified that there was no agreement between Costco and Presto that prohibited Costco from purchasing parabolic electric heaters from other suppliers for the 2018-2019 heater season. (Tr. at 709:6-712:25.)  He also testified that there was no unwritten agreement between Costco and Presto.  (Tr. at 709:14-23.)  Mr. Cox further testified that its purchase of The Heat Machine from U.S. Merchants did not cause Presto to lose any contracts with Costco; indeed, Presto continued to sell its parabolic electric heater to Costco during and following the 2018-2019 heater season.  (Tr. at 712:17-713:11.)

### 6.    The Heat Machine's 2018-2019 Sales

109.  U.S. Merchants sold The Heat Machine to Costco from September 12, 2018, through January 29, 2019.  (Tr. at 1032:16-1033:14; Ex. P-316; Ex. D-73.)

110.  The revenue that Costco business centers received from selling The Heat Machine in 2018-2019 was at least 37 percent higher than the revenue they received from

---

[16]    The limited test market included Arizona warehouse locations, Costco business centers, and a few California locations.  (*See* Tr. at 710:12-13, 1096:6-17, 1105:9-11.)

the Presto HeatDish during the previous year.  (Tr. at 478:14-22, 489:23-490:8; *see* Ex. P-408; Ex. P-409.)

111.   Exhibit P-316 is the complete list of orders and shipping to Costco of The Heat Machine for the 2018-2019 heater season.  (Ex. P-316 at 1-5; *see* Tr. at 745:18-22.) Exhibit P-317 is the gross margin report associated with sales of The Heat Machine for the 2018-2019 heater season.  (Ex. P-317 at 2; *see* Tr. at 746:7-747:6.)

### E.   Product Returns

#### 1.   Presto's Return Facility

112.   Presto operates a subsidiary called Canton Sales and Storage in Canton, Mississippi (the "Canton facility").  (Tr. at 344:24-345:5.)  Mr. David Ross, the former general manager of the Canton facility, testified that the Canton facility receives at least a couple hundred thousand product returns each year. (Tr. at 345:9-10, 381:12-16.)  Included in those returns were at least ten thousand defective parabolic electric heaters.  (Tr. at 381:21-382:2.)  It was common for Costco to return those products in boxes that were unrelated to the returned product.  (Tr. at 382:3-6.)  The Canton facility had also received products that Presto did not sell including television sets and hand tools.  (Tr. at 382:7-383:1.)

113.   Mr. Ross testified that, during the relevant time, Costco return center personnel directed returned parabolic electric heaters to Presto's Canton facility.  (Tr. at 346:9-13.)  These returned parabolic electric heaters included some HeatDish units returned in The Heat Machine boxes; they also included some The Heat Machine units

returned in HeatDish and other boxes.  (*See* Tr. at 346:25-347:13, 348:6-363:3; Exs. P-75A-75O.)

114.    Mr. Ross took photographs of the returns, which are depicted in Exhibits 75A through 75O.  (*See, e.g.*, Tr. at 349:7-9, 351:10-17, 352:16-17, 353:15-16, 354:13-15, 355:18-20.)  He e-mailed the photographs to Ms. Colleen Hawkins, Presto's customer service manager.  (*See, e.g.*, Tr. at 349:10-13, 351:13-20, 353:17-18, 354:16-18, 355:21-22, 391:19-20.)

115.    Ms. Hawkins testified that there were sixteen instances of returned The Heat Machine parabolic heaters to the Canton facility.  (Tr. at 405:5-10.)  She did not contact Costco to investigate who at Costco's facility directed these items to Presto or why.  (Tr. at 400:12-14, 451:6-13.)

116.    Ms. Hawkins is unfamiliar with Costco's return process or its internal process for returning parabolic electric heaters to Presto.  (Tr. at 450:2-451:13.)

### 2.    Costco's Return Policy

117.    Mr. Cox testified that when a product is returned to one of its warehouse stores, the product follows one of three routes—it is returned to the supplier, destroyed, or salvaged.  (Tr. at 715:22-716:2.)  This decision is based on supplier preference, which is programed into Costco's computer system via the product's item number.  (Tr. at 680:3-6, 716:3-7.)

118.    When a product must be returned to the supplier, the employees at Costco's warehouse will transfer the product to Costco's central return center for that region.  (Tr. at 680:13-23.)  An employee of Costco's central return center facilitates returning the

product to the correct supplier.  (Tr. at 716:8-12.)  Sometimes Costco employees make mistakes and send a returned product to the wrong supplier.  (Tr. at 716:13-717:14.)

### F.   Costco Receipts

119.    Mr. Cox confirmed that Costco issues receipts to its members.  (*See* Tr. at 682:7-8.)  He also confirmed that the receipts in Exhibit P-290 represent Costco receipts.  (Tr. at 681:22-682:8, 683:21-22.)  These receipts display an item name and an item number, among other things.  (*See* Tr. at 682:12-24.)

120.    Presto produced evidence of four Costco receipts that displayed the item name of "HeatDish" in connection with The Heat Machine's item number.  (Tr. at 682:12-24, 683:12-20; *see also* Ex. P-290.)

121.    Mr. Cox explained, as Costco's 30(b)(6) representative, that this misidentification is a Costco mistake and that no Costco member played any role in that mistake.  (Tr. at 682:25-684:5, 715:10-21.)  The Court finds this to be credible testimony.

### G.   The Lawsuit

#### 1.   The Complaint

122.    Presto filed the Complaint [Doc. No. 1] in this case on December 4, 2018.  Presto did not serve U.S. Merchants with the Complaint.  (Tr. at 1037:2-3.)  U.S. Merchants learned about the Complaint's allegations from Costco.  (Tr. at 1036:17-20.)

#### 2.   U.S. Merchants' Response

123.    After learning about the Complaint, Mr. Green wrote a letter, dated January 11, 2019, to Presto to learn what intellectual property rights Presto claimed U.S. Merchants had violated.  (Ex. D-68; Tr. at 1037:18-20, 1039:8-16.)  Mr. Green's letter invited Presto

to "provide a detailed list of the changes National Presto believes are appropriate" and relayed U.S. Merchants' assurance to "give the utmost good faith consideration to any specific changes that National Presto wishes to propose." (Ex. D-68 at 9.)

124.   Mr. Green received no answer to this letter. (Tr. at 1039:17-18.)

125.   In response to the lawsuit, Costco elected not to purchase The Heat Machine, as originally designed, from U.S. Merchants after the 2018-2019 heater season. (Tr. at 684:15-20.) Therefore, U.S. Merchants has not imported any units of The Heat Machine since December of 2018, (Tr. at 1033:15-1034:2), and it has not sold any units of The Heat Machine since January of 2019, (Tr. at 1033:12-14).

### H.   The Heat Machine Model 1949

126.   U.S. Merchants did, however, make changes to the design of its parabolic electric heater and associated packaging for the 2019-2020 heater season. (Tr. at 1039:22-24; *see* Ex. D-115A; Ex. D-115B.) U.S. Merchants made these changes even though it did not believe that it had infringed any of Presto's intellectual property rights. (Tr. at 1039:25-1040:6.) The redesigned product is The Heat Machine Model 1949. (Tr. at 1040:14-21.)

127.   The Heat Machine Model 1949 features the same protective grille as The Heat Machine. (*Compare* Ex. P-499A, *with* Ex. D-115A.)

128.   However, the two products differ in other ways. (Tr. at 1041:21-22.) For example, The Heat Machine Model 1949 features a gray base that is circular. (Ex. D-115A.) The electrical cord is stored inside the base. (Ex. D-115A.) The housing has been redesigned, with the Greenmade trademark printed at the bottom, adjacent to the base. (Ex.

D-115A.)  In addition, the control knob no longer has discrete settings; instead, it offers a range of temperatures.  (Ex. D-115A.)

129.    U.S. Merchants has sold The Heat Machine Model 1949 since the 2019-2020 heater season at both Home Depot and Costco.  (Tr. at 1041:7-17.)

130.    Presto is aware of The Heat Machine Model 1949 and purchased one from Costco in 2019.  (Tr. at 209:9-15.)

## III.    EXPERT OPINIONS

### A.    Nonfunctionality of Presto's HeatDish

131.    As the Court will address in greater detail in its Conclusions of Law, a plaintiff asserting an unregistered trade dress infringement claim must establish that the trade dress is nonfunctional.  *Gateway*, 384 F.3d at 507.

### 1.    Plaintiff's Expert, Mr. Lawrence Tienor

132.    Presto retained Mr. Lawrence Tienor as an expert on the functionality and nonfunctionality of the design aspects of Presto's HeatDish.  (Tr. at 512:18-21.)  Presto asked Mr. Tienor to review HeatDish Models 07924 and 07928, along with The Heat Machine.  (Tr. at 553:2-13.)  Presto also asked Mr. Tienor to review photographs of commercially available third-party parabolic heaters.  (Tr. at 554:16-19.)

133.    The Court finds that Mr. Tienor was well-qualified to testify as to the functionality of Presto's HeatDish.  He worked at Presto for over 40 years, retiring as the Vice President of Engineering.  (Tr. at 513:13-515:11, 541:16-542:10.)  Since his first day at Presto, he "worked with portable space heaters."  (Tr. at 515:21–22.)  And he worked on the HeatDish from implementation until he retired, making him familiar with each model's

appearance and construction.  (Tr. at 515:23-516:1, 626:2-4.)  In addition, he conducted his own research on commercially available third-party parabolic electric heaters.  (Tr. at 554:10-15.)

134.   Mr. Tienor expressed opinions on the functionality of Presto's HeatDish. (*See* Tr. at 519:2-537:18.)

135.   In framing his discussion, he explained that for a company to sell a portable heater in the United States it must have "UL approval."  (Tr. at 521:16-21.)  "UL" refers to Underwriters Laboratories, which "is an organization that develops and publishes safety standards for consumer products."  (Tr. at 521:1–3.)  UL tests consumer products, and when a product meets its safety standards, it certifies the product with its UL symbol.  (Tr. at 521:3–7.)

136.   Mr. Tienor further explained that UL 1278 is the safety standard that applies to parabolic heaters, although other UL standards apply as well.  (Tr. at 521:22-522:18.) He opined that these UL standards provide parameters on how to design a parabolic electric heater, while clarifying that they do not mandate how a parabolic heater must be designed. (*See, e.g.*, Tr. at 524:18-525:16.)  For example, Mr. Tienor explained that the grille serves a functional purpose of guarding the heating element to prevent users and other objects from touching it.  (Tr. at 520:10–15.)  This functional aspect, he explained, is governed by UL safety standards.  (Tr. at 524:24-525:6.)  These standards require that the grille be subject to certain tests including the band drape test.  (Tr. at 525:7-11, 549:3-7, 566:15-567:3.)  However, he further explained that such tests do not dictate the exact shape of the grille, its finish, or the type of wire used.  (Tr. at 526:11-18.)

137.   With the UL safety standards in mind, Mr. Tienor opined that the HeatDish is composed of basic components—the electrical cord, heating element, housing, reflector, base, and grille—that are both functional and nonfunctional.  (Tr. at 518:21-520:15.)

138.   First, he opined that the basic components are partly functional.  (Tr. at 519:2-520:25.)  The electrical cord is necessary to "get the 120-volt electricity to energize" the HeatDish.  (Tr. at 519:4.)   The heating element is functional because it "actually produces the heat."  (Tr. at 519:6–8.)   The housing, or shroud, is functional because it "enclose[s] all of the electrical components" and "support[s] the reflector assembly."  (Tr. at 519:12–14.)   The reflector "gather[s] the heat energy from the heating element" and bounces "the waves of that energy and reflect[s] it forward."  (Tr. at 520:1–4.)   The reflector's parabolic shape is necessary to reflect the energy waves forward without broadly dispersing them.  (Tr. at 520:4–8, 528:14-20.)   Lastly, as outlined above, the grille is functional because its purpose is to "enclose or cover the heating element in the center," which "protects the user" and "any objects in the environment from coming in contact with the heating element."  (Tr. at 520:10–15.)   And the grille's chrome finish is functional because it prevents rusting.  (Tr. at 525:1-6, 546:15-17.)

139.   However, he also opined that each basic component has nonfunctional features as well.  For example, he testified that the reflector "doesn't need to be a round shape."  (Tr. at 528:21–22.)   Instead, he proposed that it could be oval, square, or rectangular "as long as it has the parabolic shape to it" and that it is made of a material that reflects the heat waves.  (Tr. at 528:21–529:2.)   Yet, he agreed that a different shaped reflector "would reflect the heat energy of the heater differently."  (Tr. at 547:21–23.)

140.    Likewise, he opined that the reflector's surface finish could be of several different types so long as it "reflects the energy from the heating element." (Tr. at 529:5–9.) He cited the Comfort Zone parabolic heater as an example of a surface with an embossed finish. (Tr. at 529:19–530:9.)

141.    He also posited that the housing is nonfunctional because it could "be any shape as long as it" encloses the electrical components and supports the HeatDish. (Tr. at 530:20–24.) In fact, he testified that there are "almost an infinite number of ways the housing can be designed," (Tr. at 531:3–4), and he confirmed that the Optimus parabolic heater uses a "cradle-type housing," (Tr. at 531:21-532:13).

142.    Lastly, he testified that certain aspects of the grille are nonfunctional. (Tr. at 533:13-535:8.) He explained that the "grille can be any color," (Tr. at 534:21), because other finishes prevent rust as well, including nickel plated, copper plated, or painted, (*see* Tr. at 534:22–24). He further opined that the grille does not need to be made of wire; instead, it could be made of expanded or perforated metal. (Tr. at 535:5–8.) He cited the Holmes parabolic heater as an example of a different grille shape and color, and as one made from a different material. (Tr. at 536:11–16.) And he cited the grille of the Comfort Zone parabolic heater as having a different color and design. (Tr. at 537:3–14.)

143.    Taking the functional and nonfunctional aspects together, Mr. Tienor opined that the overall appearance of the HeatDish "is not dictated by [the] function of the components" because "there are other methods that a designer could use to design each one of those components that would look distinctively different than the Presto unit and still have an acceptable parabolic heater." (Tr. at 537:20-538:8.) He cited the various

43

third-party heaters as examples of parabolic electric heaters that have the same functional features while looking distinct from one another. (Tr. at 538:22-539:11.)

### 2. Defendant's Expert, Mr. Michael Jobin

144. U.S. Merchants presented testimony from Mr. Michael Jobin, an expert in the field of industrial design and engineering. (Tr. at 875:5-10.) Mr. Jobin took exception with Mr. Tienor's opinion that the overall appearance of the heater is not dictated by the function of the components. (*See* Tr. at 868:12-16, 886:13-14, 950:11-14.)

145. Defendants asked Mr. Jobin to examine physical specimens, images, and engineering drawings corresponding to thirteen models of Presto's HeatDish. (Tr. at 911:20-913:1; 915:3-921:3.) Mr. Jobin examined the overall appearance of these models as well as the various features Presto identifies as comprising its trade dress. (Tr. at 913:2-21.) Defendant also asked Mr. Jobin to review the case-filings, along with the expert reports of Mr. Tienor. (Tr. at 876:7-23.)

146. The Court finds that Mr. Jobin was well-qualified to offer his opinions. He holds two degrees from the University of Michigan, a Bachelor of Science in Engineering with a focus on mechanical engineering and a Bachelor of Fine Arts with a focus on industrial design. (Tr. at 870:17-21.) He is the named inventor on 25 patents, 19 of which are utility patents and six of which are design patents. (Tr. at 870:2-4.) Those patents cover an electric fan, a handheld instrument, safety eyewear, a medical device, and a custom heating system. (Tr. at 870:8-12.) He has more than 28 years of experience in product development as a designer, mechanical engineer, consultant, and entrepreneur. (*See* Tr. at 870:24-873:6, 879:11.) He has won a number of awards for products that he

has designed.  (Tr. at 873:7-16.)  Currently, he is the co-founder and director of product development at a company called "908 Devices," which manufactures portable chemical detection technologies.  (Tr. at 870:24-871:6.)

147.    Mr. Jobin also has experience with products that are similar in complexity to parabolic heaters.  (*See* Tr. at 873:17-874:18.)  Specifically, he has designed fans, heaters, and heating elements.  (Tr. at 874:2-18.)  He has also designed a forced convection heater that had a similar heating element, grille, and enclosure as those of the HeatDish.  (*See* Tr. at 874:5-10.)  He is familiar with the safety issues, materials, cost constraints, and other issues related to consumer electrical products like the HeatDish.  (*See* Tr. at 874:8-18.)

148.    When asked on cross-examination whether he was offering an opinion as to likelihood of confusion, Mr. Jobin confirmed that he was not.  (Tr. at 975:5-9.)  Similarly, when asked whether he was offering an opinion as to secondary meaning, he confirmed that he was not offering any such opinion.  (Tr. at 969:13-15.)  Mr. Jobin's testimony was solely related to the functionality and nonfunctionality of the components of the HeatDish. (Tr. at 868:9-16.)

### a.    Functionality

149.    As did Mr. Tienor, Mr. Jobin opined that the HeatDish's basic components are functional.  (*See generally* Tr. at 886:10-899:20.)  The parabolic reflector is functional because it reflects the heat rays from the heating element.  (Tr. at 886:13-887:1.)  The base is functional because it "prevent[s] the product from tipping over."  (Tr. at 894:7-9.)  The housing, or shroud, supports the parabolic dish and encloses the electrical components. (Tr. at 895:4-10.)  The recessed center provides a place to display the name badge that is

protected from damage if the heater were to be tipped over. (Tr. at 911:4-9.) The tilt of the parabolic reflector impacts where the heater can be placed in relation to the person to be heated. (Tr. at 941:14-19.) The electrical cord's length is largely determined based on concerns about the user tripping on it, and the cord wrap allows for a neat and tidy appearance. (Tr. at 942: 22-943:9.) Lastly, the grille is functional because it prevents fires and prevents users from touching the hot components, (Tr. at 902:9-12), and its chrome finish prevents rusting, (Tr. at 901:3-12).

150.    In addition, Mr. Jobin opined that some of the HeatDish's features relate to cost. (Tr. at 907:7-14.) For instance, the radial wire used on the grille balances the trade-off between safety and cost. (Tr. at 907:7-14.) And exposing the backside of the reflector is a cost-saving measure. (Tr. at 896:16-19.)

### b.    The HeatDish's Appearance

151.    Mr. Jobin also testified that Presto's HeatDish has not incorporated a consistent design over time. (Tr. at 922:22-923:15.) He explained that certain models of the HeatDish have been adjustable either in height or angle, causing them to have different appearances. (Tr. at 924:12-925:13.) Similarly, the HeatDish models have featured various colors and shapes of the base. (Tr. at 925:14-926:10.) In addition, the housing has changed design, as shown in HeatDish Model 07904, where the housing does not connect to the base because of the adjustable height feature. (Tr. at 927:1-12.) Moreover, the grille has changed from an angular design—as seen in Models 07900, 07904, and 07908—to a curved design. (Tr. at 930:16-21, 931:3-13, 972:21-25.) And the "number of concentric rings has changed from 3 to 2 and back to 3." (Tr. at 930:23-24.) The color, graphics, and

look of the emblem plate has changed over time as well.  (Tr. at 931:19-932:13.)  Lastly, Mr. Jobin measured the grille recesses of the various models and found that there is "almost an inch difference between the earlier and the later models," which, in his opinion, is a significant change.  (Tr. at 935:2-13.)

152.    He further noted that the HeatDish has retained the same parabolic reflector and the center-located heating element across the various models.  (Tr. at 922:25-923:7.)

### c.        The HeatDish versus The Heat Machine

153.    Mr. Jobin compared HeatDish Models 07908 and 07924 (together, the "HeatDish") to The Heat Machine.  (Tr. at 937:7-11.)

154.    He testified that the HeatDish and The Heat Machine feature bases that differ in shape, color, and logo.  (Tr. at 938:22-939:19.)  He also described differences in the housing (i.e., the angle of the reflector, the shape, and the location of the handle).  (Tr. at 939:25-941:3.)  He calculated that the HeatDish reflector is positioned at a 20-degree angle, while The Heat Machine's reflector is angled at a 12-degree angle.  (Tr. at 940:4-9.)

155.    Mr. Jobin further testified that the HeatDish and The Heat Machine have different control knobs, which make them operate differently.  (Tr. at 941:23-942:17.)  The HeatDish has an "infinite thermostat" that allows for many heating settings, while The Heat Machine has three settings: off, low, and high.  (Tr. at 941:24-942:5.)

156.    Mr. Jobin also described variations in their electrical cord wraps.  (Tr. at 942:25-943:9.)

157. Likewise, he calculated the diameter of the HeatDish's reflector to be 16 1/8 inches while the diameter of The Heat Machine's reflector was 15 3/4 inches. (Tr. at 944:13-945:5.)

158. Lastly, Mr. Jobin testified about the differences in the grilles. (Tr. at 945:16-947:18.) He explained that The Heat Machine has 56 radial wire bars while the HeatDish has only 48, which he believed made The Heat Machine appear more solid. (Tr. at 945:18-20, 976:9-12.) He also highlighted the fact that The Heat Machine attaches the grille with fasteners, while the HeatDish uses a crimping technique. (Tr. at 946:5-8.) And he calculated The Heat Machine's grille to be at least 0.23 inches deeper than the HeatDish's grille. (Tr. at 946:15-19.)

159. Mr. Jobin agreed with Mr. Tienor that the HeatDish's grille could be designed in different ways to satisfy the UL 1278 safety standard, (Tr. at 962:16-19), and he confirmed that those various designs can result in grilles with different visual appearances, (Tr. at 963:8-10). Moreover, he confirmed that the parabolic reflector could have a different surface finish, resulting in a visual appearance that is different from the HeatDish's mill finish. (Tr. at 963:17-964:11.)

**B.    U.S Merchants' 2018-2019 Profit**

**1.    Plaintiff's Expert, Mr. Michael Chase**

160. Presto presented Mr. Michael Chase, an expert in accounting and damages, to calculate U.S. Merchants' profits from selling The Heat Machine. (Tr. at 792:13-22, 795:4-6, 797:19-24.) His testimony was offered to assist the Court in its disgorgement analysis. (*See* Tr. at 792:20-22.)

161.   The Court finds that Mr. Chase is qualified as an expert in accounting and damages.  He is a certified public accountant and has worked at accounting firms since he earned his bachelor's in accounting in 1984.  (Tr. at 792:23-794:19.)  During his career, he has performed data gathering and entry, financial analysis and modeling, and profit calculations.   (Tr. at 794:25-795:3.)   The American Institute of Certified Public Accountants has accredited him in business valuation and certified him in financial forensics.  (Tr. at 795:6-10.)  In addition, he has been retained in over one hundred cases, including 25 trials.   (Tr. at 795:11-16.)   These cases have involved issues relating to intellectual property, patent, trademark, and trade dress infringement.   (Tr. at 795:16-21.)

162.   Mr. Chase relied on U.S. Merchants' sales data to conclude that U.S. Merchants sold 17,968 units of The Heat Machine to Costco during the 2018-1019 heater season.   (Tr. at 804:24-805:23; Ex. P-427B; Ex. P-427C.)   He used the same data to calculate that U.S. Merchants had revenue of $774,681 from The Heat Machine.  (Ex. P-427B.)  Similarly, he relied on U.S. Merchants' internal accounting documents to calculate $32.07 as The Heat Machine's unit cost.  (Tr. at 806:9-21; Ex. P-317.)

163.   Given these calculations, Mr. Chase's expert opinion is that U.S. Merchants' operating profit relating to The Heat Machine was $198,447.  (Tr. at 801:24-802:16.)  Mr. Chase also opined that apportionment was not necessary in this case.  (Tr. at 807:12-808:13, 809:6-11.)

164.   Notably, Mr. Chase conducted a hypothetical analysis based on The Heat Machine's lower retail price.  (Tr. at 1207:14-21.)  This analysis was meant to account for

"the influence of lower prices, combined with the opportunity for higher quantities."  (Tr. at 1207:17-19.)

165.   After accounting for lower prices, Mr. Chase calculated an operating profit of $130,245 from the alleged trade dress infringement.  (Tr. at 823:15-18; Ex. P-427D.) Mr. Chase testified that this was not a price elasticity analysis.  (Tr. at 1208:22.)

### 2.   Defendant's Expert, Mr. Carl Degen

166.   U.S. Merchants presented Mr. Degen as an economics expert to address his "assessment of disgorgement damages."  (Tr. at 1112:25-1113:1, 1114:8-13.)  Defendant asked Mr. Degen to review and comment on Mr. Chase's report and identify appropriate deductions from his profit calculation.  (Tr. at 1114:21-25.)  Mr. Degen reviewed the pleadings, nine depositions, and certain financial documents.  (Tr. at 1115:1-6.)

167.   The Court finds that Mr. Degen was well-qualified to testify as an economics expert on disgorgement damages.  He has an undergraduate degree in economics and completed the course work and exams for a Ph.D., although he never finished his thesis. (Tr. at 1113:21-24.)  He has testified in 92 depositions and in 29 trials.  (Tr. at 1114:6-7.) And he has opined on disgorgement damages relating to trade dress claims in many other cases.  (Tr. at 1114:3-5.)

168.   Mr. Degen agreed with Mr. Chase that U.S. Merchants sold 17,968 units of The Heat Machine.  (Tr. at 1116:19-21.)  He also agreed that U.S. Merchants' revenue totaled $744,681.  (Tr. at 1116:21-22.)  Consequently, he agreed with Mr. Chase's operating profit calculation of $198,447.  (Tr. at 1116:23-1117:3.)

169.    Although Mr. Degen agreed with Mr. Chase regarding this calculation, he testified that there are other factors to consider other than the alleged infringement.  (Tr. at 1119:9-13.)  The other factors include the following: (1) Costco's 2017 decision to stop selling Presto's HeatDish in its Arizona warehouse locations; (2) Costco's decision not to purchase Presto's heater; (3) the impact of selling a product at Costco; (4) U.S. Merchants' point-of-sale display; (5) U.S Merchants' longstanding relationship with Costco; (6) U.S. Merchants' "Greenmade branding and reputation for quality"; (7) U.S. Merchants' product packaging; (8) the weather; and (9) The Heat Machine's lower retail price.  (Tr. at 1120:10-1122:20.)

170.    Mr. Degen calculated how two of these factors, the lower retail price and Costco's 2017 decision to drop Presto from its Arizona warehouse locations, decreased the operating profit applicable to the alleged infringement.  (*See* Tr. at 1122:21-25.)

171.    When accounting for the lower price under a price elasticity analysis, Mr. Degen calculated the amount of operating profit from the alleged trade dress infringement to be $120,656.  (Tr. at 1118:2-17.)

172.    After adjusting U.S. Merchants' profit to account for the impact of the reduced price *and* sales made to Arizona warehouse locations, Mr. Degen calculated U.S. Merchants' profit on the sale of The Heat Machine to be $51,369.  (Tr. at 1124:23-1125:2.)  Given the other factors, Mr. Degen opined that U.S. Merchants' operating profit attributable on the sale of The Heat Machine is no more than $51,369.  (Tr. at 1125:15-1126:6; 1136:21-1137:3.)

## CONCLUSIONS OF LAW

### I.  JURISDICTION

173.   This Court has subject matter jurisdiction over Presto's Lanham Act claim for trade dress infringement under 15 U.S.C. § 1125 and 28 U.S.C. § 1331.  The Court also has pendant and supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over Presto's state law claims for tortious interference with prospective business relations, common law unfair competition, unlawful trade practices, and deceptive trade practices under Minnesota law.

### II.  TRADE DRESS INFRINGEMENT

174.   Under the Lanham Act, civil liability arises against anyone who uses the trade dress of another's product in a way that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  15 U.S.C. § 1125(a)(1)(A).

175.   Presto claims trade dress protection in the overall look of the HeatDish. (Summ. J. Order [Doc. No. 335] at 26.)  In describing its trade dress, Presto has identified the following features: (a) a heating element in the center; (b) a curved grille; (c) a recess in the center of the grille giving the grille a Bundt cake shape appearance; (d) an emblem on the center of the grille; (e) a reflective coating; and (f) a shroud extending from the base to the back of the dish such that the dish tilts upward.  (*Id.*)  And, at trial, Ms. Cohen testified that, although Presto has made certain design changes throughout the years, it has

kept constant the dish and the grille, including the big recess in the grille and the angle between the base and the grille.  (Tr. at 72:17-20, 83:16-18.)

176.   To prevail on its trade dress infringement claim, Presto must prove that its alleged trade dress is "(1) inherently distinctive or acquired distinctiveness through secondary meaning; (2) nonfunctional; and (3) its imitation would result in a likelihood of confusion in consumers' minds as to the source of the product."  *Gateway*, 384 F.3d at 507. "Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products."  *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001).  And courts in this circuit "have generally defined trade dress as the total image of a product, the overall impression created, not the individual features." *Goddard, Inc. v. Henry's Foods, Inc.*, 291 F. Supp. 2d 1021, 1040 (D. Minn. 2003) (internal quotation marks and citation omitted).

### A.    Secondary Meaning

177.   Presto's alleged trade dress is unregistered. To establish a claim for infringement of an unregistered trade dress under Section 43(a) of the Lanham Act, a plaintiff must show its product has acquired secondary meaning.  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 216 (2000).

178.   In order to establish secondary meaning, a plaintiff "must show that by long and exclusive use in the sale of the user's goods, the mark has become so associated in the public mind with such goods that the mark serves to identify the source of the goods and to distinguish them from those of others."  *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 870 (8th Cir. 1994) (citing *Co–Rect Prods., Inc. v. Marvy! Advertising Photography, Inc.*,

780 F.2d 1324, 1330 (8th Cir. 1985)).  "[T]he chief inquiry is whether in the consumer's mind the mark has become associated with a particular source."  *Co-Rect Prod., Inc.*, 780 F.2d at 1332–33.

179.  The inquiry here then is whether the trade dress, that is, the overall appearance of this parabolic electric heater, serves to identify the source of the parabolic electric heater as Presto.

180.  To address this issue, Presto could have submitted direct evidence of secondary meaning, including consumer surveys and testimony.  *See Aromatique*, 28 F.3d at 871 ("Consumer surveys and testimony of consumers . . . may be the only direct evidence of secondary meaning and should be considered.")

181.  Because Presto has not presented any consumer surveys or consumer testimony in this case, the Court must determine "whether secondary meaning can be inferred from the evidence that was presented," *id.*

182.  Courts may infer secondary meaning from circumstantial evidence.  *Frosty Treats Inc. v. Sony Computer Entertainment America Inc*., 426 F.3d 1001, 1005 (8th Cir. 2005).  Circumstantial evidence includes "evidence of deliberate copying of that mark."  *Aromatique*, 28 F.3d at 871.  Additional factors include the length of time the trade dress has been used, the plaintiff's established place in the market, advertising expenses directed toward associating the trade dress with the product's source in the minds of consumers, and whether the trade dress is exclusive.  *Frosty Treats*, 426 F.3d at 1005; *Empi, Inc. v. Iomed, Inc.*, 923 F. Supp. 1159, 1164 (D. Minn. 1996).

### 1.  Deliberate Copying

183.  Presto argues that U.S. Merchants deliberately copied the HeatDish.  (Pl.'s Proposed CoL [Doc. No. 582] ¶¶ 19-21.)  Presto points to an e-mail communication where Mr. Tanwani requested the "Presto look-alike-Grill[e]" from Mr. Green.  (Ex. P-194; *see* Pl.'s Proposed CoL ¶ 20.)  Presto also highlights an e-mail where Mr. Green wrote that he had asked his manufacturers "to make a grill[e] the same design as Presto" and "to add a metal medallion to the front of the unit like Presto had."  (Ex. P-166; *see also* Pl.'s Proposed CoL ¶ 20.)

184.  To be sure, secondary meaning may be inferred from evidence of deliberate copying of the trade dress.  *See Aromatique*, 28 F.3d at 871.

185.  However, the copying that was present here cannot support an inference of secondary meaning for a few reasons.

186.  First, the evidence makes clear that Costco requested that U.S. Merchants develop a competing product to Presto's HeatDish.  Mr. Ojendyk testified that Costco wanted an improved HeatDish.  (Tr. at 285:20-286:4, 288:5-10, 310:22-311:4.)  Likewise, Mr. Cox testified that Costco never told U.S. Merchants that it wanted "the exact same features" as the HeatDish; instead, he stated that Costco informed U.S. Merchants that they "were looking for a competing offer."  (Tr. at 649:14-19.)  And Mr. Green testified that Costco wanted an improved product for a better value.  (Tr. at 749:11-12.)

187.  Second, U.S. Merchants sought the advice of counsel to confirm its design would not infringe on Presto's intellectual property rights.  (Tr. at 1008:11-1009:7, 1014:14-18, 1030:3-4.)  Counsel advised U.S. Merchants that Presto did not have any

applicable design patents and the evidence confirms that is true.  (Tr. at 1012:11-12; *see also* Ex. D-1161 at 6 (sending one of Presto's expired patents).)   After receiving a photograph of U.S. Merchants' first prototype, counsel explained that it did not find any design patents prohibiting that type of parabolic heater.  (Ex. D-1161 at 3.)  Counsel further explained to U.S. Merchants that the parabolic electric heater market was crowded and that "ornamental differences appear to reside in the base and the stem behind the parabolic radiator."  (Ex. D-1161 at 3.)  U.S. Merchants' counsel also advised that she was unable to locate any design patents that have a base and stem like those of the prototype.  (Ex. D-1161 at 3.)  U.S. Merchants' counsel then indicated that U.S. Merchants could itself pursue design patent protection on the prototype.  (Tr. at 1013:13-17; Ex. D-1161 at 3.)

188.    U.S. Merchants understood this advice of counsel to mean that it would not be violating anyone's intellectual property rights with respect to the design of The Heat Machine parabolic electric heater.  (Tr. at 1012:18-20, 1030:2-4.)

189.    Third, U.S. Merchants expended significant time and resources researching alternative designs, discussing potential improvements, and analyzing additional features. For example, Mr. Ojendyk and Mr. Green spent time analyzing the best features available from other commercially available third-party parabolic electric heaters.  (Tr. at 307:6-308:4.)  This included analyzing Presto's HeatDish.  (Tr. at 308:3-4.)  After concluding that there was no third-party option that embodied the type of parabolic electric heater U.S. Merchants wanted to offer Costco, U.S. Merchants instructed its manufacturer to come up with "a better performing product" than the HeatDish.  (Tr. at 306:10-15, 754:8-16.)  U.S. Merchants spent considerable time speaking with Costco about their preferences.  (*See,*

*e.g.*, Ex. P-209; Ex. P-279; Ex. P-21; Tr. at 649:4-5, 653:13-654:20, 1019:18-1020:10.)

U.S. Merchants incurred costs when it manufactured prototypes for Costco's review. (*See* Tr. at 653:19-654:12, 1024:23-1025:4; Ex. P-209; P-597.)  Notably, U.S. Merchants' final prototype included an oscillation feature and used the brand name Ziari, both of which Costco rejected. (Tr. at 674:1-675:1, 760:13-761:9, 786:5-787:21.)

190.    Fourth, when U.S. Merchants learned about the lawsuit, Mr. Green sent a letter to Presto asking whether any specific changes could be made to the heater to avoid litigation.  (Ex. D-68; Tr. at 1037:18-1039:16.)  Mr. Green invited Presto to "provide a detailed list of the changes National Presto believes are appropriate" and relayed U.S. Merchants' assurance to "give the utmost good faith consideration to any specific changes that National Presto wishes to propose."  (Ex. D-68 at 9.)  Presto never responded to this letter.  (Tr. at 1039:17-18.)

191.    Fifth, U.S. Merchants stopped selling the allegedly infringing product.  In an effort to "resolve the issue," U.S. Merchants developed The Heat Machine Model 1949. (Tr. at 1039:22-24, 1040:14-21.)  Although The Heat Machine Model 1949 features the same protective grille, (*Compare* Ex. P-499A, *with* Ex. D-115A), it is different in other ways.  Specifically, it has a gray and circular base inside of which is stored the electrical cord.  (Ex. D-115A.)  The Greenmade trademark is printed on the housing, near the base, and is no longer on a nameplate.  (Ex. D-115A.)  In addition, the control knob no longer has discrete settings; instead, it offers a range of temperatures.  (Ex. D-115A.)

192.    Lastly, U.S. Merchants consistently and clearly labeled its product with its Greenmade trademark.  (Ex. P-499A; Ex. D-115A.)  The Court found at summary

judgment that U.S. Merchants' Greenmade trademark is dissimilar to Presto's trademark as a matter of law. (Summ. J. Order at 32 n.16.)   Here, the Greenmade trademark is prominently displayed on three sides of The Heat Machine's packaging and on its base. (Ex. P-499A; Ex. P-499B; Ex. D-115A; Ex. D-115B.)   In the same way, the Presto trademark is prominently displayed on its packaging and base.  (Ex. P-454A; E. P-454B.) Such conspicuous placement is evidence that U.S. Merchants sought to distinguish its product from Presto's HeatDish.  *See Aromatique*, 28 F.3d at 871 (finding no secondary meaning, despite intentional copying, "[b]ecause of Gold Seal's conspicuous use of its own trademarks"); *see also Venn v. Goedert*, 319 F.2d 812, 816 (8th Cir. 1963) (finding no trade dress infringement under Minnesota's common law of unfair competition in part because the accused infringer had prominently labeled its products); *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1134 (Fed. Cir. 1993) (holding that defendant's trade dress was not likely to be confused with that of plaintiff in part because of conspicuous placement of defendant's identifying marks on the accused trade dress).  Because U.S. Merchants has conspicuously placed its Greenmade trademark on The Heat Machine, the court will not infer secondary meaning based on deliberate copying.  *See MSP Corp. v. Westech Instruments, Inc.*, 500 F. Supp. 2d 1198, 1214 (D. Minn. 2007) (finding that the deliberate copying did not support an inference of secondary meaning, at the preliminary injunction stage, where defendant offered evidence that it planned to conspicuously display its own mark on the product).

193.    In urging a different result, Presto contends that the Greenmade trademark is not conspicuously placed on The Heat Machine and thus cannot negate U.S. Merchants'

deliberate copying, citing *Moline Plow Company v. Omaha Iron Store Company*, 235 F. 519 (8th Cir. 1916).  (Pl.'s Proposed CoL ¶¶ 25-27.)  But *Moline Plow* does not lead to a different result here.

194.    In *Moline Plow*, the Eighth Circuit held that defendant's placement of "Made by Star Mfg. Co." was inconspicuous because it was written in a small font below a phrase that was in large font and that included the word "Moline," which is part of the name of plaintiff's company.  235 F. at 524.  As such, the court held that this "leaves little doubt that these marks must create confusion."  *Id.*

195.    However, these facts are very different:  the Greenmade trademark stands alone on the base and is surrounded by a vibrant green color.  (Ex. P-499A.)  Also, when sold in Costco locations, the point-of-sale display prominently showcases various packages that also display the Greenmade trademark.  (Ex. P-499B; Ex. P-288.)

196.    Presto argues, nonetheless, that the deliberate copying is egregious here, citing to the similarity in the overall appearance of the HeatDish and The Heat Machine, as seen below.

 

(Ex. P-40; Ex. D-41.)[17]  The Court agrees that the products look somewhat similar.

197.    Even if there was deliberate copying (the evidence only suggests that the grille may have been copied), "[w]here there is a demand for a type of product, capitalizing on that demand by copying that product does not necessarily indicate that the original product has secondary meaning," *Aromatique*, 28 F.3d at 871.

198.    In this case, the demand for a grille that looked similar to Presto's grille came from Costco.  (Tr. at 1097:11-17; *see* Ex. P-21 at 2-3.)  U.S. Merchants confirmed that it received feedback from Costco that it did not like the first prototype's grille and therefore

---

[17]    The image of the HeatDish is a screenshot from the first page of Exhibit D-41.  The image of The Heat Machine is a screenshot from the first page of Exhibit P-40.

"addressed that by providing a Presto look-alike grille that Costco approved."  (Tr. at 1097:11-17.)

199.    Nor has Presto produced evidence that U.S. Merchants intended to pass off The Heat Machine as a Presto product.  *See Aromatique*, 28 F.3d at 871 (finding that deliberate copying did not support inference of secondary meaning where the evidence established that defendant sought to distinguish its product from plaintiff's product); *see also Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 663 (7th Cir. 1995) ("Copying is only evidence of secondary meaning if the defendant's intent in copying is to confuse consumers and pass off his product as the plaintiff's."); *Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 45 (1st Cir. 2001) ("[T]he relevant intent is not just the intent to copy, but to 'pass off' one's goods as those of another.")

200.    For these reasons, the Court finds that even if there was deliberate copying of the grille here, that fact does not support a finding of secondary meaning.

## 2.    Exclusive and Continuous Use

201.    Most courts agree that "exclusive" and "continuous" use is "circumstantial evidence that secondary meaning has attached to the Plaintiff's trade dress."  *Remcraft Lighting Prod., Inc. v. Maxim Lighting, Inc.*, 706 F. Supp. 855, 858 (S.D. Fla. 1989); *see also Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 789-90 (8th Cir. 1995) ("[L]ength and exclusivity of continuous use is a factor bearing on secondary meaning.").  Although Presto argues that it has exclusively and continuously used the same trade dress since 1989, the evidence at trial does not fully support that claim.

202.    As the Court found at summary judgment, "many of the elements of Presto's claimed trade dress appear to be standard fare." (Summ. J. Order at 32.) The evidence at trial confirmed that many of Presto's competitors have adopted substantially similar components for their heaters. Parabolic electric heaters feature a set of core elements including a base, housing, parabolic reflector, heating element, and grille. (*See, e.g.*, Ex. P-67 (Comfort Zone); Ex. P-201A (Comfort Zone); Ex. P-201B (Holmes); Ex. P-563 (Oscillating Parabolic Heater); Ex. D-117 (Optimus); Ex. D-126A (Konwin); Ex. D-1200 (Duraflame).)

203.    At trial, Presto maintained that it exclusively and continuously used its Bundt cake grille design in its parabolic electric heaters.

204.    As to exclusivity, however, U.S. Merchants presented evidence of the Konwin parabolic electric heater. (Ex. D-126A.) The Konwin heater was purchased online on or about December 9, 2021. (Tr. at 862:16-19, 865:5-9.) The grille of the Konwin parabolic electric heater looks very similar to the HeatDish's Bundt cake grille. (*Compare* Ex. D-126A, *with* Ex. P-454A.) Specifically, it features a curved grille made with bars arranged radially around the heating element, together with two concentric circles and a recessed center. (Ex. D-126A.) This is evidence of a similar grille in the market in December of 2021. (*See* Tr. at 885:7-18.)

205.    As to continuous use, the evidence shows that Presto has changed the design of its grille since 1989.

206.    First, the evidence showed that the shape of Presto's grille has changed over time. From 1989 until 2000, the grille was angular. (*See* Ex. P-25; Ex. P-446; Ex. P-447;

Ex. P-448.)  This angular shape looks distinctly different than the curved Bundt cake shape. (*Compare* Ex. P-446, *with* P-454A.)

207.    Second, the various HeatDish models have featured different finishes over the years, including black, white, gold, and chrome.  (Ex. P-446 (black); Ex. P-447 (black); Ex. P-448 (black); Ex. P-449 (white); Ex. P-450 (gold); Ex. P-451 (black); Ex. P-452 (chrome); Ex. P-453 (chrome); Ex. P-454A (chrome); Ex. D-41 (chrome); Ex. D-122A (black).)

208.    Third, the HeatDish models have oscillated between featuring two concentric circles versus three concentric circles.  (Ex. P-446 (three); Ex. P-447 (three); Ex. P-448 (three); Ex. P-449 (two); Ex. P-450 (two); Ex. P-451 (two); Ex. P-452 (two); Ex. P-453 (two); Ex. P-454A (two); Ex. D-41 (three); Ex. D-122A (three).)

209.    Taken together, the evidence demonstrates that Presto has exclusively used the Bundt cake grille with two concentric circles and a chrome finish only from 2010 through 2018.  (*See* Ex. P-25; Ex. P-260 at 3-5; Ex. P-452; Ex. P-453; Ex. P-454A.)

210.    As to Presto's continuous use of the other features of the HeatDish, the evidence demonstrates that Presto has changed those features over the years.  (*See generally* Ex. P-25; Ex. P-260.)  Some of these changes—such as the footlight, rise, and grille finish—were quite dramatic.  (*See* Ex. P-260 at 4.)  This is further evidenced by Presto's three design patents.  (*See* Ex. D-156; Ex. P-173; Ex. P-174.)    The changes in design, as featured in these design patents, confirms that Presto has intentionally changed its design over the years.  This fact undermines Presto's argument that, in the minds of

consumers, the trade dress of the HeatDish serves to identify the source of the product and distinguish it from others.

211.    Presto reframes the argument, however, and claims what is at issue is whether the HeatDish models "convey a common commercial impression to the relevant purchasing public despite any changes in appearance," thus contending that this is a question of "tacking."  (Pl.'s Proposed CoL ¶ 51.)

212.    As explained at summary judgment, the doctrine of tacking in the trademark context applies when priority of use is disputed.  (Summ. J. Order at 34; *see, e.g.*, *Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 421-22 (2015) (discussing the doctrine of tacking where the parties disputed priority of use of the mark).)  Here, there is no dispute regarding priority of use.  And Presto does not cite any case law applying the doctrine of tacking to the secondary meaning inquiry.

213.    Moreover, Presto obtained several separate design patents for its HeatDish. (Ex. P-174; Ex. D-156; Ex. P-173.)  When Presto applied for those design patents, Presto had to demonstrate that each design was "new, original and ornamental," 35 U.S.C. § 171(a).

214.    Presto relies on *MultiCraft Imports, Inc. v. Mariposa USA, Inc.*, No. CV 16-3975-DMG (KSx), 2018 WL 3830010 (C.D. Cal. May 30, 2018), for the proposition that

old versions and new versions of a trade dress can be distinct "without a material difference." (Pl. Proposed CoL ¶ 52.[18]) However, *MultiCraft* is inapposite here.

215.   There, the Central District of California analyzed a motion to dissolve a previously issued preliminary injunction. *MultiCraft*, 2018 WL 3830010, at *1. The court explained that it can only dissolve or modify a preliminary injunction "when the moving party demonstrates new facts that make the injunction imposed untenable or inequitable." *Id.* at *5. The defendants asserted that they had recently discovered new evidence that plaintiff had committed fraud on the court by misrepresenting when it began using the infringing trade dress. *Id.* at *6. But the court disagreed, explaining that plaintiff broadly defined its trade dress in its preliminary injunction papers, which the court found to apply to all versions of plaintiff's mark, despite some minor differences between the older marks and the newer marks. *Id.* at *8. Therefore, the court found that there was no fraud. *Id.* at *9. This case addresses a completely different legal issue governed by a different legal standard.

### 3.    Advertising

216.   The next factor is whether Presto's advertising is indicative of secondary meaning. "Expenditures on advertising and promoting a trademark may be relevant to a determination of secondary meaning because the amount spent may be indicative of the extent to which the public associates that advertised mark with the source of the product

---

[18]    The Court's citation refers to paragraph 52 that is on page 57 of Plaintiff's Proposed CoL.

bearing the mark." *Aromatique, Inc.*, 28 F.3d at 872.  However, "advertising must cause the public to equate the mark with the source of the product," and "[m]ore is needed to establish the necessary consumer association than merely the self-serving testimony of the plaintiff." *Co-Rect Prods.* 780 F.2d at 1332-33.

217.  At trial, Presto introduced evidence of its (a) point-of-sale display, (b) merchandising program, (c) commercial success, (d) free end cap placement, and (e) unpaid promotions by third parties including the HeatDish's appearance in commercials, a movie, and other advertisements.  (Tr. at 84:21-87:18, 115:3-18, 136:5-141:16; Ex. P-443; Ex. P-444; Ex. P-556.)  Presto argues that this evidence clearly establishes secondary meaning.  (Pl.'s Proposed CoL ¶¶ 29-43.)

218.  To the contrary, the Court finds that this evidence does not demonstrate an association by the consuming public of the HeatDish's trade dress and its source.  *See Co-Rect Prod.*, 780 F.2d at 1332 ("[T]he advertising must cause the public to equate the mark with the source of the product.").  Put differently, it is the *effect* of advertising, not its extent that governs this Court's analysis.  *See id*.

219.  Here, the evidence does not show, and it cannot be inferred, that Presto's point-of-sale display, merchandising program, commercial success, end cap placement, or appearance in third-party promotional initiatives means that consumers have associated the HeatDish with a particular source.

220.  For example, the third-party promotional advertisements do not indicate, in anyway, that there is a connection in the minds of consumers between the trade dress and

Presto. *See Aromatique, Inc.*, 28 F.3d at 872 ("[T]he articles must in some way indicate a connection in the minds of consumers between the trade dress and Aromatique.").

221.     Furthermore, Presto has not produced evidence that its claimed trade dress is source identifying by, for example, promoting "look for" advertising.  (Tr. at 182:23-183:1.)  Instead, Presto argues that it has engaged in "look at me" advertising.  (*See* Tr. at 135:5-11).)  For example, Ms. Cohen testified that "the whole idea" of Presto's point-of-sale display is to be "sort of a '[l]ook at me' " display and that it "provides this huge image of heat."  (Tr. at 135:5-11.)  Although the Court finds Ms. Cohen's testimony credible, "[t]he desires or intentions of the creator, or even the owner, of a mark are irrelevant," *Co-Rect Prod.*, 780 F.2d at 1332.

222.     Moreover, there is no evidence of consumer perception and therefore the Court does not know whether the point-of-sale display created any sort of association between the HeatDish's trade dress and Presto among consumers.  *Cf. Goddard*, 291 F. Supp. 2d at 1048 ("[W]e are unable to assess the relevance of Freshway's advertising expense, as we have no showing that those advertisements were aimed at familiarizing the public with the identity of Freshway's products, *by virtue of its trade dress*, as opposed to some other aspect of the Plaintiff's product, or business." (emphasis added).)

223.     During trial, Presto presented evidence of the HeatDish's success and now argues that these advertising efforts have resulted in substantial sales and that those sales establish secondary meaning.  When discussing commercial success, the pivotal question is not whether the advertisements resulted in sales, but whether "the *effect*" of advertising

caused "the public to equate the [trade dress] with the source of the product."  *Co-Rect Prod.*, 780 F.2d at 1332.

224.   In this case, the evidence at trial overwhelming established that the HeatDish's commercial success flowed from Presto's merchandising program—not its trade dress.  (*See* Tr. at 198:8-23; Ex. P-277 at 1.)  Ms. Cohen explained that when Presto first sold the HeatDish to Price Club it was a "disaster," (Tr. at 84:1-3), and that the HeatDish sales did not improve until Presto implemented the merchandising program, (*see* Tr. at 203:12-22; *see also* Tr. at 123:7-10.)

225.   Thereafter, Presto understood that its merchandising program was critical to selling its heaters.  For example, Ms. Cohen e-mailed Mr. Cox in February of 2017, explaining that "without merchandising support the product sells poorly" and the heater is a "turkey."  (Ex. P-277 at 1; Tr. at 198:20-199:2.)  Likewise, Ms. Cohen e-mailed Ms. Tanner three months later arguing that without continuous end cap placement, Presto did "not believe that the units can be sold" and that "a program for this season would not make sense." (Ex. P-411 at 6.)  Furthermore, Ms. Cohen confirmed at trial that the merchandising program "is key to the success" of the HeatDish, noting that the use of "monitors and field reps" have resulted in off-the-chart sales.  (Tr. at 123:7-10, 203:12-16.)

226.   This type of evidence belies any argument that the HeatDish's commercial success flows from its alleged trade dress.  *See Aromatique, Inc.*, 28 F.3d at 873 (explaining that "sales figures alone are inadequate to establish a connection between a product and its source" because "something other than the secondary meaning of the trade dress may have been responsible for the success of the product").

227.    Courts around the country have consistently required plaintiffs to link their sales to the trade dress. *See, e.g.*, *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1148 (10th Cir. 2016) ("[S]ales volume may not be indicative of secondary meaning because it could be related to factors other than source identification." (internal quotation marks omitted)); *Cicena Ltd. v. Columbia Telecomms. Grp.*, 900 F.2d 1546, 1551 (Fed. Cir. 1990) (recognizing that "sales success is not necessarily indicative of secondary meaning, but can be attributed to many other factors," including the product's "aesthetically pleasing" appearance); *Sazerac Co., Inc. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013, 1034 (N.D. Cal. 2017), *aff'd*, 786 F. App'x 662 (9th Cir. 2019) (concluding that the plaintiff's sales were not indicative of secondary meaning because the plaintiff had "provided no evidence that its . . . sales [were] due to [its] trade dress").

228.    Lastly, Presto argues that evidence of unsolicited third-party use of the HeatDish in advertising materials demonstrates secondary meaning, citing *Board of Supervisors of LA State University v. Smack Apparel Company*, 438 F. Supp. 2d 653 (E.D. La. 2006), *aff'd sub nom*, 550 F.3d 465 (5th Cir. 2008).  (Pl.'s COL ¶¶ 40-41.)

229.    The court in *Smack Apparel*, when analyzing the evidence at the summary judgment stage, found that plaintiffs—four universities with successful football teams—had presented evidence establishing secondary meaning in their school colors.  438 F. Supp. 2d at 655, 658.  The court explained as follows:

> The court finds that plaintiffs have established secondary meaning in their particular color schemes, logos, and designs.  It is undisputed that the universities have used their color combinations for a lengthy period of time. The universities market scores of items bearing their color schemes, logos, and designs, and sales of these items exceed tens of millions of dollars.  The

universities advertise items with their school colors in almost every conceivable manner, and the record contains ample evidence that the universities' school colors have been referenced numerous times in magazines and newspapers. The universities have even used the colors to refer to themselves, *i.e.,* LSU sometimes refers to itself as the "Purple and Gold." Defendants admit that they selected the color schemes, logos, and designs for their shirts in order to refer to the universities and call them to the mind of the consumer, although defendants deny that they intended to confuse the public into thinking the universities manufactured [defendant]'s shirts.

*Id.* at 658.

230.   Here, Presto has not produced any comparable evidence. Consequently, evidence showing the HeatDish in third-party promotional initiatives is far from enough to infer secondary meaning in this case.

231.   Accordingly, the Court concludes that this factor weighs against secondary meaning.

### 4.   Market Position

232.   Presto contends that, because its parabolic heater was sold exclusively at Costco, there is a strong inference that consumers associate the trade dress with Presto. (*See* Pl.'s Proposed CoL ¶¶ 46-48.) But Presto offered no evidence to support such an inference. *Cf. Goddard*, 291 F. Supp. 2d at 1048 ("Nor has Freshway proffered any evidence that, as a result of those sales, the consumers have identified its trade dress, with their products, since no consumer surveys, nor anecdotal evidence, has been presented to that effect."). Accordingly, the Court finds that this factor weighs against a finding of secondary meaning.

5.      **Actual Confusion**

233.    "Evidence of actual confusion also is relevant to determining whether secondary meaning has been established." *Am. Ass'n for J. v. The Am. Tr. Lawyers Ass'n,* 698 F. Supp. 2d 1129, 1143 (D. Minn. 2010) (internal quotation marks and citation omitted).

234.    Presto presented evidence of sixteen returned The Heat Machine units to its Canton facility and four receipts that display The Heat Machine's Costco item number next to the HeatDish name.  (Exs. P-75A-75O; Ex. P-290.)  Presto contends that this evidence constitutes actual confusion that supports an inference of secondary meaning under the holding of *American Association*.  (Pl.'s Proposed CoL ¶¶ 52-58.[19])

235.    But the court's decision in *American Association* demonstrates why Presto has failed to meet its evidentiary burden here.  Presto attempts to analogize the sixteen returned units to consumers in *American Association* who sent membership dues to the defendant instead of plaintiff.  *See* 698 F. Supp. 2d at 1143.  But plaintiff in *American Association* presented evidence, from two consumers, explaining *why* they sent their dues to defendant instead of plaintiff, as outlined below:

> For example, one attorney who received a solicitation letter from the Association later requested a refund because "[i]n June, 2007 [he] forwarded a check . . . to The ATLA (The American Trial Lawyers Association) for membership dues.  [He] thought [he] was sending membership dues to ATLA (Association of Trial Lawyers of America) because [the Association's] name and logo appear to be almost identical."  Similarly, another attorney who received a solicitation letter from the Association stated

---

[19]    The Court's citation is to the paragraphs on pages 60-62 of Plaintiff's Proposed CoL.

that "[b]ecause of the obvious similarity of the terms 'The American Trial Lawyers' Association' and 'The ATLA' to the terms Association of Trial Lawyers of America and ATLA, I mistakenly believed that this solicitation had been sent by the organization I know as ATLA and the Association of Trial Lawyers of America." In reliance on this mistaken belief, the attorney paid the membership fee and inadvertently became a member of the Association.

*Id.* at 1143 (alterations in original).

236.    Unlike in *American Association*, Presto has not presented any evidence as to *why* it received the sixteen product returns, meaning the Court has no way to determine whether there was actual confusion. In fact, Ms. Hawkins, Presto's customer service manager, testified that she did not contact Costco to investigate who at Costco's facility directed these items to Presto or why. (Tr. at 391:19-20, 400:12-14, 451:6-13.)

237.    Likewise, the receipts are not evidence of actual confusion because Presto has presented no evidence as to why the receipt mismatched The Heat Machine's item number with the HeatDish's name. To the contrary, Mr. Cox testified on behalf of Costco that this was a Costco mistake. (Tr. at 682:21-683:2, 683:18-20, 715:10-21.)

238.    Accordingly, the Court finds that the actual confusion factor weighs against a finding of secondary meaning.

### 6.    Summary

239.    After weighing the factors, the Court concludes that Presto has failed to prove by a preponderance of the evidence that the HeatDish has acquired secondary meaning.

### B.    Functionality

240.    Next, the Court considers whether Presto has shown that its claimed trade dress is nonfunctional.

### 1.   Expert Testimony

241.    The Court finds that the testimony of both experts confirms that many of the elements of Presto's trade dress exist to serve a function.  The base's function is to prevent the heater from tipping over and to store the electrical cord.  (Tr. at 519:19-24, 894:7-9.) The purpose of the parabolic reflector is to reflect the heat rays toward the person to be heated.  (Tr. at 520:1–8, 528:14-20, 886:13-887:1.)  The housing encloses the electrical components and supports the parabolic reflector.  (Tr. at 519:12–15, 895:4-10.)  The purpose of the grille is to prevent ignition of flammable materials or contact with a person, and its chrome finish prevents rusting.  (Tr. at 520:10–15, 525:1-6, 546:15-17, 901:3-12, 902:9-12.)  Both experts testified to these functional purposes of the HeatDish's basic components.  (*See* Tr. at 519:2-520:15, 886:10-899:20.)

242.    The Court also finds that the experts credibly testified that a few of these functional elements could vary in size, color, and shape.  For example, Mr. Tienor testified that the housing could vary in shape.  (Tr. at 530:22-531:4.)  He also credibly testified that the grille could feature a different color, finish, or material.  (*See* Tr. at 534:21-24, 535:5-8.)  And the Court finds credible that, although the parabolic reflector could be a different shape, if it were, it would reflect the heat waves in a different way.  (*See* Tr. at 547:21-23.)

243.    Similarly, Mr. Jobin credibly testified that engineers could design different looking grilles that function similarly.  (*See* Tr. at 963:8-10.)  He also credibly testified that the grille could have a different number of radial wires, which give parabolic heaters different appearances.  (*See* Tr. at 945:18-20, 976:9-13.)  And he credibly opined that the housing can vary in shape.  (*See* Tr. at 939:25-941:3.)

244.    Lastly, the Court finds that Mr. Jobin credibly testified that the decision to use the radial wire on the grille is a tradeoff between safety and cost.  (*See* Tr. at 907:7-14.)  And that exposing the backside of the parabolic reflector is a cost-saving measure. (Tr. at 896:16-19.)

## 2.    Analysis

245.    Presto claims trade dress protection in the overall look of the HeatDish. (Summ. J. Order at 26.)  It identifies the following components in its HeatDish model: (a) a heating element in the center; (b) a curved grille; (c) a recess in the center of the grille giving the grille a Bundt cake shape appearance; (d) an emblem on the center of the grille; (e) a reflective coating; and (f) a shroud extending from the base to the back of the dish such that the dish tilts upward.  (*Id.*)  At trial, Presto focused instead on its parabolic reflector and the grille, including the big recess in the grille and the angle between the base and the grille.  (Tr. at 72:17-20, 83:17-18.)

246.    The Eighth Circuit has adopted the following test for functionality:

> If the particular feature is an important ingredient in the commercial success of the product, the interests in free competition permits [sic] its imitation in the absence of a patent or copyright. On the other hand, where the feature or, more aptly, design, is a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer demand in connection with the product, imitation may be forbidden where the requisite showing of secondary meaning is made. Under such circumstances, since effective competition may be undertaken without imitation, the law grants protection.

*Aromatique*, 28 F.3d at 873 (alteration in original) (quoting *Prufrock Ltd., Inc. v. Lasater*, 781 F.2d 129, 133 (8th Cir. 1986)).  The court analyzes "the total image of a product, the overall impression created, and not the individual features."  *Empi*, 923 F. Supp. at 1164.

Plaintiff has the "heavy burden of showing that the feature is not functional." *TrafFix*, 532 U.S. at 30.

247.   Here, there is no dispute that the basic components of the HeatDish are functional.  As outlined above, the base's function is to prevent the heater from tipping over and to store the electrical cord.  (Tr. at 519:19-24, 894:7-9.)  The parabolic reflector reflects the heat rays toward the person to be heated.  (Tr. at 520:1–8, 528:14-20, 886:18–887:1.)   The housing encloses the electrical components and supports the parabolic reflector.  (Tr. at 519:12–15, 895:4-10.)  The grille prevents ignition of flammable materials or contact with a person, and its chrome finish prevents rusting. (Tr. at 520:10–15, 525:1-6, 546:15-17, 901:3-7, 902:9-12.)

248.   There is also no dispute that some of the components of the HeatDish, including the grille, were designed to meet the UL safety standards, which also makes them functional.  (*See* Tr. at 521:22-522:18, 901:9-12, 903:7-11.)

249.   Nonetheless, Presto argues that the HeatDish is nonfunctional because, in general, parabolic heaters can be manufactured in alternative ways that exhibit distinct appearances, as shown below.  (*See* Pl.'s Propose CoL ¶¶ 73-75.)



(Ex. P-67; Ex. P-326; Ex. P-69; Ex. P-328; Ex. P-201A; Ex. P-201B; Ex. P-454A; Ex. D-1199; *see also* Ex. P-446; Ex. P-447; Ex. D-117; Ex. D-126A.)

250.   As this evidence shows, these parabolic heaters have a base, control knob, housing, circular parabolic reflector, and a grille.

251.    Mr. Tienor relied on the various designs of third-party parabolic electric heaters to conclude that the overall appearance of the HeatDish "is not dictated by [the] function of the components" because "there are other methods that a designer could use to design each one of those components that would look distinctively different than the Presto unit and still have an acceptable parabolic heater."  (Tr. at 537:20-538:8-539:11.)

252.    But the Court's analysis does not end upon a showing that other parabolic heaters look different because of their shape and color.  Instead, the Court analyzes whether the HeatDish's "shape and design, although they serve useful purposes, are primarily adopted *to distinguish* [it] from those of its competitors."  *Empi*, 923 F. Supp. at 1164 (emphasis added).

253.    Here, Presto has presented no evidence that the shape and design of the HeatDish were developed primarily to distinguish it from its competitors.

254.    In regard to the grille—Presto's primary focus at trial—there is no evidence that Presto has ever promoted or advertised the look of the "iconic" Bundt cake grille. Presto seemingly only advertised the grille's functional attributes, namely, that it is a "strong steel grille" that "guards the ceramic-insulated heating element."  (Tr. at 184:24-185:24; *see* Ex. P-454B, D-122B.)  In fact, the evidence suggests that Presto developed the large bulge for its grille to pass the UL band drape test.  (Ex. D-454 at 1; Ex. D-455; Tr. at 563:1-20.)

255.    Here, *Honeywell Int'l Inc. v. ICM Controls Corp.*, 45 F. Supp. 3d 969 (D. Minn. 2014), is instructive.  In *Honeywell*, the court analyzed, at the summary judgment stage, whether the trade dress of a small controller was nonfunctional when the product

could have been designed with different "shapes, colors, and configurations." 45 F. Supp.

3d at 975, 992-1004.  The court explained that "the test for functionality proceeds in two

steps." *Id.* at 996 (internal quotation marks and citation omitted).  First, the court decides

whether the claimed trade dress is "essential to the use or purpose of the article or if it

affects the cost or quality of the article." *Id.*  Second, if no functionality is found under the

first step of the test, "a second inquiry is made as to whether competitors would nonetheless

be at a significant non-reputation-related disadvantage." *Id.*  The court made clear that

" '[w]here the design is functional under the [first test] there is no need to proceed further

to consider if there is a competitive necessity for the feature.' " *Id.* (quoting *TrafFix*,

532 U.S. at 32-33)).  The court then explained that plaintiff failed to consider the first step

and instead skipped to the second step by introducing evidence and testimony that

"multiple options exist for the particular shape, color or configuration" and that the

product's components "could have readily been designed differently." *Id.* at 997-99.  The

court made clear that failing to present evidence on the first step was fatal to its claim,

explaining as follows:

> Critically missing from the evidence that [plaintiff] puts forward in its
> opposition to [defendant]'s motion is a demonstration that its claimed trade
> dress is not essential to the use or purpose of the products and does not affect
> their cost or quality. While [plaintiff] emphasizes the interchangeability of
> other competitors' designs . . . and points to the "feasibility" of alternative
> designs . . . it does not put forward evidence that those designs do not have
> cost or quality consequences that the [plaintiff] designs avoid.

*Id.* at 1000.

256.   Here, Presto has made the same fatal error.  Like in *Honeywell*, Presto jumps

past the first step of the functionality test.  It has not produced evidence that the claimed

trade dress of the HeatDish is not essential to the use or purpose of the product or that it does not affect its cost or quality.  To the contrary, as outlined above, both experts testified that each component was functional.  In addition, Mr. Jobin credibly testified that the decision to use the radial wire on the grille is a tradeoff between safety and cost, and that exposing the backside of the parabolic reflector is a cost-saving measure.  (Tr. at 896:16-19, 907:7-14.)

257.    Moreover, the *Honeywell* court expressed its concern that granting trade dress protection to a small controller "would mean that the overall appearance of practically any everyday appliance or piece of generic equipment would meet the non-functionality test, because as long as the item is large enough or has at least a few external components, some variation in the configuration is bound to be possible."  45 F. Supp. 3d at 1004.  This Court shares this same concern—simply because a parabolic electric heater is large enough to have some design alternatives does not change the fact that each component serves a function.  Nor does it change the fact that the overall appearance of the HeatDish was constructed to serve the purpose of heating the user in accordance with UL standards.  Finding nonfunctionality here would mean that practically all parabolic electric heaters meet the nonfunctionality test.

258.    For these reasons, the Court finds that Presto has not met its burden in showing by a preponderance of that evidence that the HeatDish's overall trade dress is nonfunctional.

259.    Other circuits have reached similar conclusions.  *See, e.g.*, *Antioch Co. v. W. Trimming Corp.*, 347 F.3d 150, 158 (6th Cir. 2003); *Leatherman Tool Group, Inc. v.*

*Cooper Indus., Inc.*, 199 F.3d 1009, 1010-11, 1013-14 (9th Cir. 1999) (finding a pocketknife's overall appearance was functional and thus reversing district court's denial of judgment as a matter of law).  For example, the Sixth Circuit has concluded that a grease pump's overall appearance was functional, explaining that, although it can be designed to have a different appearance, its overall appearance "was substantially influenced by functional imperatives or preferences."  *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 506 (6th Cir. 2013).  The Sixth Circuit has also explained that "where individual functional components are combined in a nonarbitrary manner to perform an overall function, the producer cannot claim that the overall trade dress is nonfunctional," finding an album design that was composed of functional components, while appearing different than other albums, was functional.  *Antioch*, 347 F.3d at 158, 160.

260.    And the Court's conclusion is consistent with general public policy.  The Supreme Court has explained that "[t]rade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products."  *TrafFix*, 532 U.S. at 29.  In fact, copying helps "preserve our competitive economy" and "[r]everse engineering of chemical and mechanical articles in the public domain often leads to significant advances in technology."  *Id.* (internal quotation marks and citation omitted).

### C.    Likelihood of Confusion

To prevail on a Lanham Act claim, Presto must demonstrate that U.S. Merchants' use of its trade dress is likely to cause confusion among an appreciable number of

consumers. *See* 15 U.S.C. § 1125(a)(1). When considering whether likelihood of confusion exists, courts in the Eighth Circuit must consider the following factors: "(1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to 'pass off' its goods as those of the trademark owner; (5) incidents of actual confusion; and (6) the type of product, its costs and conditions of purchase." *Co-Rect*, 780 F.2d at 1330; *Insty*Bit, Inc. v. Poly-Tech Indus., Inc.*, 95 F.3d 663, 667 n.5 (8th Cir. 1996) ("[W]e conclude that the six *Co-Rect* factors also govern claims of trade dress infringement."). No one factor is determinative. *Insty*Bit, Inc.*, 95 F.3d at 670. Likelihood of confusion is typically a question of fact. *SquirtCo v. Seven–Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980).

### 1.   Strength of Presto's Trade Dress

261.   Beginning with the first factor, Presto contends that the strength of its trade dress is evidenced by its exclusive relationship with Costco for thirty years, its advertising dollars, the HeatDish's sales, and the intentional copying of its grille by Konwin and U.S. Merchants. (Pl.'s Proposed C0L ¶¶ 79-86.) However, as explained at summary judgment, this is not enough because the strength of a product's trade dress depends on its recognizability in the market. (Summ. J. Oder at 42.) Presto failed to present favorable reviews, consumer surveys, design awards, and other evidence that typically demonstrates the strength of a product's trade dress. *Cf. Insty*Bit, Inc.*, 95 F.3d at 670 (finding, on appeal from summary judgment, that the plaintiff's trade dress was strong because its products had "received favorable reviews from several woodworking magazines and nationally

televised home-improvement programs," and its "consumer survey showed that over thirty-eight percent of the respondents were familiar with [plaintiff]"); *Ott v. Target Corp.*, 153 F. Supp. 2d 1055, 1065 (D. Minn. 2001) (reasoning, on a motion for summary judgment, that "the strength of Ott's trade dress is evinced by the plethora of articles and advertisements in doll magazines about Ott and her unique designs, her numerous doll industry awards, her customary appearances at international toy shows, Target's own national advertising promoting her fame, and strong consumer recognition"). Accordingly, the Court finds that Presto's trade dress is weak and thus this factor does not favor finding likelihood of confusion.

### 2.  Similarity Between The HeatDish's Trade Dress and The Heat Machine's Trade Dress

262.   The second factor is the similarity between the HeatDish's trade dress and The Heat Machine's trade dress, which focuses on the overall impression of the two products. *Aveda Corp. v. Evita Mktg., Inc.*, 706 F. Supp. 1419, 1429 (D. Minn. 1989); *Empi*, 923 F. Supp. at 1166.

263.   U.S. Merchants presented evidence of minor differences between the two products, including how the grilles are attached to the reflector, the color of the nameplate, the handle placement, the control knob function, the electrical cord wrap, and the weight of the base. (*See* Tr. at 989:3-991:15; *see also* Ex. P-454A; Ex. P-499A.)  However, the overall appearances of the HeatDish and The Heat Machine are similar, as shown below.

 

(Ex. P-40; Ex. D-41.)[20]  The strongest similarity between the two products is, of course, the Bundt cake grille.  Accordingly, the Court finds that this factor weighs in favor of finding likelihood of confusion.  *See Empi*, 923 F. Supp. at 1167 (finding that the similarity in trade dress supported a finding of likelihood of confusion where "the products at issue are strikingly similar").

### 3.    Competitive Proximity

264.    The third factor—the degree to which The Heat Machine competes with the HeatDish—supports a finding of likelihood of confusion.  Both parties sold their products

---

[20]    The image of the HeatDish is a screenshot from the first page of Exhibit D-41.  The image of The Heat Machine is a screenshot from the first page of Exhibit P-40.

to Costco.  (Tr. at 90:3-9, 1096:2-9.)  They also both seek to attract consumers who want a personal heater.  *See Gateway*, 384 F.3d at 510 (finding products in close competitive proximity in part because they attracted the same types of consumers).  Moreover, U.S. Merchants was seeking to become the exclusive supplier of parabolic electric heaters to Costco.  (Ex. P-250 ("I sure hope that it sells well, so we can get the entire program next year.")

### 4.    U.S. Merchants' Intent to Confuse

265.    The fourth factor concerns the infringer's intent to "pass off" its goods as those of the plaintiff.  *Co-Rect*, 780 F.2d at 1330.  Presto failed to present any evidence that U.S. Merchants intended to pass off The Heat Machine as a Presto product.  *See Ott*, 153 F. Supp. 2d at 1065-66.

266.    As explained above, U.S. Merchants sought the advice of counsel, has presented testimony and evidence that they sought to improve upon the HeatDish, never produced an exact replica of the HeatDish, and has prominently displayed the Greenmade mark on its packaging and product.  Simply put, the evidence at trial overwhelmingly establishes that U.S. Merchants did not intend to confuse any consumer.  Therefore, this factor weighs against likelihood of confusion.

### 5.    Actual Confusion

267.    The next factor considers evidence that consumers were actually confused by the imitation of the claimed trade dress.  *Co-Rect*, 780 F.2d at 1330.  The Eighth Circuit has explained that consumer surveys "may provide useful evidence of the likelihood of

confusion" but that "they are not required for such a determination."  *Insty\*Bit, Inc.*, 95 F.3d at 671.

268.   As explained above, Presto did not present any consumer survey evidence. Instead, Presto offered evidence of a few product returns and Costco receipts.  (Exs. P-75A-75O; Ex. P-290.)  But Presto failed to present any evidence as to *why* Costco returned The Heat Machine products to the Canton facility.

269.   What is more, the Canton facility receives at least a couple hundred thousand product returns each year, including at least ten thousand defective parabolic electric heaters.  (Tr. at 345:9-10, 381:12-382:2.)  Producing evidence of the return of sixteen heaters is, therefore, de minimis.  *See Duluth News-Tribune, a Div. of Nw. Publications, Inc. v. Mesabi Pub. Co.*, 84 F.3d 1093, 1099 (8th Cir. 1996) (affirming summary judgment because the evidence of actual confusion was "de minimis and insufficient to establish a genuine issue of material fact")

270.   Likewise, Presto has not presented evidence as to *why* the receipts matched The Heat Machine's item number with the HeatDish name.

271.   To the contrary, Mr. Cox, testifying as Costco's 30(b)(6) representative, explained that the mismatched item number and product name on the four receipts constitute mistakes on Costco's part.  (Tr. at 682:16-684:5, 715:7-12.)  Because the return process is governed by a product's item number (*see* Tr. at 680: 3-6, 716:3-7)—not some discretionary decision by a Costco employee or a consumer—such mistakes cannot be used to infer that the Costco employee, or more importantly, consumers were confused.  Simply put, the receipts do "not show that the error resulted from the cashier's confusion as to the

identity of the two products as opposed to a computer error or other explanation." *Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp. 2d 997, 1017 (N.D. Ill. 2010), *aff'd*, 412 F. App'x 304 (Fed. Cir. 2011); *see Children's Factory, Inc. v. Benee's Toys, Inc.*, 160 F.3d 489, 496 (8th Cir. 1998) (explaining that, when employees incorrectly type the wrong product names due to imitation, "the mistakes do not prove that customers were confused"). Thus, Costco's mistake gives no indication whether consumers were more likely to associate Presto as the original source.

272.    To the extent Presto argues that these mistakes do, in fact, show that Costco employees were confused, the Eighth Circuit has explained that the proper inquiry focuses on consumers. *See Children's Factory*, 160 F.3d at 497 ("We have held that letters from distributors are at best only indirect evidence of any connection in the minds of consumers." (internal quotation marks and citation omitted)).

273.    Accordingly, the Court concludes that this factor weighs against likelihood of confusion.

### 6.    Conditions of Purchase

274.    The final factor for the Court to weigh in determining whether there is a likelihood of confusion is the degree of care reasonably expected of an ordinary purchaser. *See Duluth News-Tribune, a Div. of Nw. Publications, Inc. v. Mesabi Pub. Co.*, 84 F.3d 1093, 1099 (8th Cir. 1996). Generally, "the greater the cost of the product or service, the more time and effort consumers are expected to expend when making decisions, and therefore the likelihood of confusion decreases." *Mars Musical Adventures, Inc. v. Mars, Inc.*, 159 F. Supp. 2d 1146, 1153 (D. Minn. 2001).

275.    Here, there is no evidence that the prices of the HeatDish and The Heat Machine are so high, or the conditions of their purchase so complex, that consumers would reflect carefully on their purchase so as to undercut the confusion generated by The Heat Machine's imitation of Presto's trade dress. Therefore, this factor supports a finding of likelihood of confusion.

### 7.    Summary

276.    After considering these factors, the Court finds, as a matter of law, that Presto has failed to establish any likelihood that a consumer will confuse the trade dress of The Heat Machine with the trade dress of the HeatDish.  Indeed, the evidence at trial established that Presto's trade dress is weak, U.S. Merchants did not intend to confuse consumers and it prominently displayed its Greenmade trademark, and no consumers have actually been confused.

### D.    Conclusion

277.    The Court concludes that Presto's trade dress infringement claim fails as a matter of law because Presto failed to show, by a preponderance of the evidence, the elements of distinctiveness and likelihood of confusion on its trade dress claim.

## III.    TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

278.    To succeed on a claim for tortious interference with prospective business relations under Minnesota law, a plaintiff must show the following:  "(a) [t]he existence of a reasonable expectation of economic advantage; (b) [d]efendant's knowledge of that expectation of economic advantage; (c) [t]hat defendant intentionally interfered with

plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation; (d) [t]hat in the absence of the wrongful act of defendant, it is reasonably probable that plaintiff would have realized his economic advantage or benefit; and (e) [t]hat plaintiff sustained damages. *Fagen, Inc.*, 2016 WL 5660418, at *11 (citing *Gieseke*, 844 N.W.2d at 219).

### A.     No Reasonable Expectation of Prospective Business Relations

279.   The Court finds that Presto did not have a reasonable expectation of prospective business relations with Costco.  To establish a reasonable expectation in prospective business relations under Minnesota law, "a plaintiff must offer evidence showing 'a reasonable probability of a future economic relationship,' as opposed to a 'mere hope or wish.' " *Fagen, Inc.*, 2016 WL 5660418, at *11 (quoting *Gieseke*, 844 N.W.2d at 221, 222 n.11).  There must be "intentional conduct affecting specific relationships."  *H Enters. Int'l, Inc. v. Gen. Elec. Capital Corp.*, 833 F. Supp. 1405, 1417 (D. Minn. 1993).

280.   Here, the evidence demonstrates that neither Costco nor Presto had any sort of reasonable expectation of a future business relationship, despite their 30-year history. For example, Costco and Presto limited their business relations to yearly commitment letters governing a single heater season.  (Tr. at 204:13-16, 641:12-13; *see, e.g.*, Ex. P-94; Ex. P-516; Ex. P-503.)  And Ms. Cohen acknowledged that it was highly unusual to receive "any commitment at all" from Costco.  (Tr. at 130:3-16.)

281.   Moreover, the evidence shows that Costco made a definitive decision not to purchase from Presto for the Arizona warehouse locations during the 2018-2019 heater

season.  (Tr. at 204:22-25, 206:7-11; Ex. P-501 at 1.)  Arizona locations were excluded from the 2018-2019 commitment letter.  (Ex. P-516 ("Heaters will not be carried by warehouse buildings located in Arizona.").)  And Ms. Cohen knew that Presto would not be supplying these locations prior to signing that commitment letter.  (Tr. at 205:19-207:8.)

282.    Notably, Ms. Cohen had suggested that Presto would not do business with Costco absent the merchandising program.  (Tr. at 647:4-7; Ex. P-411 at 6 ("Without endcaps, I'm afraid a program with the business delivery centers does not make sense.").) This confirms that Presto understood each parties' ability to walk away each year.

283.    For these reasons, the Court concludes that Presto had no reasonable expectation of economic advantage.

### B.    No Independently Tortious Act or Violation of a State or Federal Law

284.    This claim also fails because Presto has not demonstrated that U.S. Merchants engaged in intentional interference that is independently tortious or in violation of state or federal statute or regulation.  *See Fagen, Inc.*, 2016 WL 5660418, at *11.  In the Complaint, Presto did not identify an alternative basis for meeting the fourth element other than the causes of action alleged in the Complaint.  (*See* Compl. ¶ 119.)  Because the Court concludes that Presto has not prevailed on those causes of action, Presto has not established that U.S. Merchants' conduct was independently tortious or unlawful.  Accordingly, this claim must fail.  *See Lutheran Ass'n of Missionaries*, 2005 WL 629605, at *13 (holding that defendant's counterclaim of tortious interference "is premised on [plaintiff]'s allegedly unlawful use of the marks, and since the Court has already determined that [plaintiff] owns the marks, this claim must also fail as a matter of law").

## IV.   STATE LAW CLAIMS

285.   Because Presto's common law unfair competition claim, along with its unlawful and deceptive trade practices claims under Minnesota law, require the same likelihood of confusion analysis as Presto's Lanham Act claim, the Court's finding of no likelihood of confusion applies equally to Presto's state law claims. *Lutheran Ass'n of Missionaries*, 2005 WL 629605, at *4 (explaining that "a claim for common law unfair competition" under Minnesota law "parallels a claim for unfair competition under the Lanham Act"); *Rainbow Play Sys.*, 364 F. Supp. 2d at 1039 ("Claims for deceptive trade practices under Minnesota statute require the same analysis as claims under federal Lanham Act."); *Alternative Pioneering Sys.*, 822 F. Supp. at 1441 (explaining that the court analyzes Minn. Stat. § 325D.13 in a substantially similar way to Lanham Act claims); *Buetow*, 650 F.3d at 1184 ("Once the statutory standards are established, Lanham Act decisions provide useful guidance in determining the proof required to establish consumer confusion under . . . the MUTPA."); *Song v. Champion Petfoods USA, Inc.*, 27 F.4th 1339, 1343 (8th Cir. 2022) (explaining that Plaintiff must show that alleged misrepresentations "could deceive a reasonable consumer" to establish a MUTPA claim).

## V.   DISGORGEMENT OF PROFITS

286.   The Court may award the equitable remedy of disgorgement of profits under the Lanham Act. 15 U.S.C. § 1117(a) (permitting an award of "defendant's profits" for a violation of 15 U.S.C. § 1125); *see also Wing Enters., Inc. v. Tricam Indus., Inc.*, 511 F. Supp. 3d 957, 974 (D. Minn. 2021).

287.    Courts have "broad discretion" in determining a portion of profit to be awarded. *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 819 n.15 (D. Minn. 2011) (quoting *Metric & Multistandard Components Corp. v. Metric's Inc.*, 635 F.2d 710, 715 (8th Cir. 1980)).    Under the Lanham Act, a plaintiff may recover an infringer's profits, only to the extent such profits "are attributable to the use of the infringing mark." *Id.* at 818 (quoting *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206-07 (1942)).    It is the defendant's burden to isolate those profits that are attributable to alleged infringement.  *Id.*

288.    Based on the Court's finding that U.S. Merchants did not infringe Presto's trade dress, there is no basis for granting Presto's request for disgorgement of profits.

## VI.    INJUNCTIVE RELIEF

289.    This Court may grant an injunction "to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title." 15 U.S.C. § 1116(a). As noted, Presto's Lanham Act claims arise under 15 U.S.C. § 1125(a).

290.    "The Court has wide discretion in fashioning an appropriate equitable remedy to prevent violations of Plaintiffs' trademark." *Zerorez Franchising System, Inc. v. Distinctive Cleaning, Inc*., 103 F. Supp. 3d 1032, 1048 (D. Minn. 2015).

291.    Based on the Court's finding of no likelihood of confusion, there is no basis for granting Presto's request for injunctive relief.  Nor is there a showing that Presto has suffered an irreparable injury, that monetary damages would be inadequate compensation

if there were an injury, or that the public interest would be served by granting a permanent injunction.

## **ORDER**

Presto failed to prove, by a preponderance of the evidence, all of the elements of its claims for trade dress infringement and tortious interference with prospective business relations, as well as claims for common law unfair competition, unlawful trade practices, and deceptive trade practices under Minnesota law. Accordingly, based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Judgment be entered for U.S. Merchants on Count 1 of the Complaint (trade dress infringement under 15 U.S.C. § 1125(a)(1)(A));

2. Judgment be entered for U.S. Merchants on Count 7 of the Complaint (tortious interference with prospective business relations);

3. Judgment be entered for U.S. Merchants on Count 9 of the Complaint (unfair competition under Minnesota common law);

4. Judgment be entered for U.S. Merchants on Count 10 of the Complaint (deceptive trade practices under Minn. Stat. § 325D.44);

5. Judgment be entered for U.S. Merchants on Count 11 of the Complaint (unlawful trade practices under Minn. Stat. § 325D.13); and

6. The parties appear for a status conference at 9:30 a.m. on September 21, 2022, regarding the jury trial on Count 6 of the Complaint (copyright infringement under 17 U.S.C. § 501).

Dated: August 18, 2022

s/ Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge